┌─ SC V. SLAGER – ROUGH DRAFT – 11-29-2016 ─┐

```
 1              THE WITNESS:  Michael Slager, S-l-a-g-e-r.
 2   BY MR. SAVAGE:
 3     Q.  May it please the Court:
 4              THE COURT:  Yes, sir.
 5     Q.  Good morning?
 6     A.  Good morning, sir.
 7     Q.  Are you the same Michael Thomas Slager that's been
 8   charged with murder in this case?
 9     A.  Yes.
10     Q.  On April 4 of 2015 while employed with the North
11   Charleston police department, did I shoot Walter Scott?
12     A.  I did.
13     Q.  Did your shooting of Mr. Scott result in his
14   death?
15     A.  Yes.
16     Q.  When you shot him, were you filled with ill will
17   or grave heart of malice?
18     A.  No, I was not.
19              MR. DuRANT:  Your Honor, I would ask that he
20   not lead this witness.
21              THE COURT:  All right.  Don't lead the
22   witness.  You may proceed.
23   BY MR. SAVAGE:
24     Q.  At the time you shot him, did you possess an
25   uncontrolled impulse 20 do evil?
```

7

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1      MR. DuRANT:  Once again, Your Honor, I would

2  ask he not lead this witness.  He can ask what was on his

3  mind but he is basically testifying.

4      THE COURT:  All right.  Don't lead the

5  witness.  You may proceed.

6  BY MR. SAVAGE:

7    Q.  Tell us why you shot Mr. Scott.

8    A.  To start at the beginning, that morning, it was a

9  normal Saturday morning.  I woke up, came to work and

10 answered a couple calls in the morning, for an alarm,

11 normal Saturday morning.

12      And then I was back to my zone, in Charleston

13 Farms where I'm assigned.  At that time I was driving

14 down Rivers Avenue -- I'm sorry driving down Remount Road

15 toward Rivers Avenue doing the circle around Charleston

16 Farms and I was coming down Remount toward Rivers.  I

17 observed a vehicle without a brake light.  The one in the

18 rear-view mirror, third brake light.

19    Q.  Were you looking for that particular vehicle, did

20 you know anything about that particular vehicle, were you

21 focussed on any individual or was this just a Saturday

22 morning?

23    A.  No, I didn't notice the vehicle at all until I was

24 behind it, coming up behind it.  It was a normal Saturday

25 day.  At that time I waited a little bit and then I saw

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1   the vehicle come up to the railroad tracks on Remount

2   and.  At that time I confirmed that the brake light was

3   out.

4       Q.  Are there procedures that govern your conduct at

5   times like that?

6       A.  Yes.

7       Q.  Did you follow your procedures?

8       A.  I did.

9       Q.  Tell us what you did.

10      A.  When I was behind the vehicle, I double-checked to

11  make sure that light was out and then I conducted the

12  traffic stop.

13      Q.  For what purpose?

14      A.  You know, a lot of times people don't know their

15  brake lights are out.  People don't know their headlights

16  are ounce, their turn signals are out.  I no he my car it

17  doesn't tell me when the brake light is out, so I stop

18  him, is you know, to write him a warning and just to tell

19  him hey, your brake light is out and you need to get the

20  bulb fixed.  It's always a state issue at night or in the

21  daytime, you know, if all the brake lights aren't

22  working, you could cause an accident.

23      Q.  Is that technically -- or in the be technically,

24  is that a violation of a state statute?

25      A.  Yes, it is.

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    Q.   And have you stopped people before for equipment

2    failures for taillights or turn signals, brake lights or

3    whatnot, headlights?

4    A.   Yeah, I have.  I would say hundreds of times.

5    Q.   And what is the usual practice?  What within your

6    procedures what discretion do you have on what you

7    typically do?

8    A.   What I typically do is I make contact with the

9    driver and tell him the problem and I write him a

10   warning.  It's just --

11   Q.   And a warning, what does that require, a court

12   appearance, a fine?

13   A.   It requires nothing.  It's just a warning paper

14   that tells him that they have an equipment violation,

15   there's no fine, there's no points on their license, they

16   don't go to court.

17   Q.   And what was your intent when you stopped the

18   vehicle that morning?

19   A.   To write a warning.

20   Q.   And did you follow procedure by interviewing,

21   talking to the driver of the vehicle?

22   A.   I did.

23   Q.   Take us through that discussion until you returned

24   to your unit.

25   A.   I got out of my car and walked up to the vehicle

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1  and with the window rolled down identified who I was,

2  Officer Slager, and I said with North Charleston, and I

3  asked for Mr. Scott's license, registration, and

4  insurance card.

5      Q.  Did you tell him why you stopped him?

6      A.  I did.  I told him it was because his third brake

7  light was out.

8      Q.  I know -- if you could just speak up a little bit,

9  it may be my hearing or your voice, I'm not sure, but did

10  you tell him why you stopped him.

11      A.  I did.

12      Q.  And did you follow procedures in terms of calling

13  into headquarters or dispatch to advise him where you

14  were and what you were doing?

15      A.  I did.

16      Q.  And did you follow all procedures in your

17  interview, your questioning of Mr. Scott?

18      A.  Yes.

19      Q.  Did you make any observations of Mr. Scott or

20  anyone else in the vehicle?

21      A.  When I walked up to the vehicle and I was standing

22  at the window, I observed the passenger in the vehicle,

23  and the passenger was just looking straight ahead like he

24  wasn't even stopped.  I think he was doing something with

25  his phone, I don't really recall.  And then I observed

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1   Mr. Scott, and he was going through his pockets with his

2   hands, trying to locate something, I think.

3       Q.   Prior to -- when did you first recognize the race

4   and gender of the occupants of that vehicle?

5       A.   When I walked up to the vehicle and made contact.

6       Q.   And did this continue to be a routine stop?

7       A.   Yes, it was.

8       Q.   And when you asked for identification, were you

9   provided with a driver's license?

10      A.   I was.

11      Q.   Were the you provided with a registration and

12  insurance?

13      A.   No, I was not.

14      Q.   And tell us what happened.

15      A.   I asked for those documented.  Mr. Scott gave me

16  his license and I asked for the license and -- I'm sorry,

17  the registration and insurance card.  When I did, he

18  stated that the vehicle wasn't his car, then he stated it

19  was his car and the story -- it went back and forth from

20  it was my car to I was buying my car.

21      Q.   And did you ask or direct him to provide the

22  insurance?

23      A.   I did.

24      Q.   Did you suggest anything to him?

25      A.   Yes.  I suggested to look in the glove box because

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1  that's where I think everybody -- that's where I keep my

2  insurance and registration card.

3      Q.   And what was his response?

4      A.   He stated that he didn't own the car and it wasn't

5  in there.

6      Q.   Now, up to that point, Officer Slager, despite the

7  observations you made, was everything normal in the

8  context of your experience in traffic stops?

9      A.   Yes, everything was normal.

10     Q.   Have you ever conducted a traffic stop blue lights

11  day or night where the driver was not nervous?

12     A.   Yes, many times.

13     Q.   It must be a rare occasion when people aren't

14  nervous.  So the activities of Mr. Scott at that time,

15  the observations of him were within that parameter of a

16  normal traffic stop?

17     A.   To me, yes.

18     Q.   And when you returned to your vehicle, what -- for

19  what purpose?

20     A.   I walked back to my vehicle with the license and I

21  was going to write him a warning ticket.  Also, I have to

22  check the license and the vehicle tag to make sure the

23  license is good or if there's it any warrants, also to

24  check the tag to make sure the car it wasn't stolen.

25  Also, I wanted to check the tag because of the

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    conflicting story it about who the owner of the car was.

2        Q.   But nothing unusual about that.

3        A.   No, that's normal procedure I do every day.

4        Q.   And how do you go about doing that?  Do you radio

5    in to dispatch?

6        A.   I used to, but at the time I had a new computer

7    program with a laptop in my car that I could type the

8    information in.

9        Q.   And tell the jury, if you will, how that works.

10       A.   It's a computer program called NCIC, and it's a

11   federal database that has everybody's information in it,

12   so I put his driver's license in there, his driver's

13   license number or his name and date of birth, and it

14   sends the information to the FBI and it comes back to

15   whatever's on record for that individual and also the

16   tag, I do the same with the tagging, through that

17   database or you could run the tag through South Carolina

18   DMV and it wil l give you the information about the owner

19   of the vehicle, description of the vehicle.

20       Q.   Did you do that in this instance?

21       A.   No.  I didn't have time.

22       Q.   Tell us what you did when you got back in your

23   unit?

24       A.   When I got back to my unit I had to log on to the

25   computer program, and that takes a minute to load up.  At

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1  that time I was waiting for that to load up, I had to get

2  my ticket book, which has my warning book in it too.

3  It's combined, and I was getting the warning out.  I also

4  had to reach above my visor to get my cheat sheet because

5  I can't remember all the statutes, there's too many

6  statutes for me to remember, and I was in the process of

7  getting all the information together, and then

8  Mr. Scott's door opened.

9      Q.   And it was your intent at that time to write what?

10     A.   A warning.

11     Q.   For what?

12     A.   The brake light that was not working.

13     Q.   What about the absence of an insurance card?

14     A.   What I do -- it's important to have insurance for

15  the vehicle, so what I usually do is I'll write a ticket

16  for no proof of insurance, and I'll tell the driver, you

17  know, your Court date's in two weeks.  If you come to

18  Court with your insurance card, I'll drop the ticket and

19  the judge is pretty acceptable with that.  So it's

20  basically a fix it ticket.

21     Q.   What?

22     A.   A figure it ticket.

23     Q.   What does that mean?

24     A.   That basically means if you fix the problem, I

25  dismiss the ticket.

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1    Q.   Nothing personal to you.  Now, when you got in

2    your car, you're entering that data into the computer,

3    did you make any further observations of the driver of

4    the vehicle you had stopped?

5    A.   While I was in my vehicle?

6    Q.   Yes.

7    A.   There was some movement going on, but I was pretty

8    much paying attention to trying to get this information.

9    Q.   And what happened next?

10   A.   When the door opened --

11   Q.   What door?

12   A.   I'm sorry, when Mr. Scott's door opened, Mr. Scott

13   jumped out of the car and I observed this so I had to

14   throw everything on my lap in the front seat and I got

15   out of my car, and when I got out of my car, I told

16   Mr. Scott to have a seat in his car.

17   Q.   And what happened?  Did he get back in his car?

18   A.   Yeah, he complied and got back in his car and shut

19   the door.

20   Q.   Even after that situation where the activities

21   that morning, what you observed within the normal context

22   of a traffic stop?

23   A.   Correct.

24   Q.   Was there anything that alarmed you at that point

25   in time that you would call for backup or anything like

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    that?

2        A.   No.

3        Q.   And then, after Mr. Scott followed your directives

4    what did you do?

5        A.   I resumed -- I had to reach in my passenger seat

6    and get my warning book and my little cheat sheet and I

7    was going to write the warning.

8        Q.   And what did you observe next?

9        A.   I observed the door open of the vehicle again and

10   Mr. Scott jumped out of the car and started running down

11   the street.

12       Q.   And when he did that, what did you do?

13       A.   I got out of my car, locked the door, shut the

14   door, and took a couple steps.  I don't really recall how

15   many steps, and then I called over the radio 223

16   dispatch --

17       Q.   Time out what is 223?

18       A.   That's my badge number.

19       Q.   So you were identifying yourself to dispatch?

20       A.   I was.

21       Q.   You used in your number what was that?

22       A.   1080 on foot I'm on a foot chase.  I'm running

23   after somebody.

24       Q.   And at this time had the normal circumstances

25   changed to something else?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    A.   Yes.

2    Q.   And is it customary for somebody to run with a

3  brake light being out?

4    A.   No.

5    Q.   So what was in your mind at that time?

6    A.   That in Scott must have been running for another

7  reason.

8    Q.   And did you follow him?

9    A.   I did.

10   Q.   Tell us what happened next.

11   A.   We ran down Craig Street, and I told him to stop,

12  and he didn't, continued to run.  We got a little start

13  down Craig Street --

14   Q.   When you told him, did you shout it out?

15   A.   Yes, yes.  I shouted as loud as I could because he

16  was running away and I wanted to make sure he heard me.

17   Q.   And did he comply with your instructions at that

18  time?

19   A.   No.  He continued to run.

20   Q.   And what did you do next?

21   A.   I yelled Taser three times.

22   Q.   You yelled Taser, Taser, Taser?

23   A.   Correct, as loud as I could.

24   Q.   And did he comply?

25   A.   No, he did not.

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    Q.   What did he do?

2    A.   Continued to run down Craig Street.

3    Q.   Did you keep him under your observation at that

4    point?

5    A.   When we were going down Craig Street, yes.

6    Q.   And continue.  What happened as you were running

7    down Craig Street?

8    A.   We come to the yellow brick road, which is a road

9    into an old trailer park home on Craig Street, and it as

10   he turns right down that road, I lost sight of him.

11   Q.   When you say I lost sight of him tell us what you

12   mean by that.

13   Q.   When we turned corner there's a fence that goes

14   partially around the property, and when he turned right

15   on the yellow brick road, there's a bunch of vegetation

16   so I couldn't see him when he turned the corner?  But

17   that was a second or two.

18   A.   That he -- no.

19   Q.   That you lost sight.  I mean you're running after

20   him.  He moves, you continue to run after him?

21   A.   Correct.

22   Q.   What was he doing at that time?  Was he talking to

23   you?  Was he -- you at this time had yelled stop, you had

24   yelled Taser, Taser, Taser?

25   A.   Correct.

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    Q.   Did he in any way indicate that he was going to

2  comply with your directives?

3    A.   No, he did not.  He did not.

4    Q.   And what happened next?

5    A.   I used my Taser.  I pointed it -- it was in my

6  hand and I had it in my hand and I had to wait a minimum

7  because he was holding his right arm behind his back as

8  we were rounding the corner.

9    Q.   And when you say something with his right hand,

10  tell the jury what he was doing?  Put them in your mind

11  at that time and tell us what you observed.

12    A.   When we rounded the corner, and I was yelling

13  Taser, he was using his right hand to do this motion

14  (indicating.)  And I know at the time I had the Taser so

15  the first thought in my mind was he was trying to prevent

16  me from using the Taser on him, and I know that because

17  I've heard other officers talk about it, and I've seen it

18  with other officers too.  I don't know how Mr. Scott knew

19  that, but he was going this direction to try to prevent

20  the little prongs from coming out, I guess maybe he was

21  trying to knock them away, I don't know.

22    Q.   And what did you do?

23    A.   I had to wait a minute, because I knew --

24    Q.   When you say a minute, people -- you waited 60

25  seconds?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    A.   I'm sorry.  I waited maybe a second, two seconds.

2    Q.   And what did you do?

3    A.   And then after he stopped with his arm movement, I

4    pulled the trigger and activated the Taser and the two

5    barbs shot out.

6    Q.   And was it effective?

7    A.   I don't think so, because he continued to run down

8    the road.

9    Q.   Where did the prongs go?

10   A.   I don't know.  One might have went into him

11   because you need two for it to work, so one might have

12   went in, maybe the second one went past him, and then

13   landed on the road somewhere or maybe they both went past

14   him, I don't know.

15   Q.   Did that cause him to comply with your directives?

16   A.   No, he continued to run down the road.

17   Q.   And what did you do next?

18   A.   I think I told him to stop again.  I'm not really

19   sure.  And then I reloaded the cartridge, I took the

20   cartridge off the Taser and put the new one on to use the

21   Taser again.

22   Q.   And did he in any way express, I've had enough?

23   A.   No.  He continued to run down the road.

24   Q.   And did you fire your Taser?

25   A.   I did.

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    Q.    Well, tell us about it.

2    A.    Before I fired, I yelled Taser again.

3    Q.    You warned him?

4    A.    Correct, gave him a warning I was going to use it

5    again.

6    Q.    Did you tell him to stop?

7    A.    Yes.

8    Q.    Did he comply with your directives?

9    A.    No, he continued to run.

10    Q.    And then what happened?

11    A.    I shot -- I used the Taser, activated it and the

12    two barbs came out.  I'm assuming it hit him because he

13    went down on the ground, he went down on the ground.

14    Q.    Did you know -- did you know at that time whether

15    or not the Taser was effective?

16    A.    At that time I thought it was, but now, sitting in

17    court, I don't think it was, so when he went down, I

18    thought it worked.  I thought it was working because

19    that's what usually happens, they fall to the ground.

20    Q.    And did he comply at that time with your

21    instructions?

22    A.    No.  He was trying to get off the ground, and I

23    pulled the trigger again.

24    Q.    All right.  Take us through that slowly.  Go back

25    to you instructing him to stop, instructed him that a

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1  Taser was coming again and there was no compliance and

2  you shot the Taser?

3      A.   I did.

4      Q.   Take us through those moments, though seconds of

5  what you recall.

6      A.   So I changed the cartridge and then I yelled,

7  Taser again, once, twice, I don't recall how many times I

8  yelled it, and then I pulled the trigger and activated

9  the Taser.  When I activated the Taser, the to prongs

10 came out and then the next thing I know is Mr. Scott fell

11 to the ground.

12     Q.   Do you know what caused him to fall to the ground?

13     A.   At the time I thought it was the Taser.

14     Q.   And as a result of what you believed to be at the

15 time, what did you do?

16     A.   I thought that everything was going to be good.

17 At that time, knowing the Taser worked, I approached

18 Mr. Scott to handcuff him.

19     Q.   And did you handcuff him?

20     A.   No.  I wasn't able to.

21     Q.   Now, let's go back to where you stopped Mr. Scott.

22 Do you recall the name of the store where you pulled in?

23     A.   I think it was Auto Zone.

24     Q.   From that location when you got out of your car,

25 if you know, how far did you run before you got to the

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1   yellow brick road?

2      A.   At that time, I don't know the distance.  It was

3   far.

4      Q.   And do you know how far you ran to where Mr. Scott

5   was on the ground?

6      A.   At that time, I don't know the distance, but I

7   know it was pretty far.  I know the distance now.

8      Q.   But at the time?

9      A.   No.

10     Q.   Now, tell us what you were wearing when you were

11  in that chase.

12     A.   I was wearing boots socks, underwear, T-shirt, my

13  homeowner bulletproof vest, my uniform pants, and my

14  uniform shirt, and then I had shirt stays that went from

15  my shirt to around my feet to keep my uniform shirt

16  tucked in.

17          Then I had my duty belt, and under underneath my

18  duty belt I had an inner belt.  I also had six belt

19  keepers and then a firearm, OC, two handcuff cases, some

20  gloves, a Taser, two handcuff keys, a radio --

21     Q.   So, Mr. Slager, you were in court the other day

22  when not Chief Driggers, his son, we lies but he

23  indicated this was the equipment you were -- or similar

24  to the equipment you were assigned that day; is that

25  correct?

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1       A.   Yes, it is.

2       Q.   And did you have a vest on that day?

3       A.   Yes, I did.

4       Q.   Tell the jury, if you would, how you were fitted

5    for the vest and whether or not that restricts your

6    moving and your breathing.

7       A.   When the police department buys you a bulletproof

8    vest, you sit down and they measure you, I don't know the

9    exact -- they measure around your waist and around your

10   chest and I guess from your Adams apple down to your

11   belly button so they measure you in different locations

12   to make sure that the vest will cover your body

13   completely around your whole torso.

14      Q.   And I assume that's effective when you're standing

15   still?

16      A.   Yes.

17      Q.   And what does it do when you're running?

18      A.   So when you put it on, those two Velcro strips

19   that you have to go across your chest to keep it in a

20   spot and you need to wear it tight so doesn't move around

21   so when you breathe and your chest expands, it will

22   restrict that movement and also when you move around it

23   restricts the movement too.

24      Q.   So we're back now at the point where Mr. Scott was

25   on the ground, tell us, do you recall any instructions

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1   any responses from Mr. Scott?  And, again, I don't want

2   you to say what you know from being in court the last two

3   weeks, or four weeks, two months, whatever, tell us --

4   put your mind back a few months and tell you what

5   happened neck.

6       A.   Mr. Scott was on the ground.  He started to get up

7   for the first time, and I pushed -- pulled the trigger

8   for the Taser again to make him comply, so I could

9   handcuff him.  And then when that happened, I remember

10  standing next to him and I reached to detain him, to put

11  him in handcuffs.  At that time he was -- he had his

12  hands -- he was in a pushup position getting up, so I

13  grabbed for his hand to put so I could detain him because

14  I don't know why he's running for a brake light.  It

15  didn't make any sense to me when he was given a warning

16  and he's in the parking lot of the auto parts store.  I

17  don't know.  You know in the back of my mind from my

18  experience there's other factors other things going on.

19      So I tried to grab his left hand to put behind his

20  back to handcuff him, and as I'm doing that, he's in the

21  pushup position trying to get up at the same time and

22  when that happens at the same time, his pushup and the

23  hand behind his back, he must have rolled over to his

24  side, and then now he's on his back, facing me, and I'm

25  on top of him.  I'm just thinking, what's going on?  I

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    don't understand why he's doing all this?  Why he's not

2    stopping?

3         So I have the Taser in my hand and for the Taser,

4    is the wires that come out of the Taser, if you turn --

5    if you pull the trigger on the Taser, the wires -- if you

6    touch the wires, you can be shocked too.  The current

7    runs through it.  There's not really of protection, I

8    guess, because I've had that happen to me before, so I

9    think that's why I took the bridge off.  I don't remember

10   taking it off.  That's the only reason I think I could

11   have taken it off at the time thinking back, so I'm

12   trying to held hold him down with my elbow, and I have

13   the Taser in my right hand, you know, trying to hold him

14   down, and he's still trying to fight and trying to get

15   up.  He's not listening to what I'm saying.

16   Q.  Well, what were you saying?

17   A.  I think I was telling him, you know, to get on the

18   ground, to stop.  I was saying something, but now I know

19   what I said after being in the courtroom.

20   Q.  But back then, do you remember independently from

21   the courtroom environment or preparing for the courtroom,

22   do you have an independent recollection of what you were

23   saying and what he was saying to you?

24   A.  I don't recall what I had was saying.  I think I

25   said get on the ground, but that's what I always say, so

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─

1  maybe I reverted back to that.  I don't really recall.

2      Then I'm holding him down, and I want him to stop,

3  so I use the drive stun on the side to make him comply to

4  make them stop so I could take him into custody because

5  he's not, he's not stopping.

6      At that point, I knew Mr. Scott was a lot stronger

7  than I was because he was pushing me and I just knew I

8  was going to lose the fight I knew I was going to lose

9  because with my weight on top of him he was just like,

10  keep on going.

11      I think, you know, at that time, I think we're

12  rolling around on the ground, some of that is really

13  fuzzy in my mind, and then I remember, you know, when I

14  called for Habersham.

15  Q.  Let me ask you if this radio was part of your

16  equipment that day?

17  A.  Yes.

18  Q.  If you would, put it on to the best of your

19  ability so that the jury can get a visual of when you

20  called for Mr. Habersham.

21  A.  So the radio -- Your Honor, can I stand up?

22      THE COURT:  Yes.

23      THE WITNESS:  So the radio is on my belt in

24  this position here.

25  BY MR. SAVAGE:

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1   Q.   Can you put it in your pocket for now?

2   A.   So it's over in this position.  And I have it come

3   up behind me and it clips on to my shirt like this.

4   Q.   So stay standing so that the jury can see you, and

5   obviously you weren't standing at the time, but tell us

6   what was in your mind and what you did.

7   A.   So I have my radio like this because the button is

8   here, and I can hit it with my thumb on my left hand, or

9   I can reach with my finger, so that's why I keep it here.

10  So I'm holding Mr. Scott down and he's destroying to get

11  up.  He's fighting, we're rolling around on the ground,

12  and, you know, it happened so fast, I don't recall every

13  single movement, and I have the Taser in my right hand,

14  and I used it on him to make, you know, so he would

15  comply, so I could take him into custody.

16      As I'm doing that, I know I'm starting to figure

17  out I'm losing the fight, so I'm holding him down with my

18  elbow and my forearm.  I lift my hand up to call for

19  Habersham to come, because Habersham's my partner.

20      And I knew he would be there the quickest.  And as

21  I'm doing that, the only part I have on Mr. Scott is my

22  elbow, and I think it's in this area, holding him down,

23  and my right hand's pointed away and at that time I'm

24  calling for Habersham, 156, step it up, which 156 is

25  Habersham's badge number, and 156 means come faster, and

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1  as I do that, Mr. Scott grabs the Taser with his hand and

2  starts yanking on it, and then he grabs it with his other

3  hand and yanks on it with both hands, and then he rips it

4  out of my hand and then that day, I had some cuts on my

5  fingers and stuff, so I don't, maybe it came from there,

6  maybe it came from when we were rolling on the ground, I

7  don't know, it.

8      Q.  And?

9      A.  And he takes the Taser out of my hand with such

10  force, it comes out of my hand, and then I see him with

11  the Taser in his hand, and I see him spin it around.

12  That's the only thing I see is that Taser, coming at me,

13  I see that barrel, like this big, coming at me.  And I

14  knew I was in trouble.  I knew I had called backup.  I

15  needed backup.  I knew I was being overpowered.  And I

16  saw that Taser coming at me, coming at me, coming at me

17  like this, and he's coming after me, I'm trying -- my

18  eyes, I don't know what's going on, and I'm trying to get

19  away.  I'll trying to get away, and I think -- as I'm

20  backing up or trying to get back on the ground, I think

21  we both stand up at the same time, I don't know, but

22  we're both up, and that's when I see --

23      Q.  So let me interrupt you.  You're on the ground.

24  The Taser is taken away.  The Taser is being used against

25  you.  Are you moving away or are you -- what are you

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1   doing, do you remember?

2      A.   If I remember correctly, I'm backing up, trying to

3   get away from the Taser.

4      Q.   And what was Mr. Scott doing?

5      A.   He was coming towards me.

6      Q.   When he got up when you disengaged, did he turn

7   around and run away?

8      A.   No, no.  He continued towards me.

9      Q.   So after you disengaged on the ground, you're

10  backing up and he didn't turn around and run off?

11     A.   No.  He was extending his right arm, leaning

12  forward, coming at me with that Taser for the second

13  time.

14     Q.   And I know you've seen some photographs of that,

15  some still shots from Mr. Santana's video.  If you could

16  put the jury in the place of what you observed when you

17  observed it with respect to the getting up off the

18  ground.

19     A.   We were like this close (indicating.)  Arm's

20  length away, how far it was.

21     Q.   And what did you do when he -- tell me his

22  position.  Was he standing up, was he turning away, his

23  toes, his feet, his body presence, what is it that

24  communicated with you nonverbally but communicated with

25  you by his person and his movements?

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1     A.   Can I stand up?

2     Q.   Sure.

3     A.   When we got off the ground, I instructed Mr. Scott

4   to turn right away and go, but he didn't.  He stood up,

5   we both stood up, he's leaning forward, right arm

6   extended out, facing me, coming towards me.

7     Q.   This is after what happened on the ground?

8     A.   Correct.

9     Q.   After he had taken possession of the Taser?

10    A.   Yes.

11    Q.   He stayed in the fight?

12    A.   Yes.

13    Q.   What did you decide at that time?  What was in you

14  mind?

15    A.   In my mind, fear.  I was scared.  With everything

16  leading up to this, from the run to not cooperating to

17  the fight on the ground, to Mr. Scott with the Taser

18  coming after me while we were on the ground in the chest

19  area and us breaking apart as we're standing up and

20  coming at me again, you know, it was total fear that

21  Mr. Scott didn't stop, continued to come towards me.

22    Q.   Did he ever give you any indication of compliance

23  or surrender?

24    A.   No, not at all.

25    Q.   And what did you do next?

```
┌─ SC V. SLAGER – ROUGH DRAFT – 11-29-2016 ─┐
```

1    A.   At that time I pulled my firearm and I pulled the

2    trigger.

3    Q.   How many times?

4    A.   I don't know.  I fired until the threat was

5    stopped, like I'm trained to do.

6    Q.   Did you fire every bullet that was in your weapon?

7    A.   No.

8    Q.   Did you handcuff Mr. Scott?

9    A.   I did, yes.

10   Q.   Why did you do that?

11   A.   After the shooting and Mr. Scott was on the

12   ground, I didn't know if I hit him.  I didn't know if he

13   tripped, if he fell.  And he is still at threat at that

14   time, and in the police academy and North Charleston

15   training, you always handcuff a subject, always.

16   Q.   Did you do that out of malice or ill will?

17   A.   Absolutely not.

18   Q.   Did you do it because you were trained to do it?

19   A.   Yes.

20   Q.   Did you realize at that time or any time before

21   that that Mr. Scott did not have your Taser?

22   A.   No.

23   Q.   When did you determine that he did not have your

24   Taser?

25   A.   When I went and handcuffed Mr. Scott, I was

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1  looking around and I didn't see it, so I looked on the

2  ground, like this, and I saw it in the road and I ran

3  over and got it.

4     Q.   And what did you do with it?

5     A.   I grabbed it and I ran back over to Mr. Scott.

6     Q.   And what did you do with the Taser?

7     A.   After that, you know, I must have thrown it on the

8  ground by Mr. Scott's body.  You know, I don't remember

9  doing that.

10    Q.   But we see it on the video now.

11    A.   Yeah.

12    Q.   And did you pick it back up?

13    A.   I did.

14    Q.   Did you try to plant evidence or do anything that

15 would try to be deceptive or deceitful?

16    A.   No.

17    Q.   After you fired your weapon at Mr. Scott, what

18 does procedure require you to do in terms of

19 communication?

20    A.   Call on the radio right away and tell dispatch

21 what happened.

22    Q.   Do you remember what you said to dispatch?

23    A.   Yes.

24    Q.   Tell the members of the jury what you said and why

25 you said what you said.

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    A.   I came over the radio and said two two three

2  dispatch, shots fired, suspect down and he grabbed my

3  Taser.  So I was telling dispatch that I used my weapon

4  and the subject was hit, was down on the ground, and that

5  he grabbed my Taser.

6    Q.   And the suspect down, what message does that send

7  to emergency response?

8    A.   That a subject needs immediate care and dispatch

9  will automatically send the fire truck, which is across

10  the street and the ambulance.

11    Q.   And did you have time to reflect and think about

12  I'll make up a story and tell them that he grabbed my

13  Taser?

14    A.   Into the.

15    Q.   How many seconds if you know after you fired your

16  shots did you call dispatch?

17    A.   It was right away.  I don't recall how long,

18  but --

19    Q.   And that's why you shot Mr. Scott.

20    A.   Yeah.

21    Q.   At any time during your interaction with Mr. Scott

22  that morning, did he ever say anything to you or did he

23  ever send a signal to you that he was going to comply

24  with your instructions?

25    A.   One time he did.  And that was when I told him to

┌─ SC V. SLAGER – ROUGH DRAFT – 11-29-2016 ─┐

1    get back in the car the first time.  That was the only

2    time he complied when I told him to do.

3        Q.   If -- this time on Saturday morning, at 9:30, you

4    were still a police officer.

5        A.   Yes.

6        Q.   And you were riding down Remount Road and what you

7    described earlier, would you do it again?

8        A.   The traffic stop?

9        Q.   Well, the whole incident, what happened that

10   morning.  (If at this time.)

11       A.   You know, Mr. Savage, that's a hard question to

12   answer, because things that I know now, 218 months later

13   compared to what I knew on the scene and had to make a

14   split second choice, you know --

15       Q.   So what are those things that you either knew or

16   didn't know at that moment you decided to engage with

17   Mr. Scott and to continue following him and Tasing him

18   and trying to detain him?  What was in your mind at that

19   time?  What were the variables that were present?

20       A.   In my mind at that time, people don't run from the

21   broken taillight.  There's always another reason.  And

22   with him running and continually escalating the

23   situation, he's running from something he's also fighting

24   me on the ground and he grabs my Taser, he uses it on me,

25   tries to use it again, Mr. Scott is getting away -- he

┌─ SC V. SLAGER – ROUGH DRAFT – 11-29-2016 ─┐

1    wants to get away for some reason he -- I don't know.

2        Q.   Had at any time during the stop or prior to you

3    using your weapon did you have an opportunity to -- tell

4    the jury what a -- what do you call it, Terry stop is,

5    frisk?

6        A.   Correct.

7        Q.   Tell the jury what that is.

8        A.   That's when you have some kind of suspicion and

9    you ask the person to exit the car, or if they're on the

10   street you basically just do a quick frisk for weapons,

11   if they have any weapons on them.

12       Q.   And did Mr. Scott's actions in any way prior to

13   his running give you reasonable suspicion to search him?

14       A.   No.

15       Q.   To pat him down for weapons?

16       A.   No.

17       Q.   So did you know at the time whether he was armed

18   or not?

19       A.   I did not know.

20       Q.   Were his actions consistent with somebody who

21   believed they could overtake you?

22       A.   I --

23            MR. DuRANT:  Leading question, Your Honor.

24   BY MR. SAVAGE:

25       Q.   What did his actions, what message did it send you

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1   that morning, what he was doing?

2       A.   On the traffic stop, it was normal.  After the

3   traffic stop, the message was is that he would do

4   anything to get away.

5       Q.   And did you know who the passenger was?

6       A.   No, I had no idea who the passenger was.

7       Q.   At the time you engaged in the ground fight, did

8   you know where the passenger was?

9       A.   I did not know.

10      Q.   At the time you were chasing him, was Mr. Scott

11  using his cellphone?

12      A.   I think so, yes.

13      Q.   You say you think so.  Tell us a little bit more

14  about that.

15      A.   I remember one incident where he had the phone in

16  his hand, running, yelling, I'm on Remount Road, I'm on

17  Remount Road.  From my experience he was giving

18  directions to somebody where he was.  I don't know if he

19  was calling somebody to come and pick him up, I don't

20  know what he was doing.

21      Q.   And tell us about the phone.  Did you see the

22  phone when you were engaged in the fight?

23      A.   Yeah.  It was on the ground.

24      Q.   And did you hear anything from the phone at that

25  time?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    A.   I did.

2    Q.   Tell the jury what you heard.

3    A.   I heard a voice on the phone stating, stop.  Do

4  what the police say, to that effect.  I don't remember

5  how many times it was.

6    Q.   And what was in your mind?  How did you interpret

7  that?

8    A.   That it was another officer coming to back me up,

9  coming from behind to back me up, telling the person,

10  telling Mr. Scott to stop and do what the police say and

11  then nobody was there.

12    Q.   So in your mind, you thought what was coming out

13  of the phone was what?

14    A.   Another officer behind me.

15    Q.   Present.

16    A.   Correct.

17    Q.   And, of course, when you're asked would you do it

18  again, there are things that you've found out in the past

19  18 months?

20    A.   Correct.

21    Q.   We can go into those.

22    A.   Okay.

23    Q.   That may have changed your mind.  What do you know

24  now that you didn't know then?

25    A.   About Mr. Scott's history.

┌─ **SC V. SLAGER – ROUGH DRAFT – 11–29–2016** ─┐

1    Q.  Just --

2              MR. DuRANT:  Objection.  Relevance.

3              THE COURT:  The objection is sustained.

4  BY MR. SAVAGE:

5    Q.  Are the things that you've learned -- for instance

6  we hear unarmed?

7    A.  Correct.

8    Q.  We know that now.

9    A.  Yes.

10   Q.  There are other matters about parties involved,

11  what they were doing, who they were with and whatnot that

12  we know now.

13   A.  Yes.

14   Q.  As a result of what you know now, would you have

15  ever gotten out of your car?

16   A.  Absolutely not.

17   Q.  What would you have done?

18   A.  I would have called for backup right away.

19   Q.  Now, let's go you've been here all week.  Let's go

20  back to high school.

21              THE COURT:  We're going to take a break right

22  now.  Ladies and gentlemen, if you go to the jury room,

23  please do not discuss the case.

24              (In open court, jury not present.)

25              THE COURT:  As we started the live feed went

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1    out so they've been trying to get me to take a break 1,

2    2, 3, 12, 2015.

3                    (Recess taken.)

4                    (In open court, jury not present.

5                    THE COURT:  You can bring the jury.

6                    (In open court, jury present.)

7                    THE COURT:  Yes, sir.  You may proceed.

8                    MR. SAVAGE:  May it please the Court:

9                    THE COURT:  Yes, sir.

10   BY MR. SAVAGE:

11      Q.   When we took the break, I was just about to ask

12   you about your upbringing, if you would start in high

13   school.

14      A.   I went to high school in New Jersey, graduated and

15   then I did a little work at a restaurant, a banquet

16   house, and then at the same time I started college but

17   that really didn't work out for me, I guess, so I joined

18   the military.

19      Q.   Tell me about your family.  What -- when you say

20   you group up in New Jersey, tell us maybe go back before

21   that.

22      A.   So I lived with my parents, they got divorced when

23   I was young.

24      Q.   That's your dad and your mom?

25      A.   Yes, they're here, and so I went with my mom, I

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─

1    think I was ten years old maybe, so I went with my mom to

2    Texas.  Stayed there for a little bit, and then I went to

3    live with my dad in New Jersey.  I went to high school

4    there, and that's when I ended up joining the military.

5        Q.   In high school did you have -- were you involved

6    in outside activities?

7        A.   I was.  In high school, we had a TV station, a

8    TV station in the school, so we did a morning show.  The

9    TV was in each classroom, and, you know, the kids would

10   come on and say the morning announcements and then

11   also --

12       Q.   What was your role in that?

13       A.   I worked in the back.  I worked with editing and

14   the cameras.

15       Q.   And did you work outside -- did you have any

16   activities outside of the act determine anything

17   environment?  Did you work?

18       A.   I did.  I worked at a restaurant and I also

19   volunteered at EMS.

20       Q.   Emergency medical services?

21       A.   Yes.

22       Q.   And that was county or city what?

23       A.   It was the city.

24       Q.   And did you do any boating?

25       A.   I did.  We had a boat, my dad had a boat probably

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    all the way through middle school, high school so I was

2    on the boat all the time, worked on the boat.

3        Q.    So when you tried out in college, you decided --

4    what branch of the service did you go in?

5        A.    I enlisted in the Coast Guard.

6        Q.    In the Coast Guard, how long were you serving in

7    the Coast Guard?

8        A.    Six years.

9        Q.    And during your tenure in the Coast Guard, what

10   type of jobs did you have?  What was did your -- did they

11   have an MOS?

12       A.    Yes, in the Coast Guard there's only 11 jobs.

13       Q.    How many?

14       A.    11 jobs, so you have your main job and everybody

15   has collateral duties, so I was at a station in Florida

16   and I had a handful of collateral duties.

17       Q.    You went into law enforcement?

18       A.    I did, I did, sit was a boarding team member.  I

19   was also on the customs joint task force in the port

20   there.

21       Q.    And did you have any captain's masts or

22   disciplinary problems, did you have any issues when you

23   were in the Coast Guard?

24       A.    No issues, no problems.

25       Q.    What type of discharge did you receive?

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1     A.   Honorable and.

2     Q.   And that was after --

3     A.   Six years.

4     Q.   Six years.  What did you do after you -- were you

5  married at that time this time?  Tell us --

6     A.   No, I wasn't married at the time.  When I was

7  getting out of the Coast Guard, I had a buddy who lived

8  in North Charleston, and he was telling me that North

9  Charleston police department was hiring at the same time

10 I was getting out, so I thought to myself, I'll move to

11 South Carolina.  And I did.

12    Q.   How old were you when you came to South Carolina?

13    A.   I think I was -- six years ago, I was 29.

14    Q.   And were you married at that time?

15    A.   I was not.

16    Q.   And did you -- were you accepted by the North

17 Charleston police department?

18    A.   Yes, I was.

19    Q.   And what did you do when you were accepted?

20    A.   When I was accepted, I went to a three week pre

21 academy at the department and that basically means that

22 we go to the range one time and fire and qualify on the

23 firearm, and then we had to get OCed with OC pepper spray

24 but I didn't have to do that because I did that in the

25 military, and basically we sat in a room and we went over

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1    the legal material before we went to the academy.

2        Q.   And how long were you in the academy?

3        A.   It was nine weeks.

4        Q.   And we've heard a little bit about the academy,

5    academic training, physical training, whatnot?

6        A.   Yes.

7        Q.   Physical requirements?

8        A.   Yes.  We had to do an obstacle course when we got

9    there.

10       Q.   And since you took that obstacle course in your

11   career as a law enforcement officer what physical

12   training or obstacle courses have you had since?

13       A.   None.

14       Q.   And you've heard the testimony this week I don't

15   want to be repetitive but a lot of classroom work, a lot

16   of firing range work.  What about Tasers what do they

17   tell you in the criminal justice academy about Tasers?

18       A.   Nothing.

19       Q.   What do you mean, nothing?

20       A.   At the criminal justice academy doesn't teach

21   about Tasers.

22       Q.   And where did you learn with Tasers?

23       A.   At North Charleston police department.

24       Q.   And after you -- I'm assuming you graduated.

25       A.   I did.  I graduated.

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    Q.   And you weren't sent back at all for repeating

2    classes or anything like that?

3    A.   No, I passed all my classes.

4    Q.   And when you got to North Charleston, what type of

5    capacity did you serve in then?

6    A.   After I graduated from the academy I went to

7    TO training.

8    Q.   If you would speak up and don't use initials,

9    because we don't know what that means.  You went to what

10   type of training?

11   A.   I was assigned to a field training officer.  That

12   basically means a veteran police officer on in the

13   department who I work with and he teaches me how to be a

14   police officer on the street.

15   Q.   And when you came to court today, did you bring

16   some notes to refresh your memory of the different

17   activities that you participated in?

18   A.   I did.

19   Q.   Why don't we take a look at the daily observation

20   reports.  I don't want you to read from them but you're

21   entitled to read from them to refresh your memory to tell

22   the jury the type of reports that were written up by you

23   during your field training.

24   A.   Okay.

25   Q.   The field activity reports were daily; is that

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─

1    correct?

2      A.  Yes.

3      Q.  Well, let's look at March 24th and tell the jury

4    what your officer wrote up about you.

5              MR. DuRANT:  Objection.  Hearsay.

6              THE WITNESS:  I don't have that one.

7    BY MR. SAVAGE:

8      Q.  All right.  Well, let's go to April 13th.

9      A.  I don't have --

10     Q.  Are you looking at your field training records?

11     A.  Yes, sir.

12             THE COURT:  This is April 13th of what year?

13             MR. SAVAGE:  2010.

14             MR. DuRANT:  Your Honor, I would object to

15   this entire line of questioning.  Basically what he's

16   doing is having him read what that person wrote about

17   him.  If they want to put that person up fine, but this

18   is nothing but hearsay.

19             THE COURT:  Mr. Savage?

20             MR. SAVAGE:  What I've asked him to do is to

21   refresh his memory from these activities that occurred

22   years ago by looking at those reports, if he needed to

23   refresh his memory but not to testify from them.  He's

24   not reading from the reports.  He's testifying, refreshed

25   recollection of what he did on those dates.

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    THE COURT:  As to what he did or what someone
2  said about him?
3    MR. SAVAGE:  What he did.  Now, if he didn't
4  write these reports, I agree, but these are his notes of
5  his activities of that day which refreshes his memory of
6  what he did.
7    THE COURT:  I overrule the objection.
8    MR. SAVAGE:  May I see your records, please.
9  BY MR. SAVAGE:
10   Q.  So if you would take a look at your activity
11  report from March 24th, don't read from it refresh your
12  memory as to what you did that day, and tell the jury.
13   A.  So on that day, I was with my field training
14  officer and we got out with a couple of individuals,
15  waking the street.  At that time we made contact with
16  them and they were arrested due to the act of carrying
17  concealed weapon and having narcotics on them.
18   Q.  And on April 14th, what did you do that day?
19   A.  That day I was with my field training officer and
20  we were driving around in Union Heights.  I observed a
21  gentleman riding a bicycle in and out of cars on the
22  wrong side of the street and we went to make contact with
23  him and he ran away.  At that time, I chased and detained
24  the subject and upon a search he had a whole bunch of
25  narcotics in his pocket.

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    Q.   On those dates, was anybody hurt?

2    A.   No, sir.

3    Q.   On April 22 of 2010, refresh your memory as to

4    what you did that day.

5    A.   At that time, I was with another officer on day

6    shift --

7            MR. DuRANT:  I'm going to have to object to

8    relevance, Your Honor.  This is all very interesting but

9    what does it have to do with the issues before this jury?

10           THE COURT:  Response, Mr. Savage.

11           MR. SAVAGE:  As I understand relevance it's

12   evidence that will help the jury make a determination in

13   the case and the fact that he was a rookie engaged in a

14   number of foot chases and detentions and arrests in high

15   crime neighbor neighborhoods without any violence

16   perpetrated I think is important for the jury to know.

17           THE COURT:  Solicitor?

18           MR. DuRANT:  Once again, Your Honor, I mean,

19   it's all well and good and we would acknowledge that

20   Officer Slager never killed anybody before April the 4th

21   but it has nothing to do with his behavior on April the

22   4th of 2015.

23           THE COURT:  I sustain the objection.

24   BY MR. SAVAGE:

25   Q.   During the time period in which you were under a

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1    field training officer, did you have a variety of

2    experiences in detaining, arresting people who were armed

3    and dangerous narcotics dealers and that sort of thing?

4        A.   Yes.

5        Q.   And that's all reflected in --

6                 MR. DuRANT:   Same objection, Your Honor.

7    BY MR. SAVAGE:

8        Q.   Reflected in the report that the solicitor has had

9    for 18 months?

10       A.   Yes, sir.

11       Q.   And certainly these are public records that the

12   solicitor, or anyone else could get to read to learn

13   about your background?

14       A.   Yes, sir.

15       Q.   And the --

16                MR. DuRANT:   Your Honor, I made an objection

17   on relevance.  My objection on relevance is continuing,

18   and I just don't see how this has anything to do with the

19   issues before this Court.

20                THE COURT:   And I rule on a question by

21   question basis.  Is there an objection to the last

22   question or the next question?

23                MR. DuRANT:   I'm objecting to the entire line

24   of questioning, Your Honor.  I don't think this has

25   anything to do with the issues before this Court.

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1      THE COURT:  I rule on a question by question

2  basis.

3      MR. SAVAGE:  I'll move on, Your Honor.

4      THE COURT:  Yes, sir.

5  BY MR. SAVAGE:

6    Q.  There's been a lot of talk by the solicitor in

7  their questioning of witnesses about your use of force?

8    A.  Yes.

9    Q.  Have you ever had an instance of use of force in

10  which you had been reprimanded or sanctioned or in any

11  way charged with any abuse of authority or violation of

12  procedure?

13    A.  No.

14    Q.  Well, let's go through each and every one of them

15  so you can tell the jury what you did, starting with the

16  first use of force employed.  Do you have those reports

17  in front of you?

18    A.  I do, sir.

19    Q.  And you can take a look at them and you can tell

20  us the date, if you will, and you can tell us what the

21  issue was that caused you to use force.

22    A.  Yes.

23    Q.  So is the first date is what, sir?

24    A.  6/7/2010.

25    Q.  And what did the suspect do that caused you to use

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1   force and what type of force was it?

2       A.   This was a traffic stop.  The subject stated that

3   he had a gun under the front seat and he refused to get

4   out of the car with that loaded gun under the front seat.

5       Q.   And what type of force was employed?

6       A.   At that time I used my Taser, presented my Taser,

7   and then he complied.

8       Q.   And you said there was compliance?

9       A.   Yes, sir.

10      Q.   On -- the next event when did that take place?

11      A.   April 20, 2011.

12      Q.   And what was the circumstance of that use of

13  force?

14      A.   That use of force was another officer located a

15  stolen vehicle.  At that time he wanted another unit to

16  help him to effect a traffic stop on the car.  At that

17  time the vehicle fled and a chase happened.  We went into

18  Accabee neighborhood.  As the car is driving down the

19  road, the driver and the passenger both jump out of the

20  moving vehicle and proceed to run into the neighborhood.

21  The driver runs under a house and tries to hide, and then

22  I chase after the passenger who also ran.  At that time

23  the passenger would not stop, would not comply and a

24  Taser was used.

25      Q.   And did the suspect then comply with the

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    directives?

2        A.   Yes.

3        Q.   What is the third use of force?

4        A.   Third one is dated June 20th, 2011.  If I remember

5    correctly that incident, a gentleman parked his moped in

6    front of the door of a gas station, convenience store, on

7    the sidewalk and I went to make contact with him and have

8    tell him to move his moped to the parking spot.  At that

9    time he proceeded to flee the area, to drive away, and he

10   proceeded to run a stop sign at the corner of -- I think

11   Harvey and South Allen, in that area, Dorchester Wayland

12   and then I initiated a traffic stop.  He did not comply.

13   He continued to elude and a car chase ensued and he went

14   across the street into oncoming traffic, no regard for

15   anyone, and then he came to a wooded field where he

16   jumped off the moped and ran into the woods towards the

17   CSX railroad property.  At that time he gave chase,

18   commands to stop.  He refused and a Taser was used.

19       Q.   Without further incident?

20       A.   Correct.

21       Q.   He was in compliance?

22       A.   I'm sorry?

23       Q.   He was in compliance?

24       A.   Yes.

25       Q.   And the next incident, please, in July of 2011.

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    A.   July 22 of 2011, myself and Sergeant Ghi were in

2    Chicora-Cherokee.  We were at the corner of out to two

3    and carver and we observed a mail subject walking around,

4    exposing himself in front of other neighbors.  We made

5    contact and he proceeded to flee and the Taser was used

6    and my was arrested for indecent exposure.

7    Q.   Any further incident result of that?

8    A.   No.

9    Q.   Next one please November of 2012.

10    A.   November of 2012.  That's going to be one where we

11    were at a bar due to the fact of multiple shootings

12    violent crimes.  The whole team had to go to this bar

13    when it closed.  One of vehicles left the parking lot and

14    ran into another car.  We followed and made contact with

15    the driver at his house.  At that time it was him and his

16    brother there, and he did not want to talk to me.  I

17    proceeded to be very boisterous and loud (he) then he

18    proceeded to throw his wallet at me and run on foot.  At

19    that time I gave chase and the Taser was used and then we

20    were on the ground, trying to handcuff him, a fight

21    happened, and he proceeded to grab my Taser.  At that

22    time, luckily, another officer got there right at that

23    incident so no more force was used except for handcuffing

24    the individual.

25    Q.   Any repercussions or first incidents result of

┌─ SC V. SLAGER – ROUGH DRAFT – 11-29-2016 ─┐

1   that?

2       A.   No.

3       Q.   Suspect acted in compliance?

4       A.   After he was handcuffed, yes.

5       Q.   By the way each and every one of these instances

6   are these signed off by your superiors?

7       A.   Yes, they are.

8       Q.   So your sergeant, lieutenant, captain and the

9   chief and the deputy chief?

10      A.   Correct.

11      Q.   In June of 2013 when you were involved in another

12  incident?

13      A.   Yes, I was.  This one happened actually in front

14  an officer's home.  An individual was breaking into

15  vehicles and the officer came home and located him hiding

16  in the driveway.  At that time I assisted the officer and

17  we took him to the ground with an armed bar take down and

18  he was detained.

19      Q.   And how was the Taser utilized in that situation?

20      A.   If I remember correctly, it was a drive stun.

21      Q.   And any further repercussions?

22      A.   No.

23      Q.   On July 17 of 2013, tell us what happened that

24  day.

25      A.   I'm sorry.  July 17th, 2013?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    Q.   Correct.

2    A.   That was the one where -- my memory -- we received

3    a call to a home in reference to a six-foot-three 280

4    pound man, intoxicated, causing a problem in his mother's

5    home, arrived on scene and we told him he needed to leave

6    due to his mother's request.  At that time, he was

7    becoming more and more upset and then he proceeded to

8    punch his girlfriend in the face and she flew across the

9    room.  At that time I utilized my Taser to take him into

10   custody.

11   Q.   And at that time did he comply?

12   A.   Yes.

13   Q.   The next incident, please.

14   A.   Yes.  That one is going to be on 8/31/2013.  This

15   one we responded to a call at an apartment complex where

16   a female was inside and her boyfriend was trying to get

17   in the door.  At that time we arrived on scene and as we

18   arrive coming on scene we were notified by dispatch that

19   the suspect was still on scene so we turned our

20   headlights off and we parked down the street so he

21   wouldn't see us coming.  At that time, we arrived on

22   scene and he continued to kick in the door trying to, I

23   guess, get her.  At that time, we told him to come down.

24   He was very upset and he proceeded to fight officers,

25   fight me.  My Taser was used and two other officers were

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    on scene also and he was taken into custody.

2        Q.   And how was the Taser employed at that time?

3        A.   At that time, it was -- I'm sorry.  I didn't use

4    the Taser, another officer used the Taser, and that was

5    with the probes.

6        Q.   And so why is there a use of force report in your

7    file when you didn't use the Taser?

8        A.   Because I was on scene, so if you have 20 officers

9    on scene for use of force, every officer's in that

10    report.

11        Q.   All right.  On September 15th of 2013, what

12    happened?

13        A.   Is August 312015?  I have September 15th, am I

14    wrong.  I don't have that one, sir.

15        Q.   What is the next one you have?

16        A.   This one is -- I'm sorry, it is September 15th.  I

17    read the wrong date.  We got a call to a resident in

18    Union Heights in reference to a man who broke into a home

19    and tried to rape a woman.  At that time, myself and

20    another officer figured out who the gentleman was.  We

21    went to his house and when he opened the door, he was

22    very sweaty and he stated he had just woken up from a

23    dead sleep.  They had the same name and we wanted to talk

24    to him.  At that time the individual became belligerent

25    and slammed the door in our faces.  At that time we tried

```
┌──────────────────────────────────────────────────┐
│        SC V. SLAGER – ROUGH DRAFT – 11–29–2016     │
```

1    to restrain the subject and he proceeded to fight us.

2         At that time a Taser was used to put the gentleman

3    in custody.

4         Q.   Did it effect compliance?

5         A.   Yes, it did.

6         Q.   In all these records we've been reading, these

7    were when you were working in the south area?

8         A.   Yes.

9         Q.   And your shift at that time was what hours?

10        A.   It was 10 p.m. to 8 a.m.

11        Q.   So all these incidents were in the early morning

12   hours?

13        A.   Yes.

14        Q.   What about in December, December 22 of 2013?

15        A.   This one happened at 5:22 in the morning.  Another

16   officer got out with a subject who was intoxicated.  At

17   that time the officer was going to take the person into

18   custody and he resisted, grabbing on to a car.  At that

19   time, the subject turned around and bear hugged the

20   officer and tried to grab his equipment on his belt.  At

21   that time I used the Taser due to the fact this gentleman

22   was assaulting the other officer.

23        Q.   The gentleman was how tall and what did he weigh?

24   6 foot three, 245 pounds?

25        A.   Yes, sir, six foot 3, 245 pounds.

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1    Q.   And on February 25 of 2014?

2    A.   I -- we -- I was dispatched to a domestic violence

3    call.

4    Q.   What time was that?

5    A.   That was at 3:52 in the morning.  And it was in

6    Union Heights and when we arrived on scene, the daughter

7    met us at the door and stated that her mom was being beat

8    up by the boyfriend.  As I went through the house into

9    the bedroom, I observed the female laying on the bed, on

10   her back, and the male was on top of her, choking her and

11   told her that you better not tell the police what I'm

12   doing.

13        At that time he was taken into custody without any

14   kind of issue, and then when we got to the vehicle he

15   refused to get into the vehicle.  He was handcuffed and

16   refused to get into the vehicle.  At that time, after

17   telling him and instructing him multiple times by myself

18   and a sergeant on scene we decided to use eye Taser in a

19   drive stun mode to drive stun him in the pelvic bowl area

20   which is the pelvic region so he could wind of bend down

21   and get limb in the vehicle that's the only way he could

22   have gotten into the scar.  After that he complied.

23   Q.   On May 4 of 2014, on this incident here, it was at

24   10:44 p.m., and we responded to a call where a roommate

25   would not SLED another roommate inside the house.  I

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    guess they were having some kind of an argument, I don't

2    knee what we call that as we arrived we were outside and

3    we could hear the roommate inside stating -- I'm saying

4    that are you ready for this, to that effect.  When he

5    opened the door, he didn't see the police and proceeded

6    to punch the roommate in the face and the roommate fell

7    to the ground.  At that time we were told he was -- we

8    told him he was under arrest and we had to use our Taser

9    to effect the arrest?  Did he comply at that time?

10   A.  He did.

11   Q.  Then on May 4 of 2014?

12   A.  On that date officer Clement, another officer, it

13   was at 3:33 in the morning conducted a traffic stop on a

14   subject.  At that time, he called for backup and I

15   arrived on scene and the officer wanted to get the

16   subject out of the vehicle to do an arrest and the

17   subject ran away.

18        At that time, we ran across Rivers Avenue into a

19   field and I'm pretty sure -- he was not listening to what

20   officers were saying, continued to run, and I used my

21   department issues Taser, but it missed the subject.  And

22   then I followed up with the drive stun and he was in

23   compliance.  He was handcuffed.

24   Q.  And on May 27th of 2014.

25   A.  This is somewhat the same incident as the last

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1   one.  The subject was in a vehicle at a traffic stop was

2   conducted for speeding and he also ran from the vehicle

3   and he was not compliant with officer's request and he

4   was Tased and taken into custody.

5      Q.   So the one on May 4th, when you say speeding, what

6   types of speeds are you talking about?

7      A.   I'm sorry.  On May 4th it was no turn signal and

8   on May 24th it was speeding.

9      Q.   And what type of speeds are you talking about?

10     A.   The officer initiated a traffic stop, stated he

11  was going at a high rate of speed through the

12  neighborhood.

13     Q.   100 miles an hour?

14     A.   Could have been, yes.

15     Q.   And did we do August 8 2014?

16     A.   August 8 of 2014, I responded to a gas station at

17  5:19 in the morning to assist another officer who was

18  doing a traffic stop in the parking lot.  At that time,

19  they were ran through the computer and they had warrants.

20  The person resisted, did not comply, tried to run away,

21  and a Taser was used to effect the arrest.

22     Q.   Suspect was in compliance?

23     A.   Correct.

24     Q.   And on August 25th of 2014?

25     A.   Yes.  On August 25th, 2014, another officer

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1   conducted a traffic stop on a vehicle.  When that officer

2   conducted a traffic stop, he realized that the license

3   was suspended and he called for another unit.  I arrived

4   on scene and another officer arrived on scene.  At that

5   time the officer walked up to the vehicle and told the

6   subject to get out of the vehicle, that you're under

7   arrest.  The officer told the subject eight to ten times

8   that he was under arrest for driving under suspension and

9   the subject would not comply.  He stated no and would not

10  get out of his vehicle.  At that time myself and two

11  other officers opened the door and proceeded to get him

12  out of the car.  We had to physically pull him out of the

13  car because my was resisting after he was told he was

14  under arrest.

15      When he was in the car, he leaned over to the

16  passenger side and proceeded to grab a bat, a bat or a

17  club.  At that time, we yanked him out of the car because

18  he was grabbing that weapon, and if I remember correctly

19  the other officer on scene used -- pulled his firearm out

20  due to the fact that this individual was grabbing a bat.

21  As we pulled him out of the vehicle, we had to pull him

22  out pretty strong he was grabbing a bat we didn't know

23  what he was doing the bat so we yanked him out of the car

24  and he was on the ground.  At that time the officers are

25  telling him put his hands behind his back, giving hip

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─

1    commands he's refusing, he continually putting his hands

2    underneath his stomach in his waistband area and at that

3    time I used my Taser due to the fact of everything that

4    SLED up to the incident and he was taken into custody.

5        Q.   He was compliant at that time?

6        A.   He was.

7        Q.   In a situation like that, is that recorded on a

8    video?

9        A.   Yes, that incident it was recorded on two car

10   videos in in two different locations.

11       Q.   And these can be ugly situations.

12       A.   Yes.

13       Q.   But this was investigated?

14       A.   It was.

15       Q.   And there were four officers presented?

16       A.   There three officers and then a sergeant arrived

17   on scene.

18       Q.   And you were cleared from any wrongdoing.

19       A.   I was.

20       Q.   Have you ever been put on the early warning

21   system?

22       A.   Not to my knowledge, no.

23       Q.   Well, you would know if you were, wouldn't you?

24       A.   Yes, I would have.

25       Q.   And have you ever been reprimanded in any way as a

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    result of your use of force?

2      A.  No.

3      Q.  And have those uses of force been investigated in

4    preparation for this case by outside law enforcement

5    agencies?

6      A.  Yes.

7      Q.  And have you been reprimanded or in any way told

8    you did something wrong?

9      A.  No.

10     Q.  The last use of force we talked about was on

11   August 25th of 2014.  That's approximately six months

12   before this incident.  What changed in your career status

13   at that time, or about that time?

14     A.  My wife becoming pregnant.

15     Q.  And as a result of her pregnancy, what changed in

16   your work hours, your shift, your location?

17     A.  Honestly, my wife sort of nagged me a little bit

18   to go to a normal schedule, so --

19     Q.  Is this your wife in the courtroom here?

20     A.  Yes.

21     Q.  And I guess I forgot to ask, when did you get

22   married?

23     A.  We got married September 2010.  September 25,

24   2010.

25     Q.  And as a result of that have you accepted

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1  financial and emotional responsibility for the children

2  of a previous marriage?

3      A.   Yes.

4      Q.   How old are they now?

5      A.   They're 13 and 15.

6      Q.   And as a result of your marriage, did you have

7  plans to have a family?

8      A.   Yes.

9      Q.   In addition to those two children?

10     A.   Yes.

11     Q.   Tell us about that.

12     A.   I've always wanted a son or a daughter, so due to

13 some medical issues we had to do IVF.

14     Q.   Pardon me?

15     A.   In vitro fertilization because of some medical

16 conditions so we had to go to a doctor, take out a loan,

17 and they basically make the baby.

18     Q.   Did it work?

19     A.   It worked.  The first time it did not work and we

20 had to do it for the second time.  It worked the second

21 time.

22     Q.   And I assume that the birth of -- is it a son?

23     A.   Yes.

24     Q.   Was it a joyous occasion that you attended?

25     A.   No, I did not attend.

─── SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ───

1    Q.   Why not?

2    A.   I was in jail.

3    Q.   Why?

4    A.   (Pause.)  I was in jail.

5    Q.   For this case?

6    A.   Yes, sir.

7    Q.   Do you have a copy before you of Defendant's 101,

8    100, and 102?  Let me give you these copies and ask you

9    if you recognize these documents.

10   A.   I do, yes.

11   Q.   During the course of working, have you received

12   letters from people you've arrested?

13   A.   I have, yes.

14   Q.   Have you received letters from the chief of

15   police?

16   A.   Yes, I have.

17   Q.   Have you received letters from Ms. Wilson's

18   office?

19   A.   Yes, I have.

20            MR. SAVAGE:  Your Honor we'd ask to introduce

21   as evidence Defendant's Exhibits 101, 100, and 102.

22            MR. DuRANT:  Objection.  Hearsay.

23            THE COURT:  I sustain the objection.

24   BY MR. SAVAGE:

25   Q.   So without telling us the details of that, have

┌─ SC V. SLAGER – ROUGH DRAFT – 11-29-2016 ─┐

1    you heard back from a woman you arrested?

2      A.  I did.

3      Q.  And you've heard from the chief of police?

4      A.  Yes.

5      Q.  And you've heard from the solicitor's office.

6      A.  Yes.

7      Q.  Without going into details regarding your

8    excellence in police work?

9      A.  Yes.

10     Q.  With respect to Taser training, and I want to stay

11   brief on this, but is sergeant -- is Sergeant Ghi a

12   trainer?

13     A.  Yes.  He trained me one time, yes.

14     Q.  If you would step down, Mr. Slager, and show us

15   with specificity the type of training you received at

16   North Charleston police department regarding the use of a

17   Taser that this jury hasn't heard yet.

18     A.  We had training where an officer had his -- a

19   rubber firearm in his holster and then another officer

20   had a Taser in his hand, with a drive stun mode, and the

21   officer with the Taser would have it his side, down,

22   straight like this, with his hand, with your hand down,

23   and we were a certain amount distance away, back up some

24   more, sir --

25     Q.  More than 27 inches?

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1    A.   Yes, sir, maybe a little bit more, give or take

2  about that area.  And what we had to do is the officer

3  had to pull his rubber gun out and say bang before the

4  officer used the live Taser to hit the officer with the

5  firearm.

6    Q.   Now, we haven't heard about this before.  Who is

7  the sergeant the instructor?

8    A.   Sergeant Ghi.

9    Q.   And who is the partner you were dealing with in

10  this?

11    A.   Michael Bridges.

12    Q.   And tell us what happened.

13    A.   So when sergeant Ghi was saying go, Mr. Savage

14  would bring his hand up and run towards me with the Taser

15  on, clicking, and try to get me with it.  As soon as it

16  went I had to pull the rubber gun out and say bang at the

17  same time so whatever the object was to shoot before I

18  got Tased.  It didn't work.  There was multiple times

19  where he would say go by the time I pulled my gun out, it

20  was only coming up to this Mr. Savage would already be

21  with me with the Taser in the hand.

22    Q.   Did you actually get hit with the Taser?

23    A.   I did, a couple timed.

24    Q.   In the drive stun?

25    A.   Yes.

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    Q.   And what happened to your weapon?

2    A.   It went flying 20 feet this way, I don't know

3    where it went pain shooting up my arm, all down here.  I

4    was stunned, I didn't know what to do.

5    Q.   Reverse roles.  Now you got Ghi supervising who

6    was the officer?

7    A.   The officer would being Mike bridges.

8    Q.   So bridges now has the weapon and you have the

9    Taser?

10   A.   Correct.

11   Q.   Same result?

12   A.   Correct.  Same result.

13   Q.   While you're down here, I'm not going to ask you

14   to take off your shoes, tell us about the penny trick.

15   Stand in front of the jury and tell us about the penny

16   trick?

17   A.   So as you've seen before this is the shirt stay

18   this closed loop would go around your foot.  This metal

19   would go around your shirt, a little grommet here so your

20   shirt would be between and they would lock it in, and

21   what I did is I used a penny and you stick it between the

22   shirt and the back of rubber grommet like so and that

23   prevents this rubber grommet from coming down at all so

24   your shirt cannot come loose.

25   Q.   Let go.  You want me to let go or do you want to

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    get go?

2        A.    No, don't get go, sir.

3        Q.    And your shirt stayed?

4        A.    Absolutely.  Your shirt will never come off.

5              MR. SAVAGE:  Now retake the stand and answer

6    any questions the prosecutor may have.

7              CROSS-EXAMINATION

8    BY MR. DuRANT:

9        Q.    Let's talk a little bit about your career at the

10   North Charleston police department.  When did you start,

11   once again?

12       A.    I was hired in 2009.

13       Q.    And when did you actually begin policing, was that

14   when you started actually doing policing or is that when

15   you were with the field training officer or what?

16       A.    With North Charleston, when you get into your

17   field training officer, when you're riding with them

18   that's when you actually start.

19       Q.    So that was in when of 2008?

20       A.    That was in 2010.

21       Q.    Okay (2009 previous question) and of course as

22   being a law enforcement officer, you have a oath, don't

23   you?

24       A.    Yes.

25       Q.    And you took an oath, correct?

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    A.    Correct.

2    Q.    And that oath requires you among other things to

3  safeguard lives and property?

4    A.    Yes.

5    Q.    To never abuse your authority?

6    A.    Correct.

7    Q.    And to never employ unnecessary force.

8    A.    Correct.

9    Q.    And as a police officer, you're also governed by a

10  code of ethics are you not?

11    A.    Yes.

12    Q.    And these are things that basically an oath you

13  swear to God on the code of ethics you signed, correct?

14    A.    Correct.

15    Q.    And it's very similar in its contents, correct?

16    A.    I think so, yes.

17    Q.    And according to your code of ethics the

18  fundamental duty of the police officer is to safeguard

19  lives and property?

20    A.    Yes.

21    Q.    Respect the constitutional rights of all to

22  liberty, equality, and justice?

23    A.    Yes.

24    Q.    To develop self-restraint and be constantly

25  mindful of the welfare of others?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    A.   Correct.

2    Q.   To be honest and thought and deed in both your

3  personal and official life?

4    A.   Yes.

5    Q.   To be exemplary in obeying the law and the

6  regulations of your department?

7    A.   Yes.

8    Q.   To enforce the law never employing unnecessary

9  force or violence?

10    A.   Correct.

11    Q.   And that you alone are responsible for your own

12  standard of professional performance.

13    A.   That's what it says, yes.

14    Q.   And would you agree with that, that you alone are

15  responsible for your own standard of professional

16  performance?

17    A.   Yes, everyone is.

18    Q.   And as you stated in your direct testimony, you've

19  had quite a bit of training; is that correct?  And not

20  just starting with North Charleston police department.

21    A.   Uh-huh.

22    Q.   Your training began when you were in the Coast

23  Guard, correct?

24    A.   Correct.

25    Q.   And in the Coast Guard, you were trained in the

┌─ **SC V. SLAGER – ROUGH DRAFT – 11–29–2016** ─┐

1    use of force?

2        A.    Yes.

3        Q.    You were trained in defensive tactics level one

4    through four?

5        A.    Yes.

6        Q.    You were trained in arrest techniques?

7        A.    I was.

8        Q.    You were trained in handcuffing?

9        A.    Yes.

10       Q.    You were trained in weapons retention?

11       A.    Yes.

12       Q.    And you won the pistol marksman ribbon?

13       A.    Yes, I did.

14       Q.    Which means you're a pretty good shot?

15       A.    If you say so, yes.

16       Q.    I don't guess they give you that if you're not a

17   good shot, do they?

18       A.    No, you do practice.

19       Q.    And since going with the North Charleston police

20   department in 2010 is when you really started, I guess,

21   you have training there, correct?

22       A.    Yes.  We have three days of training every year.

23       Q.    And I believe it's been referred to throughout

24   this trial as AIMS training?

25       A.    Yes.

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    Q.   And that's annual in service manual training,

2  correct?

3    A.   Yes.

4    Q.   And with AIMS training you've been involved in

5  active shooter training twice?

6    A.   One time.

7    Q.   I believe in 2013 and the end of 2014, according

8  to your training log.

9    A.   I remember one time.

10   Q.   Okay.  And would you agree with what's been

11 testified that those are kind of shoot, don't shoot type

12 of scenarios?

13   A.   Some of them are, yes.

14   Q.   You've been trained in cardiopulmonary

15 resuscitation and first aid in 2012 12, 2013, 2015?

16   A.   No, I'm not CPR certified.  North Charleston

17 police department does not certify police officers in

18 CPR.

19   Q.   I didn't say you were certified I said you

20 received training in CPR and first aid as part of your

21 AIMS training in 2011, 2013, and 2015?

22   A.   First aid, yes.

23   Q.   And during high school, you worked as a volunteer

24 EMT?

25   A.   I did.

┌─ **SC V. SLAGER – ROUGH DRAFT – 11–29–2016** ─┐

1    Q.   And about 16 hours a week for three to four years?

2    A.   Correct.  No, that's not correct, I'm sorry.  It

3    was about two years.

4    Q.   You have received training as a police officer in

5    defensive tactics?

6    A.   Yes.

7    Q.   Pepper spray?

8    A.   Yes.

9    Q.   Practical problems?

10   A.   Yes.

11   Q.   Firearms training every year?

12   A.   No, firearms qualification every year.

13   Q.   Well, firearms qualification every year then,

14   correct?

15   A.   Correct.

16   Q.   Use of force?

17   A.   Correct.

18   Q.   Use of deadly force?

19   A.   Correct.

20   Q.   Legal updates every year?

21   A.   Yes.

22   Q.   Taser training every year?

23   A.   Yes.

24   Q.   And specific courses on the use of force in

25   addition to the use of force you get with your various

2:16-cr-00378-RMG    Date Filed 11/17/17    Entry Number 127-1    Page 70 of 118

1  other weapons training.

2      A.  Okay.

3      Q.  You were instructed on North Charleston's use of

4  force policy?

5      A.  Correct.

6      Q.  And, in fact, had to certify that you were

7  familiar with the use of force policy every year as part

8  of your AIMS training, correct?

9      A.  I think so, yes.

10     Q.

11          THE COURT:  Ladies and gentlemen I'll have

12  you if to the jury room for a few minutes.  Please do not

13  discuss the case.

14          (Recess taken.)

15          (In open court, jury not present.)

16          THE COURT:  Okay.  You can bring the jury.

17          (In open court, jury present.)

18  BY MR. DuRANT:

19     Q.  Officer Slager, Mr. Slager, I hand you what

20  previously has been marked as State's Exhibit 258 for

21  identification, I believe, and ask if you recognize that?

22     A.  Yes, I do.

23     Q.  And what is that?

24     A.  It's the North Charleston use of force policy.

25     Q.  And is that the North Charleston police department

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    use of force policy that was in effect at the time you

2    were a policeman on April 4 of 2015?

3        A.   Yes, it was.

4        Q.   And, if you would, could you read for the jury

5    section two of what the policy of the North Charleston

6    police department is regarding the use of force.

7        A.   The North Charleston police department recognizes

8    and respects the value of human life is immeasurable.

9    Police officers because of the sworn responsibility to

10   protect life and property may be required to utilize

11   deadly force or less than deadly force to carry out duty

12   however the protection of life must always take priority

13   over the apprehension of criminals or the protection of

14   property.  An officer the North Charleston police

15   department while he she is engaged in a lawful execution

16   of his her legal duties of a law enforcement officer will

17   use only the force which is reasonably and necessary to

18   effect his or her objectives.  The officer's

19   responsibility for protecting life must and does include

20   his or her own.

21       Q.   Okay.  And regarding the use of deadly force,

22   flipping to page four of that document, I believe, under

23   subsection (B), what are the parameters for the use of

24   deadly force under section one?

25       A.   (B)1?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    Q.   Yes, sir, (b)1 A and B?

2    A.   Officer may use deadly force only when the officer

3    reasonably believes that the action is in defense of

4    human life including the officer's own or the defense of

5    any person in immediate danger of serious physical

6    injury.  And B is to prevent the escape of a fleeing

7    felon who the officer can clearly establish facts that

8    indicated that the felon if allowed to flee will pose an

9    immediate threat to human life and, E.

10   Q.   And, finally, moving on to, I believe, page 11,

11   section M, what does it say?

12   A.   You said section M?

13   Q.   Yes, sir.

14   A.   In all cases of use of force, whether deadly or

15   now deadly force medical treatment consistent with any

16   injuries sustained by an individual will be immediately

17   provided in the form of immediate minor first aid or

18   request for EMS.

19   Q.   Now, as part of your training as a police officer,

20   you underwent training at the academy?

21   A.   Yes.

22   Q.   As well, correct, South Carolina Criminal Justice

23   Academy, and what do they teach you in terms of the use

24   of deadly force and I believe it's been referred to as

25   ability, opportunity, jeopardy.  Did you learn that as

2:16-cr-00378-RMG    Date Filed 11/17/17    Entry Number 127-1    Page 73 of 118

─── SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ───

1  well?

2      A.  Yes.

3      Q.  And could you explain to the jury what that means.

4      A.  Act is the ability for somebody to use it.

5  Opportunity is the opportunity to do it, and jeopardy is

6  if the person has a weapon, they're going to do it.

7      Q.  Okay.  So the person has to have the ability to

8  cause death or serious bodily injury, correct?

9      A.  Correct.

10     Q.  The opportunity to do that, correct?

11     A.  Correct.

12     Q.  And the officer or the public actually has to be

13  in jeopardy?

14     A.  Correct.

15     Q.  Now, with regard to this particular morning, April

16  the 4th of 2015, that was a Saturday morning was that

17  correct?

18     A.  Yes.

19     Q.  And how long had you been working days?

20     A.  Maybe six, seven months.

21     Q.  Okay.  And had you been in Charleston Farms that

22  whole time?

23     A.  I was assigned to Charleston Farms, correct, the

24  whole time.

25     Q.  And is Saturday morning, that time Saturday

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    morning typically a high crime time?

2       A.   Crime happens at any time during the day.

3       Q.   I understand?

4       A.   I can't answer that question.

5       Q.   So it wasn't your experience as a police officer

6    that when you were on nights that it was frequently more

7    busy than it was during the daytime?

8       A.   I also worked a different area of and I didn't

9    work Charleston Farms.

10      Q.   Okay.  Fair enough.  When you were on duty you

11   monitor the radio, correct?

12      A.   Correct.

13      Q.   And when somebody like Officer Habersham or

14   Officer Banias has to go to city hall for whatever do

15   they generally radio (C) that in?

16      A.   Sometimes for the warrants the warrant officer

17   might call in on the telephone so they might.  I don't

18   remember.

19      Q.   But you knew what the staffing issues were that

20   day, correct?

21      A.   I don't recall now.

22      Q.   So you don't recall it was you and Habersham and

23   Banias and Heather Lawrence being on duty that day?

24      A.   I don't recall.

25      Q.   And you would agree it was your decision to make

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1   the traffic stop, correct?

2       A.   That's correct.

3       Q.   And you didn't know that Officer Banias and

4   Officer Habersham were at city hall?

5       A.   No, I didn't.

6       Q.   Were you aware it took Officer Habersham

7   two-and-a-half minutes to get to your location, correct?

8       A.   I didn't know that did no now -- I'm sorry I

9   didn't know that then.  I know that now.

10      Q.   You know that now, and is that an unreasonable

11  amount of time?

12      A.   No.

13      Q.   I had got there pretty quick, didn't he coming

14  from city hall?

15      A.   Had he would have got there quicker if he was in

16  Charleston Farms with me.

17      Q.   And after you stopped the car, you went up to the

18  car and got the driver's license, correct?

19      A.   Correct.

20      Q.   Did you ever check the driver's license?

21      A.   I don't recall.  I might have glanced at it.

22      Q.   Wouldn't that be the first thing you do is to

23  check the driver's license to see if the guy you're

24  looking at is the same face you're looking at on the

25  driver as license?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    A.   Correct, but sometimes the driver's license
2  picture is taken years before.
3    Q.   That's true.  And you had the suspect's car there,
4  correct?
5    A.   He was parked in the parking lot.
6    Q.   Okay.  And there was a passenger in the car?
7    A.   Correct.
8    Q.   And if I understand this correctly, you said that
9  when Mr. Scott ultimately ran, you got out and locked
10  your car?
11    A.   Correct.
12    Q.   Did you have to do that with a key?
13    A.   I have a key fob.
14    Q.   So it was a key fob.  And you determined to chase
15  him?
16    A.   Correct.
17    Q.   And that was within policy, correct?
18    A.   We don't have a foot chase policy.
19    Q.   I'm told you have a policy regarding taking
20  someone into custody, right?
21    A.   Correct.
22    Q.   So the ultimate decision as to whether you're
23  going to put someone in custody is once again yours to
24  make?
25    A.   Correct.

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    Q.   And again they ran?

2    A.   He did.

3    Q.   And he didn't threaten you before he ran?

4    A.   No.

5    Q.   And Mr. Pierre Fulton didn't threaten you before

6    Mr. Scott ran, correct?

7    A.   I didn't talk to the passenger.

8    Q.   And neither one of them were belligerent to you at

9    the car, correct?

10   A.   No.

11   Q.   And Mr. Scott go give the story about him being in

12   the process of buying the car?

13   A.   He stated had he owned the car and he stated he

14   did not own the car and he was in the process of buying

15   it.

16   Q.   He said he was getting the car from a neighbor?

17   A.   I don't recall that.

18   Q.   And they were supposed to go to DMV Monday and

19   consummate that?

20   A.   That's correct.

21   Q.   And that's what he told you?

22   A.   He told me about the DMV on Monday, yes.

23   Q.   And he ran.  There's no question about it.

24   A.   Yes.

25   Q.   And it is true that someone would not normally run

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1    for an equipment violation?

2        A.   Not in my experience.

3        Q.   You've had people run for other traffic kind of

4    stuff but not for like an equipment violation?

5        A.   Correct.

6        Q.   In your experience as a police officer is having a

7    warrant a good reason that someone generally runs from

8    you?

9        A.   It's one of the reasons.

10       Q.   It certainly is one of the reasons because if

11   somebody's got a warrant and they know they got a warrant

12   and they know they're going to jail, it's normal for them

13   to run, correct?

14       A.   You could say that, yes.

15       Q.   And did you have any reason at the time to believe

16   that Mr. Scott had done anything to violate the law at

17   the time that he ran other than the insurance situation

18   and the ownership situation?

19       A.   When you conduct a traffic stop and somebody is

20   detained, so he was fleeing after being detained, and

21   when he got out of the car the first time, when I

22   instructed him to get back in the vehicle he was not flee

23   to leave, that was another reason.

24       Q.   I understand that, and then -- so he was not free

25   to leave?

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    A.    Correct.

2    Q.    But he ran.

3    A.    He did.

4    Q.    And you determined to chase him?

5    A.    Yes.

6    Q.    And you did chase him.

7    A.    I did.

8    Q.    And some ten to 15 seconds later you decided you

9  were going to use the Taser?

10    A.    I don't recall the time at the time.

11    Q.    And you told him that you were going to use the

12  Taser?

13    A.    I did.

14    Q.    And you took the Taser, your Taser out and yelled

15  Taser, Taser, Taser?

16    A.    I don't recall if I yelled at first then took it

17  out or I took it out and then yelled.

18    Q.    And at that time, had Mr. Scott done anything to

19  escalate the situation other than running?

20    A.    No.

21    Q.    And at that time had Mr. Scott done anything to

22  threaten you other than just trying to get away?

23    A.    No, not at that time.

24    Q.    Now, let's talk a little bit about the video.  And

25  I believe you've already conceded you are the officer on

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    that video, correct?

2        A.   That's correct.

3        Q.   And I believe you have also conceded that

4    Mr. Scott, the man with the green shirt on the video was

5    the man you killed.

6        A.   That's correct.

7        Q.   Would you concede from watching the video that

8    Mr. Scott did not have your Taser at the time that you

9    killed him?

10       A.   No.

11       Q.   You don't concede that?

12       A.   At the time I was there, I did not know.

13       Q.   I'm saying, from watching the video, sir, do you

14   concede that at the time that you shot Mr. Scott he did

15   not have your Taser?

16       A.   Yes, after learning information now, I do.

17       Q.   Okay.  Well, let's look at it.  I'd like to direct

18   your attention to State's Exhibit 237.  And I'd like to

19   ask you some questions regarding this video, if I could.

20            Let me go back to the beginning of this.  I want

21   to turn it up a little bit.  Did you hear the clicking

22   noise at the beginning of this?

23       A.   I did.

24       Q.   And that was you Taser, could you agree?

25       A.   I believe so.

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    Q.   And would you agree that was the last activation

2    of your Taser?

3    A.   I don't have the Taser log, no.

4    Q.   You don't hear it on here after that incident, do

5    you?

6    A.   I don't.

7    Q.   Okay.  This is the first time y'all come into view

8    on this other than the struggle on the ground.  This is

9    the first time that y'all come into view on this

10   videotape; is that correct?  That's at 13 seconds.

11   A.   I think at frame four maybe.

12   Q.   Pardon me?

13   A.   I think two frames back you can see.

14   Q.   Yes, there are frames back, but would you agree

15   this is the first time that you can see what's happening?

16   A.   No, I think you can see --

17   Q.   Well, let me go back a frame.

18   A.   I can see --

19   Q.   Okay.  Or another frame or another frame or

20   another frame or another frame or another frame.  Would

21   you agree that this is the first time you can see,

22   basically what happened?

23   A.   I think the frame before you can see.

24   Q.   Okay.  And you are grabbing Mr. Scott's right hand

25   with your left hand, correct?

┌─ **SC V. SLAGER – ROUGH DRAFT – 11–29–2016** ─┐

1    A.    Correct.

2    Q.    And Mr. Scott's hand, right hand, appears to be

3    empty?

4    A.    It appears to be.

5    Q.    Okay.  And we know that Mr. Scott had a phone in

6    his left hand, correct?

7    A.    Correct.

8    Q.    And would you agree he's not holding a Taser in

9    that scene shot?

10   A.    At the time?  No, but after looking at the video,

11   yes.

12   Q.    Okay.  And if you look down between your legs,

13   there appears to be a dark object there.  Do you know

14   what that is?

15   A.    It could be my shoe.

16   Q.    Could be.  Could be the Taser too, couldn't it?

17   A.    It could be, yes.

18   Q.    Okay.  And your right leg goes back towards,

19   correct?

20   A.    It might go to the side --

21   Q.    It might go to the side but it might go backwards

22   too, correct?

23   A.    It could, but I don't recall.

24   Q.    Okay.  Let's see where it ends up.  Okay.  Now

25   would you agree your right leg is behind you?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    A.    With the angle of the camera it could be to the

2  side.

3    Q.    Okay.  And what is that thing rolling along the

4  ground behind you?

5    A.    That would be the Taser.

6    Q.    Okay.  And what is Mr. Scott doing now?

7    A.    He's moving away.

8    Q.    So would you agree that this -- at this time he is

9  not armed and he is running away from you.

10    A.    Like I stated, at the time, before, I would say

11  no, but after watching the video, yes.

12    Q.    Okay.  Would you agree that Mr. Scott was roughly

13  in that position when you had you fire the first shot?

14    A.    When I fired the first shot.

15    Q.    Yes.

16    A.    At the time I would say no.  After watching the

17  video I would say yes.

18    Q.    You appear to be looking down at the ground behind

19  you there.  Would you tell us what you're looking at?

20    A.    Yes.  After firearms qualification we're trained

21  to scan, to look to the left and to the right.

22    Q.    Are you trained to scan them on the ground?

23    A.    I don't think I was looking to the left and right.

24  I don't recall where I was looking if I was looking to

25  the ground consider my head might be down but my eyes

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    might be looking this way.

2    Q.   Do you agree that you appear to be looking down

3    and you appear to be looking behind you?

4    A.   The video, yeah, it appears to do but I don't

5    think that's true.

6    Q.   Okay.  Now, I believe at this time you said you

7    did not know if Mr. Scott was armed or not.

8    A.   Correct.

9    Q.   Correct?  Aren't you generally trained when you're

10   approaching someone that you think might be armed you are

11   trained to have your weapon on them it and aimed in case

12   in fact he's armed and he turns around to shoot you?

13   A.   Yeah, (C) but in this situation everything leading

14   up to the shooting, I was tired, I ran 200 yards, I was

15   in a fight on the ground, Mr. Scott was coming after me

16   with the Taser twice.  In my mind, I don't -- my mind was

17   like spaghetti.

18   Q.   You were in the fight still?

19   A.   I was in the fight, yes.

20   Q.   Because you had been provoked.

21   A.   I'm sorry?

22   Q.   Because you had been provoked, right?

23   A.   No.

24   Q.   Oh, you hadn't been provoked?

25   A.   No.

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    Q.    Okay.  So you don't consider Mr. Scott coming at

2    you with a Taser as being provoked?

3    A.    To defend myself?  Self-defense, yes.

4    Q.    Or provoked period.

5    A.    No.  I was doing my job.

6    Q.    Okay.  Who are you yelling at there?

7    A.    We're trained in training and also active shooter

8    training to make loud verbal commands for a subject to

9    put their hands behind their back.

10    Q.    You sound like you could be angry there, but it

11    you're not angry, right?

12    A.    No, I was giving loud verbal commands like I was

13    trained to do.

14    Q.    To the corpse?

15    A.    I'm sorry?

16    Q.    To the corpse?

17    A.    At that time I did not know if Mr. Scott was

18    armed, I didn't know if Mr. Scott had passed.

19    Q.    And you handcuffed him, right?

20    A.    I did.

21    Q.    And that's what you're trained to do?

22    A.    Yes.  Department policy says that's what we're

23    supposed to.

24    Q.    Didn't search him for a weapon?

25    A.    If I recall when I was handcuffing him I was

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    looking at his waistband on his back.

2        Q.    Didn't roll him over to see if he was on a weapon?

3        A.    Did not.

4        Q.    Didn't look for the Taser?

5        A.    After I handcuffed him I looked for my Taser.

6        Q.    And just to be clear, that is your Taser that you

7    picked up?

8        A.    That is correct.

9        Q.    Okay.  And that is the same Taser that we just saw

10   that was eight feet behind you when the shooting started?

11       A.    At the time of the shooting I didn't know the

12   Taser was behind me.

13       Q.    I'm talking about what the video shows.  Is that

14   the same Taser that was eight feet behind you at the time

15   the shooting started?

16       A.    That's correct.

17       Q.    All right.  And who is that arriving?

18       A.    That's Officer Habersham arriving calling for his

19   kid to render aid to Mr. Scott.

20       Q.    Okay.  We're going to back that up because that's

21   kind of hard to miss, isn't that, sir?

22       A.    I'm sorry?

23       Q.    It's kind of hard to miss, isn't it?

24       A.    Miss Habersham rendering aid?

25       Q.    No, miss what you did with that Taser it's kind of

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    easy to miss, isn't it?  This is the part I'm talking

2    about that is pretty easy to miss?

3        A.   Okay.

4        Q.   And what is dropping out of your right hand?

5        A.   It appears to be the Taser.

6        Q.   Okay.  Would you agree by this time Mr. Santana

7    moved around and was in clear view of you?

8        A.   Appears to be.

9        Q.   And clearly taping you at this point?

10        A.   It appears to be, yes.

11        Q.   And that's when you decided to pick up the Taser?

12        A.   That's when I picked up the Taser, yes.

13        Q.   Now -- and would you agree that you know where all

14    that videotape, did you ever administer any first aid to

15    Mr. Scott other than walk up to him at one point and

16    check his pulse?

17        A.   I did not.  When I came back, Officer Habersham

18    was administering first aid and at that time, you know, I

19    had run -- I had been in that whole fight, the whole

20    situation, and I don't remember what happened after that.

21    I don't remember dropping the Taser.  I don't remember

22    anything.

23        Q.   Well, you have a pretty clear recollection what

24    went on here.  It seems like you're just not remembering

25    the things that are bad for you?

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    A.   Some things I remember, I don't remember Walter

2  Scott on top of me.  I don't remember Walter Scotts arm

3  around my neck, certain things -- I don't remember the

4  ground fight.

5    Q.   We're going to go into some of that stuff in some

6  depth.  We're going to start talking about that.  After

7  this incident, you told lieutenant Bowman what happened,

8  correct?

9    A.   Yes.  He asked me what happened and I told him the

10  best of my knowledge and the best of my memory what

11  happened.

12    Q.   And you told him pretty much what you testified to

13  today except you told him that you drive stunned him

14  twice?

15    A.   I don't have the statement.  I need to look at

16  that.

17    Q.   Okay.  I believe you said pretty much the same

18  thing, you stopped him, he ran, you chased him, you Tased

19  him once it didn't work you Tased him again he locked up,

20  went on the ground, continued to struggle with you and

21  you drive stunned him once in the side and once in the

22  back.

23    A.   Like I said, I need to look at that statement.

24    Q.   Okay.  And would you agree that your Taser was

25  activated six different times on that occasion?

94

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    A.   Yes, it was.

2    Q.   And referring to State's Exhibit 14, have you seen

3 that before?

4    A.   Yes, I have.

5    Q.   Okay.  And that is basically the activation times

6 for the Taser; is that correct?

7    A.   Yes, it is.

8    Q.   And there's a short two second one at the

9 beginning of the day, was that a spark test?

10   A.   Yes, it was.

11   Q.   And what is a spark test again?

12   A.   When we come on shift in the morning, we take the

13 cartridge out and we turn it on just to make sure the

14 unit is working.

15   Q.   Okay.  And you did that that morning, correct?

16   A.   Yes, I did.

17   Q.   And then it shows a five second burst from 9:36:26

18 to 9:36:31, that is the one that had no effect on

19 Mr. Scott?

20   A.   Yes, I think so.

21   Q.   Okay.  And then it shows a second eight seconds

22 later it shows a second deployment that went from 9:36:39

23 to 9:36:44, another five section burst; is that correct?

24   A.   Correct.

25   Q.   Followed one second later by a section five second

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1  burst, correct?

2      A.  Correct.

3      Q.  Okay.  And that is the Taser deployment that

4  brought Mr. Scott down, correct?

5      A.  Yeah, to my knowledge.  At the time, yes, but now,

6  after looking at the evidence, I don't think it did.

7      Q.  I believe what you said to the officers on the

8  scene and Lieutenant Ghent and Angela Peterson was that

9  he locked up and went down?

10     A.  I said that, yes.

11     Q.  Okay.  And what did you mean by locked up?

12     A.  He became stiff and fell down.

13     Q.  Which is what happens when someone is Tased and

14  NMI is achieved, correct?

15     A.  Right.

16     Q.  And then it shows a six second gap?

17     A.  Yes.

18     Q.  And then another Taser deployment, correct?

19     A.  Correct.

20     Q.  And then there's a 24 second gap and then another

21  Taser deployment, correct?

22     A.  Correct.

23     Q.  And then there's a three second gap and a final

24  Taser deployment, correct?

25     A.  Yes, that's correct.

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    Q.    And -- which I believe is the last one we hear on
2    that video, correct?
3    A.    It appears to be, yes.
4    Q.    And when you talk to lieutenants Ghent and
5    Peterson son April the 7th, would you agree that you told
6    them that you never smelled any marijuana or suspected
7    that Mr. Scott had any guns or suspected Mr. Scott had
8    any illegal drugs or anything of that nature?
9    A.    At the time, yes.
10   Q.    Okay.  And I believe you acknowledged that you
11   didn't have an opportunity to run his license and his
12   criminal history, correct?
13   A.    Correct.
14   Q.    So you didn't know that Mr. Scott had a child
15   support warrant, correct?
16   A.    No, I also didn't know he was armed and dangerous
17   and violent tendencies.
18   Q.    Oh, he was, huh?  How was he armed and dangerous?
19   A.    That's something I learned later.
20   Q.    Okay.  And for what?
21   A.    I'm sorry?
22   Q.    For what?
23   A.    I --
24   Q.    Because he had a simple assault conviction 25
25   years before, correct?

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─

1    A.  I don't.

2    Q.  Is that what you're talking about when you said

3    you wouldn't get out of the car because he had a simple

4    assault conviction 25 years before?

5    A.  No, sir.  What happens is when you run the

6    computer program, NCIC, it comes back -- been ALERT will

7    come back.

8    Q.  Right?

9    A.  And it will say armed and dangerous with violent

10   tendencies.

11   Q.  Right?

12   A.  So at that point --

13   Q.  I understand that --

14          MR. SAVAGE:  Allow the witness to answer the

15   question.

16          MR. DuRANT:  I'm list letting hip answer the

17   question.

18          MR. SAVAGE:  I object.

19          MR. DuRANT:  The fact of matter is he already

20   testified that he had not run his he criminal history.

21          THE COURT:  The objection is sustained.

22          MR. SAVAGE:  Thank you, Your Honor.

23          THE COURT:  Allow the witness to answer the

24   questions.

25   BY MR. DuRANT:

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    Q.   Had you run his criminal history?

2    A.   I did not.

3    Q.   Okay.  You have seen his criminal history since

4  then, have you not?

5    A.   I have seen it since this occurred, yes.

6    Q.   And he doesn't have a history for being armed and

7  dangerous, does he?

8    A.   I don't know.

9    Q.   You've seen the rap sheet?

10   A.   I have.

11   Q.   The only thing that he had on his rap sheet in the

12  last 25 years was for child support and traffic?

13   A.   Something -- if I remember correctly he had said

14  about a bludgeoned object, I don't know.

15   Q.   In 1989, correct?

16   A.   I would have to see that.

17   Q.   And so when you blurt out that he was armed and

18  dangerous, that's why he was armed and dangerous; is that

19  correct?

20   A.   I don't know -- I haven't read the report.  I need

21  to recall that rap sheet.

22   Q.   But you have seen the rap sheet?

23   A.   A couple months ago, yes, sir.

24   Q.   Uh-huh.  Okay.  And you knew that he had a phone

25  in his hand while you were chasing him?

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1    A.    Correct.

2    Q.    You saw the phone in his hand?

3    A.    Correct.

4    Q.    You heard people talking to him through the phone

5    in his hand?

6    A.    Correct, because he was on speaker phone.

7    Q.    Right, and telling him to do what you said,

8    correct?

9    A.    Correct.

10    Q.    During the chase never threatened you, correct?

11    A.    I'm sorry?

12    Q.    During the chase in Tase one and Tase two never

13    turned around and confronted you?

14    A.    Yes, he did.

15    Q.    During the chase and before Taser one and Taser

16    two are you changing your story now.  Now you're saying

17    he did turn around and after you gave him 50 thousand

18    volts and he locked up on the ground?

19    A.    I'm sorry.  I thought you said the whole incident

20    I didn't know you were you can talking about between

21    Taser one and Taser two.  So between Taser one and Taser

22    two he was running away.

23    Q.    And then we get to him being on the ground.

24    A.    Correct.

25    Q.    You only had two cartridges with you that day,

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1   correct?

2       A.   Yes, I did.

3       Q.   And you had used both of those cartridges correct?

4       A.   Correct.

5       Q.   And you had ejected both of those cartridges from

6   your Taser?

7       A.   Correct.

8       Q.   Before Mr. Scott gained possession of it?

9       A.   Correct.

10      Q.   So at that point, that Taser was a threat in drive

11  stun mode only, correct?

12      A.   To me, yes.

13      Q.   Now, you said that Mr. Scott jerked the Taser out

14  of your hand?

15      A.   Yes.

16      Q.   And toned it towards you, correct?

17      A.   Correct.

18      Q.   Was that when you were on the ground or was that

19  after you all stood up?

20      A.   We were on the ground.

21      Q.   Okay.  And then y'all stood up?

22      A.   Yeah, because I was trying to get away from him

23  when he was coming after me with the Taser, coming at me

24  with the Taser.

25      Q.   Kind of like he was trying to get away from you

┌─ **SC V. SLAGER – ROUGH DRAFT – 11-29-2016** ─┐

1    earlier, correct?

2        A.    No.    He was coming towards me, if he was trying to

3    get away he would have gone the other way, so he was

4    coming towards my with the Taser.

5        Q.    I'm talking about from advance auto all the way

6    from the time you Tased him twice would you agree he had

7    done nothing at that point other than try to get away

8    from you.

9        A.    Correct.    He was fleeing.

10       Q.    Okay.    And would you agree that you -- after you

11   drive -- you Tased him and you locked up, you drive

12   stunned him once, at least once and perhaps twice, based

13   upon your previous statements?

14       A.    Once, perhaps twice.

15       Q.    And have you ever been Tased?

16       A.    Yes, I have.

17       Q.    And does that feel good?

18       A.    No, it does not.

19       Q.    And you haven't barb Tased and drive stunned or

20   both?

21       A.    Both.

22       Q.    Okay.    And when you were getting Tased with the

23   drive stun, what is your natural reaction?

24       A.    To get away.

25       Q.    To make it stop, right?

┌─ SC V. SLAGER – ROUGH DRAFT – 11-29-2016 ─┐

1    A.   Right.

2    Q.   To get away.  And that's what Mr. Scott was doing,

3  wasn't he?

4    A.   He wasn't complying the whole scenario.

5    Q.   He was trying to get away?

6    A.   He would any -- he never stopped, after I gave him

7  multiple commands to stop, even before the Tasing.

8    Q.   Now -- and you told Lieutenant Ghent and Agent

9  Peterson that he was on his feet coming at you with the

10 Taser extended?

11   A.   Correct.

12   Q.   And would you agree that you were focussed on that

13 Taser?

14   A.   I was focussed on him and the Taser and I can see

15 the Taser coming at me when we were on the ground.

16   Q.   Okay.  And I wasn't clear from your direct

17 testimony.  Are you saying that he Tased you or didn't

18 Tase you or what?

19   A.   That whole situation, I don't remember everything

20 that happened.  Some things I remember and some things I

21 don't.

22   Q.   You would agree that you never told anybody that

23 he had Tased you, correct?

24   A.   That's correct but I told Sergeant Webb and

25 Driggers when he turned the Taser around and he was

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    coming at me.  I told him at the scene.

2      Q.  I think you told everybody that he turned it

3    around and was come being at you toward it but you never

4    told anybody that he Tased you with it, correct?

5      A.  I might not have remembered in the fight, some

6    things I don't remember.

7      Q.  And do you recall telling them -- again, I'm back

8    to Ghent and Peterson, that you located the Taser in

9    between where you shot and where Mr. Scott came to rest

10   on the ground?

11     A.  I did.  When I told them that three days later, I

12   wasn't out there measuring distances.  I wasn't out there

13   measuring where the shell casings were.  I wasn't

14   measuring where the Taser was, so this, to the best of my

15   knowledge the best I remember so I can't give an exact

16   distance where it was, but from what I thought and what I

17   remember, that's what I told them (distance).

18     Q.  Okay.  But you have to acknowledge that

19   Mr. Scott's hat was right there, right where you were

20   shooting and his body was 55 feet away and it wasn't

21   found in between those two Landmarks was it?

22     A.  No, it wasn't.

23     Q.  And you also told him that you picked up the Taser

24   and put it in your holster?

25     A.  Correct.

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    Q.    Because you were concerned that somebody may be

2    coming to help Mr. Scott.

3    A.    Correct.

4    Q.    And that was true, correct?

5    A.    What was true?

6    Q.    That you eventually put it in your holster because

7    you thought somebody was coming, but you neglected the

8    part about dropping it by Mr. Scott's body; is that

9    correct, would you agree with that?

10    A.    Yeah.  At that time, I don't remember that

11    happening.  You know, I grabbed the Taser off the ground,

12    like you stated because somebody else coming, where the

13    passenger was, who Mr. Scott was talking to on the phone,

14    and I don't -- you don't leave a weapon in the middle of

15    a field like that, so I picked it up and I don't know why

16    I dropped it on the ground, but I did pick it up seconds

17    later.  It wasn't because I was policing my gear.  I

18    can't even answer to that.

19    Q.    Yeah, I have no problem with you consolidating

20    your gear, sir if you pick it up and put it in your

21    holster, that's how you consolidate it, correct?

22    A.    You also consolidate on the scene too.

23    Q.    What?

24    A.    Consolidate on the scene.

25    Q.    Sir, if you're going to secure your Taser, you

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1  pick it up from the ground and you put it where?

2      A.   In my holster.

3      Q.   Do you agree that when you talked to Ghent and

4  Peterson that you never told them that you thought

5  Mr. Scott had a weapon?

6      A.   Rephrase that question.

7      Q.   Do you agree that you never told Agents Ghent and

8  Peterson that you thought Mr. Scott had a weapon, other

9  than your Taser, I into he about your Taser, correct?

10     A.   Yes.  I think I did state to them that I didn't

11 know if he had anything else on him.

12     Q.   And that you never saw him, you know, throwing

13 down drugs or anything like that that Mr. Savage has

14 intimated 15 or 20 times during this trial?

15     A.   Well, when we ran around the corner with the fence

16 and the foliage I lost sight of Mr. Scott and with that

17 arm movement I don't know what he was doing, was he

18 trying to SWAT --

19     Q.   His arm movement as you described as doing this?

20     A.   Correct.

21     Q.   Okay, take that many times to throw something to

22 the ground beside you?

23     A.   I don't know, sir.

24     Q.   The fact of the matter is you're starting to make

25 up things as we go along, aren't you?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

```
 1      A.   No.

 2      Q.   Never said that a year-and-a-half ago?

 3      A.   I need to look at the report.  I'm pretty sure I

 4 told Angela Peterson that.

 5      Q.   Never said anything that you were afraid he was

 6 going to run and hide behind a tree and shoot you with a

 7 gun?

 8      A.   I need to look at that report.

 9      Q.   Any said anything about him punching you?

10      A.   No, like I said, we were rolling around on the

11 ground and, you know, he was on top of me.

12      Q.   Never said anything about that, did you, him being

13 on top of you?

14      A.   No, because I don't remember that.

15      Q.   Okay.  Never said anything about him kicking you?

16      A.   No.

17      Q.   Or scratching you, correct?

18      A.   The kicking part, like I said we were in a fight

19 on the ground.  I don't remember everything that

20 happened.

21      Q.   Okay.  Or biting you?

22      A.   I don't think he bit me.

23      Q.   Or cursing you?

24      A.   I don't -- I don't recall what -- some of the

25 things Mr. Scott said and what I said, I don't recall
```

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1   some of them.

2       Q.  Or Tasing you?

3       A.  No.  I stated on the scene that he grabbed my

4   Taser and I showed officers what he did and he was coming

5   after me, so I don't, you know, recall what happened.

6       Q.  I understand, and you testified to that.  I'm

7   saying what you didn't tell me, okay, and would you agree

8   that you didn't tell them this stuff?

9       A.  Direct and the reason I probably didn't say

10  anything is because I don't remember it happening.

11      Q.  Or that he had gotten on top of you?

12      A.  That's correct.  I never told anyone that because

13  I don't remember.

14      Q.  Or that he had you in a head lock, never said

15  anything about that?

16      A.  No, I don't remember.

17      Q.  Or that he had you in a choke hold?

18      A.  I don't remember that, sir.

19      Q.  Or that he had ever at any point during this

20  donnybrook had any kind of tactical advantage over you at

21  all?

22      A.  Like I stated, we were rolling around on the

23  ground, fighting, and I don't remember everything that

24  happened.

25      Q.  You described it as him wiggling and trying to get

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    away?

2        A.   Correct, he was.

3        Q.   Did agent Peterson go over her notes with you?

4        A.   She read them back to me.

5        Q.   When she read them back to you, did you agree that

6    that is what happened?

7        A.   I think -- I know Mr. Aylor said we had to end the

8    meeting so we left.  I don't recall.

9        Q.   So you don't recall whether or not she went over

10   her notes with you line by line for some 45 minutes?

11       A.   I don't recall.

12       Q.   Okay.  And do you recall telling her that that was

13   a true and accurate account of what had happened to you

14   that day?

15       A.   I don't recall.

16       Q.   So it's your testimony today that you believe

17   Mr. Scott had the Taser as he ran away from you, correct?

18       A.   Yes, that's correct.

19       Q.   And would you agree that that Taser in its current

20   state at that time was not a threat to you from a

21   distance?

22       A.   No.

23       Q.   Okay.  And could you explain to the jury how that

24   Taser was a threat to you at a distance.

25       A.   At that time when Mr. Scott was coming after me

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─

1   with the Taser, I drew my weapon and fired.  I was

2   focussed on the front sight and that's all I know.  I

3   know, you know, he tried to Tase me when we were on the

4   ground.  I'm backing away, getting away he's still coming

5   after me with the Taser and at that point I made the

6   decision to use lethal force but Mr. Scott never stopped.

7   He was always dangerous.

8       Q.  18 feet away from you he was still dangerous with

9   that Taser?

10      A.  At that point when I started shooting -- I didn't

11  know what was going on with distance I didn't know what

12  was going on with all that so I fired my firearm until

13  the threat was stopped.

14      Q.  So you can't change your mind.

15      A.  I'm sorry?

16      Q.  You can't change your mind?

17      A.  I made that decision.  I did it.

18      Q.  And you would acknowledge that he was 18 feet away

19  from you when you fired the first shot?

20      A.  At that time, on April 4th, 2015 I can't tell you

21  that, but now, 18 months later, sitting in a courtroom

22  and hearing everybody's testimony, he was 17, 18 feet

23  away.

24      Q.  18 feet when the first shot was fired, some 40

25  feet away when the last shot was fired, and it was a nice

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1   long pause between seven and eight, was there not?

2       A.   I watched the video.   There was.

3       Q.   Would you agree that even if Mr. Scott had that

4   Taser it could not have been used against you at the

5   distance depicted on that video?

6       A.   At that time, I didn't have that information, so I

7   can't answer that question.

8       Q.   That wasn't my question, sir.  I wasn't asking

9   what was in your mind at that time.  You've seen the

10  video.

11      A.   I have.

12      Q.   And you've heard that he was 18 feet away.  Would

13  you agree that he was not a threat to you with that Taser

14  without a cartridge from that distance?

15      A.   No.

16      Q.   Okay.  So you're going to stick that that.

17      A.   Yes, and the reason is, from 18 feet, he could

18  have turned around and attacked me again, and they would

19  have been able to Tase me --

20      Q.   Come on down.  Okay.  In your training-e ever size

21  Mr. Savage went through with you, y'all were about this

22  far apart?

23      A.   A little farther.

24      Q.   Okay.  I'll give you that.  That far apart.  Okay?

25  And the test was, could you shoot him before he Tased

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    you.

2        A.   Correct.

3        Q.   Okay.  Both of you have weapons in your hand at

4    the time or did you have to draw?

5        A.   I have to draw from the holster.

6        Q.   Okay.  So you have to draw from the holster.  This

7    guy's got the weapon in his hand, okay?

8        A.   Correct.

9        Q.   So, yes, he has to make one step to get to you,

10   correct?

11       A.   Correct.

12       Q.   Would you agree -- pull it tight, that this is a

13   difference perspective?

14       A.   It is a different perspective, yes, now it is.

15       Q.   And could you tell me, assuming I had the Taser in

16   my right hand or left hand and I am in this position 18

17   feet away could you tell the jury how you were threatened

18   with it?

19       A.   At the time, that decision was made when Mr. Scott

20   was 27 inches, toe to toe, leaned at the waist right hand

21   extended.

22       Q.   Yes, but you didn't shoot him then did you?

23       A.   I pulled my issued Glock out and shot.

24       Q.   As he was at a dead run, correct?

25       A.   I did it as fast as I could.

```
┌─ SC V. SLAGER – ROUGH DRAFT – 11-29-2016 ─┐
```

1    Q.   You may resume your seat.  Thank you, sir.  And

2    regarding the radio transmission which you made, 223

3    dispatch, shots fired, suspect down, he grabbed my Taser,

4    that's what you said, correct?

5    A.   That's correct.

6    Q.   Would you agree that you said he grabbed my Taser,

7    you never said he took my Taser.

8    A.   To me it's the same thing, if you grab something,

9    if you grab an object, same thing as took.

10   Q.   But it could also mean something else, couldn't it

11   that I had grabbed the Taser and didn't take it?

12   A.   Not meet.

13   Q.   Because it could also mean that as he was getting

14   the heck drive stunned out of him he grabbed your Taser

15   trying to get it away from him?

16   A.   Not to me, no.

17   Q.   Okay.  And we've been through Mr. Savage went

18   through your use of force incidents and we're not going

19   to plow through that again in depth, but you would agree

20   that you had 18 use of force incidents in just over four

21   years?

22   A.   That's what -- do you have the use of form paper I

23   can confirm with?

24   Q.   Pardon me?

25   A.   I need to look at the --

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─

1    Q.   Do you still not have your notes with you?

2    A.   Yeah, I do right here.

3    Q.   Okay.

4    A.   That seems about right.

5    Q.   And 14 of those involve Taser use, correct?

6    A.   One was just presenting the Taser, not using it,

7    the other one was the other officer used a Taser, and I

8    think there's a third, fourth one of the other officer

9    using a Taser.  I did not use the Taser.

10   Q.   It's true basically that these things are

11   investigated by your sergeant, correct?

12   A.   Yeah -- from what I know is it goes from my

13   sergeant to lieutenant and then up the chain of command

14   all the way to internal affairs.

15   Q.   Right, and your sergeant writes it up and it's

16   rubber stamped on up the chain of command to the chiefs

17   of police, pretty much?

18   A.   I don't know what the lieutenant or above does

19   with these reports.  All I know is when there's use of

20   force, the sergeant interviews all officers on scene,

21   talks to the subject, looks at video and does the report.

22   Q.   If the subject is available and if the video is

23   available, correct?

24   A.   I'm pretty sure that subject is available.

25   Q.   And wouldn't it be safe to say that sometimes the

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    suspect's version of what happens differs from the police

2    officer's version of what happens?

3        A.   It could be, yes.

4        Q.   And routinely those kind of uses of force are

5    approved?

6        A.   I don't know.  I don't have any insight of what

7    the lieutenant above think about use of force.

8        Q.   Because basically the fox is guarding the hen

9    house?

10       A.   I don't know anything about that.

11       Q.   And just a for instance you mentioned one where

12   you went to the house looking for the burglary suspect?

13       A.   Correct.

14       Q.   And you knocked on the door and he opened the

15   door?

16       A.   Correct.

17       Q.   And he said he wasn't who you were looking for and

18   he didn't want to talk to you and shut the door and you

19   forced your way in and Tased him.

20       A.   It didn't happen like that.

21       Q.   Okay.  And he wasn't the suspect you were looking

22   for, was he?

23       A.   No, he wasn't.

24       Q.   Now, he might have a different view of whether or

25   not your use of the Taser was okay in that case, wouldn't

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    he?

2        A.    Everybody has their own view, yes.

3        Q.    And the other one you talked about, about the guy

4    that had been stopped in the Mercedes by another officer

5    and -- for DUS and there were four officers there, you

6    and another officer dragged him out of the car, after --

7    after you dragged him out of the car a third officer

8    arrived and that guy was being held down on the asphalt

9    with one cop on each side of him holding his arms when

10   you said back up I'm going to Tase him and Tased him in

11   the back?

12       A.    I did.

13       Q.    So -- and that was approved by the North

14   Charleston police department, correct?

15       A.    I guess it was.

16       Q.    So -- and I'm not saying that there's anything

17   wrong about that, but the use of your Taser can also say

18   something about your temperament, can't it?

19       A.    No, because the ones we went over today, the

20   subject was physically assaulting the victim or someone

21   else and --

22       Q.    Sometimes they were, sometimes they weren't?

23       A.    Right.

24       Q.    Sometimes they were just running?

25       A.    And the safest is the Taser.  So I don't want to

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1  get into a fight with a person when I can use a Taser

2  that's going to cause less harm to that person than me,

3  than an actual fist fight.

4     Q.  Or you could in this case and I know Lieutenant

5  Humphries wouldn't agree to it, but you could have just

6  taken his license, his car, and if I wanted to arrest him

7  for anything, you could have gotten a warrant and

8  arrested him?

9     A.  At that time I didn't have any charges on him

10  except he was not free to leave.

11     Q.  Well, you know, you thought it was serious enough

12  that you chased him and Tased him?

13     A.  That's what police officers do.

14     Q.  Okay.

15     A.  That's our job, we can't just ignore crime.

16     Q.  Well, yeah, I guess that's true except you didn't

17  really have any information that he committed a crime

18  other than traffic stuff.

19     A.  I think I stated had he was detained at the

20  traffic stop.  When he got out of the vehicle he was

21  instructed to sit back in the car and he was not free to

22  leave.

23     Q.  And are you trained to de-escalate situations?

24     A.  I haven't have any de-escalation training, no.

25     Q.  Do you think that's a good thing for officers to

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1   de escalate?

2       A.   Yes, the training is useful, yes, but like I say I

3   haven't had any training.

4       Q.   In behind sight do you think you made good

5   decisions that day even though it was within policy?

6       A.   With all the facts and information that I had at

7   that time, yes, but then going back, 18 months later and

8   looking at everything, things could have been different.

9       Q.   And getting back to the use of force incidents and

10  the review, your immediate sergeant on the day of this

11  since again was Sergeant James Gann, correct?

12      A.   Yes.

13      Q.   And are were you aware he wrote a report clearing

14  you on April the 6 of 2007 of any violation of policy

15  before this video came out?

16      A.   I haven't seen that report, no.

17      Q.   Now, you would agree, would you not, sir, that you

18  are human like the rest of us?

19      A.   Yes.

20      Q.   And would you agree that you encounter times of

21  happiness and sadness and despondency, just like anybody

22  else?

23      A.   Yeah, I think everybody does.

24      Q.   And would you agree that just like everybody else,

25  when you're provoked, you get angry?

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    A.   Not as a police officer, no.

2    Q.   So you're immune from becoming angry because you

3    are a police officer?

4    A.   You can't take the work home with you, and you

5    can't do that because every day -- it happens every day.

6    Q.   I understand that, so your testimony is that when

7    a suspect fights with you?

8    A.   Yes.

9    Q.   That you do not have any emotional reaction at to

10   that at all?

11   A.   No, I'm not angry.  I'm just doing my job.

12   Q.   And so never get angry, never get frustrated?

13   A.   No.

14   Q.   Never get any of that because you're immune from

15   that when you put on the blue?

16   A.   People aren't -- I'm not immune from it, I've

17   learned over the years not to take it to heart.

18   Q.   Okay.  And you're obviously an emotional guy

19   because you were shedding tears on direct during today's

20   testimony, correct?

21   A.   Correct.

22   Q.   You didn't shed a tier on April 4, 2015, did you?

23   A.   That's a whole different situation to the fact

24   that everything that led up to that, the stress, my mind

25   was like spaghetti, a different kind of incident.  (Led

SC V. SLAGER – ROUGH DRAFT – 11–29–2016

1    up.

2             MR. DuRANT:  Court's indulgence.  Would you

3    please answer any questions Mr. Savage has for you.

4             THE COURT:  Redirect in.

5             MR. SAVAGE:  Briefly.

6             THE COURT:  Yes, sir.

7             REDIRECT EXAMINATION

8    BY MR. SAVAGE:

9      Q.  Mr. Slager, I want to be sure that the jury is

10   clear on the distinction between knowledge today and the

11   knowledge you had when you employed lethal force against

12   Mr. Scott.

13     A.  Okay.

14     Q.  I want you to look at page eight of the 24 page

15   record of Mr. Scott of the information you did not have

16   on April 4th.  Did you put any information to the FBI's

17   history of Mr. Scott?

18     A.  No, I did not.

19     Q.  What did the FBI say on April 4 of 2015 about

20   Mr. Scott?

21     A.  Wanted person, caution, armed and dangerous,

22   violent ten densities.

23     Q.  Did you have that knowledge on April 4th?

24     A.  I did not.

25     Q.  Would you have gotten out of your patrol car if

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─

1    that information had come on your computer screen?

2        A.    Absolutely not.

3        Q.    There is some question here about your knowledge

4    of a video.  Are you familiar or were you familiar over

5    the years with Craig Street and the yellow brick road

6    area?

7        A.    I am, yes.

8        Q.    Is that area under surveillance by private

9    residences and businesses?

10       A.    I'm pretty sure there's the Auto Zone store at the

11   corner, there's a couple other businesses then off of

12   yellow brick road there's an apartment complex that has a

13   really big sign that says under individual year

14   surveillance or video surveillance, something like that.

15       Q.    It says under video surveillance?

16       A.    Either that or video surveillance or cameras to

17   that effect, yes.

18       Q.    On April 4, 2015?

19       A.    Yes.

20       Q.    On the location exactly where this incident took

21   place?

22       A.    Correct.

23       Q.    Since we have been talking about what you know now

24   from the videotape and audiotape, did you acknowledge

25   today continuously instruct Mr. Scott to get on the

┌─ SC V. SLAGER – ROUGH DRAFT – 11–29–2016 ─┐

1  ground?

2      A.  Yes.

3      Q.  Did you curse him?

4      A.  No, I did not.

5      Q.  Did you use any racial epithets?

6      A.  No.

7      Q.  Did you do anything to indicate that you were

8  angry at him other than for him to get on the ground?

9      A.  No.

10     Q.  Did he yell at you do you know now after listening

11 to the audiotape?

12     A.  After listening to the audio, yeah.

13     Q.  Did you learn that he said fuck the police?

14     A.  Yes.

15     Q.  Did you react to that?

16     A.  No, I did not.  I don't remember.

17     Q.  And did you warn him before these shots were fired

18 just as you had warned him about the use of your Taser?

19     A.  Yes.  You can hear on the video.

20     Q.  The prosecutor asked you if you had feelings like

21 other human beings.  As part of your responsibilities of

22 a police officer, are you trained to control your

23 emotions?

24     A.  Yes.

25     Q.  So the type of disparaging remarks that were made

SC V. SLAGER – ROUGH DRAFT – 11-29-2016

1  to you that day is part of the job?

2      A.  That's correct.  It's part of job.

3      Q.  People who drink that say that.  People who are

4  high say that.  People who are angry say that.  You hear

5  it all day long.

6      A.  Yes.

7      Q.  F the police?

8      A.  Multiple times a day.

9      Q.  People wear it on their T-shirts?

10      A.  Yes.

11      Q.  Now, Mr. Slager, look at this jury and tell them

12  whether you were happy on April 4th or whether you have

13  been happy any day since April 4th?

14      A.  I was happy before on the th because Easter was

15  the next day and I had off the few days, spend time with

16  my family and after April 4th, it's been a role ter

17  coaster.  Can't sleep, nightmares.  When I was in jail,

18  the only thing they wanted to do was give me medicine to

19  calm down.  They wouldn't even talk to me.  I remember

20  the doctor who is in charge of mental health came into my

21  cell and said I, I'll give you whatever medicine you

22  want, so, you know, it was a roller coaster.  My family

23  has been destroyed by this.  The Scott many family has

24  been destroyed by this.  It's horrible.  You know, I

25  don't know.  I just --

┌─ **SC V. SLAGER – ROUGH DRAFT – 11–29–2016** ─┐

1    Q.   When you were in jail who was in the cell next to

2    you?

3    A.   Dylan Roof.

4         MR. SAVAGE:  Answer any questions the

5    prosecutor might have.

6         THE COURT:  Recross?

7         MR. DuRANT:  I have nothing further, Your

8    Honor.

9         THE COURT:  All right.  You may step down.

10        Ladies and gentlemen:  We're going to take

11   one hour for lunch at this time.  Please do not discuss

12   the case.

13        (In open court, jury not present.)

14        THE COURT:  Mr. Savage, how many more

15   witnesses do you anticipate?

16        MR. SAVAGE:  We still have an outside chance

17   of today, Your Honor, but it's growing dim, but I

18   would -- if we go into tomorrow -- there's falsity in the

19   numbers.  We have one, maybe two witnesses that might be

20   of any significant length of time and three or four that

21   will be ten minutes.  Andy's ten minutes.

22        THE COURT:  All right.  Well, we'll reconvene

23   in one hour.

24        (Recess taken.)

25             AFTERNOON SESSION