**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 2:16-cr-00378-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| MICHAEL SLAGER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on the sentencing of defendant Michael Slager ("Slager"). The court held a lengthy sentencing hearing from December 4–7, 2017, during which the parties presented expert and eyewitness testimony, along with other evidence. There are four major disputes, all of which involve issues of law. The first dispute is the appropriate base offense level required by United States Sentencing Guidelines ("U.S.S.G.") § 2H1.1(a)(1), and the second is whether an enhancement for obstruction of justice under U.S.S.G. § 3C1.1 is warranted. Based on the parties' briefing, as well as the testimony and evidence presented during the sentencing hearing, the court finds by a preponderance of the evidence that the underlying offense is second-degree murder and that the obstruction of justice enhancement applies. Slager has also filed a motion for downward departure under U.S.S.G § 5K2.10 based on victim provocation. The court denies this motion for downward departure, as it finds that the victim's conduct did not "contribut[e] significantly" to provoking the offense behavior. The court does, however, grant a two-level downward departure under U.S.S.G. § 5K2.0 in recognition of the successive state and federal prosecutions and of Slager's susceptibility to abuse in prison. Finally, it grants a three-level downward variance based on Slager's history and characteristics. Because this sentencing presents complex issues

1

of law and fact, the court supplements the sentence it imposed from the bench at the conclusion of the sentencing hearing with this written order, to detail the particularized findings that contributed to its calculations. It does not modify the sentence or its foundation. The court imposes a sentence of 240 months imprisonment.

## I.  BACKGROUND

Slager is a former North Charleston Police Department ("NCPD") police officer who was indicted on three counts in connection with the lethal shooting of Walter Scott ("Scott"). The federal indictment charges that on or about April 4, 2015, while acting under the color of law as a NCPD officer, Slager shot Scott without legal justification, "willfully depriving him of the right . . . to be free from the use of unreasonable force by a law enforcement officer." ECF No. 1, Indictment ¶ 1. The indictment further charges that Slager intentionally misled South Carolina Law Enforcement Division ("SLED") investigators tasked with investigating the incident by falsely stating that he fired his weapon while Scott was coming toward him with a taser. Id. ¶ 3. The government alleges that, in reality, Slager fired multiple shots at Scott while Scott was running away from him. Id. ¶ 4. The indictment charges Slager with (1) the deprivation of rights under the color of law, (2) the use of a weapon during the commission of a crime of violence, and (3) obstruction of justice.

Slager was charged with murder in state court for the Scott shooting, but, after a five-week trial, the jury was unable to reach a verdict. ECF No. 128 at 1. On May 2, 2017, Slager entered a guilty plea to violating the civil rights of Scott, in violation of 18 U.S.C. § 242. ECF No. 114. The remaining federal charges, as well as the state charges, were dropped as a result of the plea agreement. Slager agrees that the following facts are accurate and form the basis for his § 242 offense:

On April 4, 2015 Slager was a commissioned police officer with the North Charleston Police Department. Slager was on duty as a police officer when he stopped Walter Scott's vehicle after observing that the center brake light was not working. During the stop, Scott fled the scene on foot. Slager engaged in a foot chase of Scott for approximately 200 yards. During the chase, Slager deployed the probes of his Taser. His first attempt to use his Taser was unsuccessful in stopping Scott. Slager ultimately caught up to Scott and deployed his Taser probes a second time.

After the second Taser deployment, Scott fell to the ground. Scott managed to get off the ground and again run away from Slager. The defendant's Taser dropped to the ground behind the defendant. As Scott was running away, Slager fired eight shots at him from his department-issued firearm. During the time that each of the eight shots were fired, Scott was unarmed and running away from Slager. Five shots hit Scott, all entering from behind. Scott suffered bodily injury and died on the scene as a result of the injuries from the gunshots.

The defendant used deadly force even though it was objectively unreasonable under the circumstances. The defendant acknowledges that his actions were done willfully, that is he acted voluntarily and intentionally and with specific intent to do something that the law forbids.

Id. at 1–3.

This matter is before the court for sentencing. In anticipation of sentencing, a Presentence Report ("PSR") was prepared. Both Slager and the government submitted sentencing memoranda, and Slager moved for a downward departure.

## II. DISCUSSION

The following issues are in dispute: (1) whether the appropriate cross-reference is voluntary manslaughter or second-degree murder; (2) whether the obstruction of justice enhancement is appropriate; (3) whether and to what extent there should be a downward departure pursuant to U.S.S.G. § 5K2.10 for Scott's wrongful conduct in provoking the offense behavior; (4) whether and to what extent there should be a downward departure pursuant to U.S.S.G. § 5K2.0; and (5) whether and to what extent there should be a variance. The court addresses each issue in turn.

### A.    Cross-Reference

The base offense level for Slager's conviction under § 242 is determined by a cross-reference to "the offense level from the offense guideline applicable to any underlying offense."  U.S. Sentencing Guidelines Manual § 2H1.1 (U.S. Sentencing Comm'n 2004).  The parties dispute whether the appropriate cross-reference under U.S.S.G. § 2H1.1 for the underlying offense is to second-degree murder or to voluntary manslaughter.  Where, as here, malice aforethought is proven by a gross deviation from the standard of reasonable care, and where there is insufficient evidence that the defendant acted in heat of passion, the appropriate cross-reference is second-degree murder.

### 1.    Voluntary Manslaughter

The PSR applies a cross-reference to voluntary manslaughter.  The government contends that a cross-reference to second-degree murder is more appropriate because Slager's own guilty plea established that he was "objectively unreasonable" in firing eight shots at Scott while Scott was unarmed and running away.  Under the facts to which Slager admitted when he pleaded guilty, Slager admits that he "willfully" killed Scott with the specific intent to commit an illegal act.  ECF No. 114 at 1–3.  This forecloses Slager's ability to argue that he acted in self-defense, which could bar any legal liability.  But it leaves open the possibility that the portion of the incident between Slager and Scott that occurred before Feidin Santana ("Santana") began filming the bystander video that captures the shooting ("the Santana video") warrants a "heat of passion" mitigation such that the cross-reference to voluntary manslaughter would be appropriate.  The court finds that it is not.

A voluntary manslaughter cross-reference is appropriate where there is a "sudden quarrel" or "heat of passion." 18 U.S.C.A. § 1112; see United States v. Elk, 658 F.2d 644, 649 (8th Cir. 1981). The fact that distinguishes manslaughter from murder is the existence of malice. Stevenson v. United States, 162 U.S. 313 (1896). In the case of voluntary manslaughter, the onset of "heat of passion" demonstrates the absence of malice. Elk, 658 F.2d at 648. While "heat of passion" must be determined from circumstances as they appeared to the defendant, it must still involve provocation that would "arouse a reasonable and ordinary person to kill someone." United States v. Collins, 690 F.2d 431, 437 (5th Cir. 1982) (emphasis added). For a law enforcement officer, the standard is provocation that would cause a reasonable officer to kill someone. United States v. Velazquez, 246 F.3d 204, 213 (2d Cir. 2001) ("Just as law enforcement officers are entitled to have their conduct insulated from liability by assessing the circumstances confronting them through the eyes of a reasonable officer . . . they must expect to have their actions assessed by the standards of a reasonable officer when liability is sought to be imposed."). In United States v. Quintero, 21 F.3d 885, 890 (9th Cir. 1994), the Ninth Circuit defined "heat of passion" as "some extreme provocation, beyond what a reasonable person could be expected to withstand, severely impair[ing] her capacity for self-control in committing the killing."

Offenses that can be categorized as voluntary manslaughter comprise what some courts have termed a "limited" category. See United States v. Livoti, 22 F. Supp. 2d 235, 245 (S.D.N.Y. 1998) ("[This] offense cannot be shoehorned into the limited category of voluntary manslaughter."). For example, courts have generally found that adultery is adequate provocation for a voluntary manslaughter instruction. United States v. Comer,

421 F.2d 1149 (D.C. Cir. 1970) (holding that a defendant who fatally stabbed his wife after finding her in bed with another man was entitled to a voluntary manslaughter instruction).  Courts have also found that where there is evidence a person was scared for his life, a jury should be instructed on voluntary manslaughter.  For example, in Kinard v. United States, 96 F.2d 522, 525 (D.C. Cir. 1938), the court found that the jury should have received a voluntary manslaughter instruction where the defendant testified that his wife, while holding a knife, told him "I am going to get you" and shoved him in the back of the head.  Even under these facts, however, the Kinard court reasoned that the evidence was "overwhelmingly indicative of murder rather than manslaughter."  Id.

In arguing that "heat of passion" applies, Slager contends that when ordered to stop running, Scott yelled back "Fuck the police."  ECF No. 129 at 13.  Words alone will not suffice for a "heat of passion" finding.  United States v. Cobb, 905 F.2d 784, 789 (4th Cir. 1990) ("[M]ere words by a pretrial detainee [cannot] justify the use of physical force by a police officer.").  To decide the reasonableness of Slager's alleged "heat of passion" in confronting someone who fled after being stopped for a broken brake light, the court must determine what happened in the minutes immediately prior to the events captured by the Santana video.  Most saliently, it depends on whether Scott was ever "on top of" Slager during the ground altercation and/or was in control of his taser, and whether Scott tased or attempted to tase Slager.  Government expert FBI Special Analyst Tony Imel ("Imel") testified during the sentencing hearing that based on his reverse projection photogrammetry analysis, Scott was over sixteen feet away from Slager when Slager

fired the first shot.[2]  Sentencing Hr'g Tr. 174:23–25, Dec. 4, 2017.  Imel further testified

that Scott was nearly forty feet away by the time that Slager fired the seventh shot.[3]  Id. at

177:8–16.  The Santana video makes clear that at no point did Scott turn around, let alone

attempt to attack Slager.

There are two people who can testify about the events that took place before the

Santana video—Slager and Santana, the bystander who witnessed the incident and filmed

portions of it on his cellular phone.  As explained in more detail in section II.B.4, Slager

gave different stories to NCPD officers at the scene, to SLED investigators in the 72

hours after the shooting, during his trial in state court, and in the pretrial proceedings in

federal court.  Due to Slager's evolving stories of what happened before and during the

shooting, he is not a credible witness.  On the other hand, a review of the statement that

Santana gave to SLED, Santana's state court testimony, and his federal court testimony

reveals a consistent story that is at odds with Slager's presentation of the sequence of

events—and indeed the events themselves—making Santana a more credible witness.

Therefore, the court credits Santana's eyewitness account of the incident.

SLED Agent Andrea Peterson ("Peterson") interviewed Santana on April 10th,

14th, 20th, and 21st in connection with the Scott shooting.  Peterson's memorandum of

the interview—which Santana was given the chance to amend if needed—is consistent

with Santana's state court and federal sentencing hearing testimony.  In his statement to

---

[2] Defense expert Eugene Liscio ("Liscio") also used reverse projection photogrammetry analysis to measure the distance between Slager and Scott at the first shot, and found that it was "17 or 18 feet or so."  Sentencing Hr'g Tr. 304:3–7, Dec. 5, 2017.

[3] Imel did not testify on how far Scott had run at the time that Slager fired the eighth and final shot, although he did testify that Scott's back was still turned at the time of the final shot.  Sentencing Hr'g Tr. 177:17–178:6, Dec. 4, 2017.

SLED, Santana described Scott's actions "to be as if someone was trying to grab you and you didn't want them to control you." Def. Ex. 23. Santana said "he could see both of Scott's hands" and that Scott did not have anything in his hands. Def. Ex. 23. Santana further explained that he saw Scott begin to run, "and that was when" Slager took his gun out and shot at Scott several times. Def. Ex. 23.

In the state trial, Santana testified that "Scott just tried to get away from the taser," and that he "didn't see [the taser] in Walter Scott's hands."[4] State v. Slager, Charleston Cty. Ct. Gen. Sess., 2015-A1010201687, Trial Tr. 24:7–8, 24:23–24, Nov. 4, 2016 (hereafter, "Nov. 4 Tr."). When asked about the ground altercation, before the first shot was fired, Santana testified that "[t]he officer was on top." Id. at 25:16–22. When asked if at any point Scott was on top, Santana answered that he "didn't see" Scott ever being on top. Id. Santana later reiterated that Slager was on top at all times during the ground altercation, and that "[i]t was just [Scott] trying to get away from the taser. And when I say a lot of movement, I don't mean being in a steady position. I mean moving trying to stand up." Id. at 26:2–8. While Slager and Scott were on the ground, Santana saw Slager "on top of Scott . . . punching [Scott] on the back." Id. at 116:2–7. Santana acknowledges that Scott did get up at one point, but in what was an apparent attempt to

---

[4] David Hallimore ("Hallimore"), Slager's forensic audio expert, testified during the sentencing hearing that by manipulating the Santana video he was able to hear Slager say "[l]et go of the taser or I'll shoot." Sentencing Hr'g Tr. 274:22–25, Dec. 5, 2017. The court does not credit this testimony, as Santana was an eyewitness at the time that he filmed the Santana video yet he testified that he never saw Scott with a taser. Furthermore, Hallimore testified that the "digital representative signals" he used to manipulate the audio from the Santana video do not tell the listener what the words are—the listener must still make their own interpretation based on the manipulated audio. Id. at 286:14–22. The court listened to the manipulated audio multiple times, and was unable to hear Slager saying "[l]et go of the taser or I'll shoot." Therefore, it does not find Hallimore's interpretation of this portion of the Santana video to be credible.

"to get away." Id. at 26:9–15. When asked if Scott moved towards Slager, Santana replied that Scott was "trying to get up . . . to get away from the taser." Id. at 27:20–24. Santana testified that, upon getting up from the ground Scott did move "towards . . . this side" to "get away" from Slager, but Santana "didn't see any kind of gun," including a "taser or stun gun." Id. at 28:2–11.

During the sentencing hearing, Santana's testimony remained consistent with his state court testimony and the statements that he gave to SLED. Santana began by discussing that he saw "a tasing in the street," and that the first thing he witnessed was "Walter Scott running." Sentencing Hr'g Tr. 26:14–19, Dec. 4, 2017. When Santana witnessed the ground altercation, he saw Slager "in a tussle" with Scott, with Scott on the ground "facing down" and Slager "on top." Id. at 28:12–17. When asked if Scott was ever "facing up towards" Slager during the ground altercation, Santana stated that Scott was "always laying face down". Id. at 29:9–30:4. Indeed, Santana testified that during the ground altercation Scott was never on top of Slager, that Scott never punched Slager, and that Scott never fought with Slager. Id. at 30:5–15. Santana also testified that he never saw Scott taking control of the taser or "charging towards" Slager. Id. at 30:17–22. After Slager and Scott got up off the ground, Santana observed Slager "still holding" Scott, and testified again that at no point after Scott got off the ground did he assault Slager, take control of the taser, or charge towards Slager. Id. at 32:19–33:6. Scott then, according to Santana, "got off" the ground and in a "determined" manner began to run away, at which point Slager began to fire. Id. at 31:23–32:18.

During the sentencing hearing, Slager offered Liscio as an expert forensic analyst who reconstructs crime and accident scenes to testify. Sentencing Hr'g Tr. 287:20–23,

Dec. 5, 2017.  Liscio created a 3-D model of the crime scene using the Santana video and a laser scan of the area taken by SLED, which allowed the viewer to see the position of Slager and Scott from many different angles.  Liscio also used reverse projection photogrammetry analysis to determine the distances between Slager and Scott at each of the eight shots.

A significant portion of Liscio's testimony revolved around his manipulation of the 3D video to determine the origin of the discarded taser—namely, whether it came from Slager or Scott's hand.  Liscio came to the conclusion that the taser came from Scott's hand by looking at the 3D video, and determining through a process of elimination from where the taser came to rest.  For example, Liscio surmises that:

> "[I]f we were to say did [the taser] come from Mr. Slager's right arm . . . there's a couple of issues there . . . just like a baseball player would throw a ball, you need to follow through.  So if you're throwing something, and throwing it away, and I assume you want to get rid of something, you don't want to have it in front of you, you would try to throw it as far away as you can from you."

Id. at 311:15–25.  However, when asked if there was any part of the Santana video where "a person can actually see the taser in Walter Scott's hand," Liscio admitted "there's no part in [the Santana video] where you can actually see the taser being held."  Id. at 331:9–16.  Indeed, Liscio further testified that there was no part of the Santana video where he could see the taser closer to Scott than it was to Slager.  Id. at 331:17–20.  Liscio finally testified that "if you look at, for example, Mr. Slager's right arm and where the taser is in relation to that, and you look at Mr. Scott's right arm and where the taser is in relation to that, you have to make your own judgment call."  Id. at 335:18–336:1.

Liscio is certainly qualified to show the 3D video that he created from the Santana video.  However, Liscio's opinion about where the taser originated from is one that any

viewer of the video can form.  Therefore, the court does not consider Liscio's opinion regarding whose hand the taser was dropped as credible.  The court finds it particularly persuasive that none of the other experts who viewed the Santana video—including Grant Fredericks ("Fredericks), Slager's forensic video analyst, and Imel—opined on where the taser originated from.  See id. at 235:3–8 (Fredericks testifying that the taser being "right behind Mr. Slager's left foot" was "the first time [the Santana video] can assist us with any information about the visual information about the taser."); id. at 238:9–17 (At the point that Fredericks first identifies the taser in the Santana video, he testified that the taser is "inches behind" Slager's left foot, and Slager and Scott are "an arm's length apart" from each other.); id. at 239:1–7 (Fredericks testifying that when the taser is behind Slager, the Santana video clearly shows that Slager has his firearm in his hand); id. at 348:23–24 (Imel testifiying that he is "very adamant that we do not know where that taser came from").  Finally, Santana, who was an eyewitness to the ground altercation as well as the subsequent shooting, testified that at no point did Scott have the taser in his hands.[5]  Sentencing Hr'g Tr. 30:17–22, Dec. 4, 2017.  The court credits

_____

[5] In the sentencing memorandum, Slager cites to the tests done by SLED investigator Megan Fletcher to argue that Scott tased Slager.  Slager never claimed in his initial statements to his superiors or SLED, or even in his state court testimony, that he had been drive stunned by a taser, but raises the issue for the first time in his sentencing memorandum before this court.  Fletcher's report stated that the "[t]aser drive-stun cannot be excluded as a possible heat source which has the potential to melt polyester fibers."  ECF No. 129-13, Fletcher Report at 7.  As an initial matter, Fletcher's conclusion does not affirmatively prove that Scott tased Slager, or even that a taser was the cause of the marks on Slager's uniform.  Rather, the report merely supports the argument that a taser cannot be conclusively excluded as one possible cause of marks on a uniform.

More significantly, however, the court held a Daubert hearing on Fletcher earlier this year and was prepared to rule that her testimony was unreliable under Federal Rule of Evidence 702.  ECF No. 110.  Therefore, the court does not view any of the tests that Fletcher conducted on Slager's uniform reliable enough to consider at the sentencing

Santana's eyewitness account over Liscio's assumption, and finds that Scott did not have the taser at any point during the incident.

Santana did not begin filming the Santana video until the ground altercation had already begun, although he witnessed more than he filmed. Id. at 31:5–7. Santana also did not see anything that may have occurred in the alleyway between the time that Scott ran away from Slager after the initial traffic stop—which is recorded on the dashboard camera video from Slager's police cruiser—and the ground altercation. But this period in the alley was very brief, and appears to consist solely of Scott running away from Slager.

Slager's contradictory stories render him an incredible witness. Given the choice between Slager's self-serving, evolving, and internally inconsistent testimony and Santana's state court testimony, which he repeated during the federal sentencing hearing, the court gives more weight to Santana's account of events. Santana's testimony reveals that Scott was not on top of Slager during the ground altercation, that Scott never had the taser, and that Scott was running away from Slager when he was shot and killed.

---

phase. After the Daubert hearing on Fletcher, the court had significant concerns about the methodology by which Fletcher arrived at her conclusion about the fabric burn marks. The results of her experiment were not subject to peer review or publication, nor were they ever reproduced by anyone else at SLED—including Fletcher herself. There was also no error rate established for her experiments. While Fletcher did examine Slager's uniform shirt, she did not refer to any peer-reviewed articles on damage caused by a taser. Instead, she tested sources such as an iron and a laminator press to determine what could have been the source of the melted fibers on Slager's shirt, and concluded that a taser could not be excluded as a possible source of that melting. Finally, Fletcher did not know the exact melting point of the particular kind of fabric used in Slager's uniform, and she did not rule out alternative sources of a burn such as firework embers.

Fletcher did not testify that Taser was the "most likely" source of the burn marks on Slager's uniform with a reasonable degree of scientific certainty. This is exactly the kind of testimony that Daubert and FRE 702 seek to prohibit. Therefore, the court does not consider Fletcher's testimony regarding the possible causes of the damage on Slager's uniform shirt admissible into evidence.

Having made the above factual determinations about what occurred on April 4, 2015, the court next turns to survey 18 U.S.C. § 242 cases to determine under what circumstances courts have applied the voluntary manslaughter cross-reference. In Livoti, the court held that "no reasonable police officer, would have lost self-control and been murderously aroused by a kid refusing to go home or by his brother telling the officer that there were no grounds for his arrest." 22 F. Supp. 2d at 244. The Livoti court found that resistance by the victim to having his hands put behind his back to be cuffed did not suffice to send a "reasonable police officer into a passion of rage in which he loses his self-control." Id. (emphasis in original). Certainly, the level of resistance here is higher than that in Livoti—it is clear that at the very least Scott opened his car door and ran away from Slager after the initial traffic stop, and that there was a ground altercation before Slager began to fire at Scott. But Santana's state and federal testimony reveal that during the entirety of the ground altercation, Scott was on the bottom and did not assault or tase Slager. Furthermore, the Santana video shows that at the time Slager fired the first shot, Scott was running away, not pointing a taser at Slager or advancing towards him. The court finds that Scott's level of resistance was inadequate to send a reasonable police officer into a "passion of rage in which he loses his self-control."[8] Livoti, 22 F. Supp. 2d at 244.

---

[8] The Livoti court ultimately found that the appropriate cross-reference for the offense conduct was involuntary manslaughter. But the facts before the Livoti court were of an officer who applied a chokehold that ultimately resulted in the death of the victim, not of an officer firing eight shots directly at the back of an unarmed and fleeing victim. In rejecting second-degree murder as the cross-reference, the Livoti court noted that while the training film used by the New York City Police Department warned that choke holds were prohibited because they "may" cause death by asphyxiation, these deaths were "very rar[e]" in the course of an arrest. Id. at 245. The court also relied upon expert testimony presented during the sentencing that it was "somewhat unexpected for a [choke

Similarly, in Velazquez, 246 F.3d at 213, the court found that there was no evidence for a "heat of passion" defense where an inmate was fatally beaten for refusing to obey a prison guard's command to reenter his cell. The Velazquez court noted that the victim was already in his cell when the fatal beating was administered, and that the beating was "not used to obtain compliance with a disregarded command; it was summary punishment for previous (and momentary) disobedience." Id. The lower court applied the voluntary manslaughter cross-reference, finding that the prison guards acted in the "heat of passion" in response to the victim's refusal to comply with orders and verbal abuse directed at the guards. Id. at 210. The Velazquez court held that this verbal abuse and refusal to comply did not support a "heat of passion" finding. Id. at 213. The Velazquez court vacated the sentence and instructed the lower court on remand as follows:

> [T]he choice between second-degree murder and involuntary manslaughter will turn on how great a risk of serious bodily injury [the victim's] assailants could reasonably apprehend would result from their assaultive conduct and what that risk reveals about the degree of their indifference to [the victim's] life . . . In particular, it will be necessary to determine whether there was a substantial risk that the repeated punching and kicking administered by [the prison guards] would inflict serious bodily injury on an average adult, sufficient to infer an extreme indifference to human life, or whether the resulting laceration of [the victim's] spleen occurred primarily because it was enlarged five or six times normal weight, a circumstance that was not reasonably foreseeable.

hold] to cause death by asphyxiation[,] suggesting that [death] was a result that was possible but not likely to occur." Id. By contrast, the most probable result of repeatedly shooting someone in the back is death.

Furthermore, in Livoti the victim's asthma made him "especially vulnerable" to the officer's use of a chokehold. See Velazquez, 246 F.3d at 215 ("[A]n inference of malice might not be appropriate where the victim is assaulted and dies substantially as a result of his unusual and unforeseeable fragility, such as a thin skull or hemophilia"). Here, there is no "unusual or unforeseeable fragility" that would negate an inference of malice.

Id. at 215 (emphasis added).  On remand, the lower court found that there was not adequate provocation and applied the cross-reference of second-degree murder.[9]

The court finds that the ground altercation between Scott and Slager that ensued before the first shot was fired—at which point Slager admits that he employed unreasonable deadly force—was not the sort that would cause an "ordinary, reasonable law enforcement officer" to shoot and kill someone, and so a cross-reference to voluntary manslaughter would be erroneous.  It is indisputable that shooting at someone's back eight times, with five shots hitting the victim, will very likely lead to death.  Under these circumstances, the court finds that Slager's decision to fire eight shots at the back of a fleeing Scott evinces an "extreme indifference to human life."

Slager argues that "violations of 18 U.S.C. § 242 can commonly be accompanied by consistent verdicts of voluntary manslaughter."  ECF No. 128 at 21.  In support, he cites to Velazquez, United States v. Moore. 708 F.3d 639 (5th Cir. 2013), and United States v. Warren, 2013 WL 1962291 (E.D. La. May 10, 2013).  As discussed, in Velazquez the lower court found on resentencing that there was no adequate provocation and applied a second-degree murder cross-reference.  See Regnier, 44 F. App'x at 525. The court now turns to consider Moore and Warren.

---

[9] The defendant appealed the new sentence of 324 months with the second-degree murder cross-reference that the district court imposed upon him in the resentencing.  The Second Circuit modified the sentence to reflect the original 135-month term of imprisonment because "[the] earlier opinion likely misled [defendant] regarding his prospects on appeal, and to avoid the serious constitutional questions that otherwise would result from that conclusion."  United States v. Regnier, 44 F. App'x 524, 525 (2d Cir. 2002).  However, the Second Circuit affirmed the judgment of the lower court that the cross-reference was second-degree murder.

In <u>Moore</u>, the Fifth Circuit upheld the district court's determination that the underlying offense was voluntary manslaughter where two police officers handcuffed the victim, kicked him in the torso, and struck him across the legs and torso with a metal police baton while he was on the ground. <u>Moore</u>, 708 F.3d at 639. The officers then drove the victim to a nearby hospital and told the hospital staff that the victim had "been found lying on the ground under a bridge and had a history of drug use," and the victim ultimately died from a ruptured spleen as a result of the beatings that the officers administered. <u>Id.</u> The lower court found that, based on the officers' initial encounter with the victim as well as the manner in which they delivered him to the hospital, the officers' conduct "so grossly deviated from the reasonable care standard that he must have been aware that a serious risk of bodily injury occurred." <u>Id.</u> at 647.

<u>Warren</u> arises from the fatal shooting of Henry Glover, in what the Fifth Circuit deemed "one of the nightmarish stories that arose from Hurricane Katrina in 2005—the physical devastation, human diaspora, and struggle of the City to maintain some semblance of law and order, and, in the chaos, a horrific failure of law enforcement." <u>United States v. McRae</u>, 702 F.3d 806, 810 (5th Cir. 2012). David Warren ("Warren"), an officer of the New Orleans Police Department ("NOPD"), was patrolling an area of New Orleans four days after Hurricane Katrina made landfall, while the city was under a mandatory evacuation order. <u>Id.</u> at 812. Although there are conflicting stories of the shooting, it is undisputed that Glover was carrying likely-stolen items out of a shopping center parking lot when Warren shot at him from a breezeway overlooking the parking lot. <u>Id.</u> at 813. Warren and other NOPD officers then drove a car with a fatally wounded Glover in the backseat to an abandoned levee and set the car—with Glover's body

inside—on fire. Id. at 817. The jury convicted Warren of violating 18 U.S.C. § 242 in Glover's death,[10] and found that his actions constituted manslaughter in violation of 18 U.S.C. § 924(j)(2). United States v. Warren, 2013 WL 1962291, at *2 (E.D. La. May 10, 2013).

Although the courts in Moore and Warren both applied a voluntary manslaughter cross-reference, the court is not able to discern whether the government ever asked either court to apply a second-degree murder cross-reference at the sentencing phase. Notably, in Warren, it was the jury—not the court at sentencing—that determined Warren's actions constituted voluntary manslaughter. Here, the government objected to the PSR's application of the voluntary manslaughter cross-reference and has asked the court to apply the second-degree murder cross-reference instead. The court agrees that a cross-reference of voluntary manslaughter can be consistent with a § 242 violation. But this does not mean that a voluntary manslaughter cross-reference is appropriate under the circumstances of this case. As discussed, the court does not find that the events that transpired between Slager and Scott constitute "heat of passion." The court has considered a number of cases involving a manslaughter cross-reference for guidance, and its analysis must necessarily focus on those cases where courts have actually discussed what circumstances constitute "heat of passion."

After careful consideration of the testimony and evidence presented during the sentencing hearing, the court finds by a preponderance of the evidence that Slager, while

---

[10] In McRae, the Fifth Circuit vacated Warren's conviction and remanded for a new trial on the basis that the district court erred by not severing Warren's trial from that of the other defendants, NOPD officers Gregory McRae and Travis McCabe. 702 F.3d at 810. In his second trial, Warren was acquitted. See United States v. McRae, 2014 WL 4063982, at *1 (E.D. La. Aug. 15, 2014)

acting in his capacity as a NCPD officer, stopped Scott for a broken brake light. When Slager returned to his police car to run the details of Scott's driver's license, Scott fled. Slager gave chase, and deployed his taser on Scott multiple times. Even after being tased, Scott kept running. At this point, bystander Santana became aware of the chase. After briefly passing out of sight in an alleyway, Santana observed Slager and Scott in a ground altercation. At all times during the ground altercation, Scott was never on top of Slager and never had the taser in his hands. After getting up from the ground, Scott ran away from Slager. Instead of giving chase once again, Slager shot at Scott eight times. Five of these shots hit Scott in the back, and Scott died as a result of the gunshots. At no point after Slager fired the first shot—when Scott was over fifteen feet away—to when Slager fired the eighth shot—when Scott was nearly forty feet away—did Scott turn around. This conduct is a "gross deviation" from the standard of care of a reasonable police officer, and evinces malice aforethought as defined by the Fourth Circuit. The court has considered all of the circumstances leading up to the shooting—that Scott yelled "Fuck the police," that Scott ran away from Slager during the initial traffic stop and disobeyed commands to stop, and that there was a ground altercation immediately prior to the shooting—and finds that taken together, they do not constitute adequate provocation to apply the "heat of passion" mitigation.[11] Therefore, the cross-reference to voluntary manslaughter is inapplicable.

---

[11] During the sentencing hearing, defense counsel appeared to argue that a finding by this court that the underlying offense was second-degree murder was somehow foreclosed by the state jury's "findings," namely that "the state jury unanimously found no murder" and "the seven state jurors who did not believe that the State had met its burden on manslaughter." Sentencing Hr'g Tr. 21:7–18, Dec. 4, 2017.

The court is not aware of any rule that it is bound by the "findings" of a state court jury. Furthermore, there was no "finding" by the state court jury because it

## 2. Second-Degree Murder

The elements for second-degree murder in violation of 18 U.S.C. § 1111 are: (1) the unlawful killing of a human being; (2) with malice aforethought; and (3) within the special maritime or territorial jurisdiction of the United States.  There is no question that the shooting happened in the United States.  By virtue of the admitted facts in the guilty plea, there is also no dispute that Slager unlawfully killed Scott.  Therefore, the court must determine only if the Scott shooting evinces "malice aforethought."  It finds that it does.

Malice aforethought "may be established by evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm."  United States v. Williams, 342 F.3d 350, 356 (4th Cir. 2003).  The presence or absence of malice must be inferred from all the facts and circumstances surrounding a killing.  United States v. Flemming, 739 F.2d 945, 947 (4th Cir. 1984).  That standard is met here, as the facts admitted in the guilty plea establish that Slager fired eight shots at Scott and each of the eight shots was fired while Scott was

---

returned no verdict, and a mistrial was declared.  Even if the state jury had acquitted Slager, collateral estoppel would not apply because the parties are not the same in the state and federal trials.  Moreover, even if Slager were acquitted of murder by a state court, this is not necessarily barred from applying a second-degree murder cross-reference, as acquitted offense conduct may be considered at sentencing.  United States v. Watts, 519 U.S. 148 (1997).

Furthermore, as explained in great detail, the court finds that there was not adequate provocation for "heat of passion."  Such a finding is not a comment on the jury proceedings that led to a mistrial in state court.  The jury there was unable to come to a unanimous conclusion that the State had proven its case beyond a reasonable doubt.  Here, the court has a lower standard to consider—namely, the preponderance of the evidence standard—and finds that the government has met its burden under this standard that Slager committed second-degree murder.

unarmed and running away.  ECF No. 114 at 3.  Five shots hit Scott in the back.  <u>Id.</u>  The

court holds that a jury could infer that shooting an unarmed man in the back as he was

running away was a "gross deviation" from the standard of care for a reasonable law

enforcement officer.  Certainly, shooting at Scott eight times as he ran away meant that

Slager was at the very least aware that there was a risk of serious bodily harm.  <u>See</u>

<u>United States v. Wood</u>, 207 F.3d 1222, 1228 (10th Cir. 2000) ("'[S]econd degree

murder's malice aforethought element is satisfied by: . . . (2) intent-to-do-serious-bodily-

injury . . .'") (quoting <u>United States v. Pearson</u>, 159 F.3d 480, 486 (10th Cir. 1998));

<u>United States v. Fleming</u>, 739 F.2d 945, 948 (4th Cir. 1984) (Holding that to support a

conviction for murder, the government "need only" prove that the defendant acted

"without regard for the life and safety of others").

    The court has examined a number of cases involving a cross-reference to second-

degree murder to guide its analysis on the applicability of the cross-reference to facts of

this particular case.

    In <u>United States v. Milton</u>, 27 F.3d 203 (6th Cir. 1994), the court held that a

defendant who fired two shots into a victim's car "must have been aware of a risk of

death or serious bodily injury" and that this "gross deviation from a reasonable standard

of care established the requisite malice aforethought to hold him accountable for second-

degree murder."  The lower court specifically found only that "the death of [the victim]

was reasonably foreseeable from [the defendant's] actions in shooting into the car" and

that "it would be reasonably foreseeable to a rational person that if you shoot a gun at a

car with people in it, somebody may get killed."  <u>Id.</u> at 208.  The Sixth Circuit held that,

even where the sentencing court failed to make any reference to the elements of second-

degree murder, the act of a firing a gun into a car as a scare tactic was sufficient for malice aforethought.[12]  Id.  If firing a gun into a car is enough for malice aforethought, certainly shooting eight times at a man's back as he runs away is malice aforethought.

The Sixth Circuit has cited Milton in two § 242 cases involving cross-references under U.S.S.G. § 2H1.1.  In United States v. Conatser, 514 F.3d 508 (6th Cir. 2008), cert. denied, 555 U.S. 963 (2008), the Sixth Circuit affirmed a second-degree murder cross-reference for a correctional officer who failed to render aid to a critically injured inmate who died as the result of multiple assaults while in custody.  The correctional officer argued that the cross-reference should have been involuntary manslaughter because he acted with criminal negligence rather than malice aforethought.  Id. at 523.  The Conatser court rejected this argument, citing Milton for the rule that malice aforethought "may be inferred when the defendant 'grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk or death or serious bodily injury.'"  Id. at 523–24 (internal citations omitted).  Similarly, in United States v. McDougle, 82 F. App'x 153 (6th Cir. 2003), the Sixth Circuit affirmed a second-degree murder cross-reference for a defendant who caused the blunt-trauma death of a mentally and physically handicapped resident of a state-run care facility.  As in Conaster, the defendants in McDougle argued that the cross-reference should have been to involuntary manslaughter based on their reckless state of mind.  Id. at 157.  The

---

[12] In Milton, the court does note that the defendant was "unprovoked" when he fired those shots into the car.  Id. at 208.  Under the plea agreement, Slager admitted that he was "unreasonable" in shooting Scott and that he acted "willfully."  No. 114 at 2.  This admission that the act of shooting Scott was unreasonable negates any possible argument that Slager could make that he acted in self-defense.  Slager can, and does, argue that the events that transpired before he fired the first shot constitute adequate provocation for a "heat of passion" mitigation.  As explained in section II.A.2, the court disagrees.

McDougle court disagreed, ruling that malice was established by the defendants' "reckless and wanton . . . gross deviation from a reasonable standard of care," of a nature that would warrant an inference that the defendants were aware of a serious risk of harm or death. Id. at 157–58.

Courts, including the Fourth Circuit, have used iterations of the Milton standard in affirming a cross-reference to second-degree murder in circumstances similar to the one at hand. For example, in United States v. Sharma, 394 Fed. Appx. 591 (11th Cir. 2010), cert. denied, 562 U.S. 1299 (2011), a jury convicted Sharma of violating 18 USC §§ 241 and 242 for causing the death of a federal inmate by moving the inmate into a cell with another inmate who was likely to assault him. At the sentencing, the district court applied the cross-reference to second-degree murder. Id. at 596. On appeal, Sharma argued that the cross-reference for involuntary manslaughter should have applied because she did not intend the victim's death, and "a mental state of reckless disregard supports . . . involuntary manslaughter." Id. The Eleventh Circuit affirmed the district court, holding that the inmate's death was a foreseeable consequence of placing him in the cell. Id. at 593. The Sharma court found that even if the defendant did not intend the victim's death, she acted with malice aforethought by deliberately putting the inmate in peril. Id. at 597. Likewise, in United States v. Smiley, 2014 WL 223381, at *5 (E.D. Mich. Jan. 21, 2014), the court held that where the evidence "demonstrates convincingly that defendant intended to kill [the victm] by firing shots at him[,] the intent to kill satisfies the malice standard." The Smiley court found that this conduct amounted to a "gross deviation from the standard of care" such that the defendant must have been "aware of a serious risk or death or serious bodily injury." Id. Finally, in United States v. Ashford, 718 F.3d 377,

380 (4th Cir. 2013), the court affirmed a second-degree murder cross-reference where the defendant testified that he was "scared" but "not angry" when he pursued and fired upon an unarmed fleeing man.

In this case, the court finds that a cross-reference to second-degree murder is supported by the facts. Slager shot at Scott eight times while he was unarmed and running away, and of these eight shots five shots hit Scott in the back. The Santana video makes clear that at no point after Slager began to employ deadly force did Scott turn around, and at no point did Scott ever have a taser in his hand. Shooting an unarmed man in the back as he runs away is a "gross deviation from the standard of care" that requires officers to refrain from employing deadly force to seize an unarmed suspect. See Tennessee v. Garner, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."). Under the facts in the guilty plea, Slager has already admitted that he was unreasonable in employing deadly force to do exactly that. As described above in section II.A.1, after a thorough review of the facts presented in the sentencing hearing the court finds that Slager did not act in the heat of passion. Therefore, the appropriate cross-reference is for second-degree murder.

**B.      Obstruction of Justice**

Section 3C1.1 of the Sentencing Guidelines provides for a two-level enhancement of the defendant's base offense level where:

> (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction . . . or (ii) a closely related offense.

U.S.S.G. § 3C1.1. Prior to applying the two-level obstruction enhancement, the court must find by a preponderance of the evidence that: (1) the defendant gave "false testimony," (2) "concerning a material matter," and (3) "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993). A "material matter" is one that "would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, comment. (n.6).

The government contends that each of the following are independent reasons for applying the obstruction of justice enhancement: (1) Slager tampered with the crime scene by retrieving the taser from the location where it lay and dropping it on to the ground next to Scott after the shooting, after which he picked the taser up and holstered it; (2) Slager misled NCPD officers in the immediate aftermath of the crime; (3) Slager misled SLED agents during the investigation on April 7, 2015; (4) Slager offered contradictory statements in his state court testimony; and (5) Slager offered contradictory statements during the April 21st and 24th, 2017 federal pre-trial hearing. The court addresses each in turn.

### 1. Taser Placement

Shortly after the shooting, Slager handcuffed Scott and retrieved the taser from the location where it had fallen, nearly ten feet behind where Slager had fired, and dropped it on the ground next to Scott's body. By this point, Slager's partner, Officer Clarence Habersham, had arrived on the scene. Approximately thirty seconds later, Slager picked up the taser and reholstered it. While moving the taser may have been an attempt by Slager to conceal his crime and buttress his false narrative that Scott was

coming towards him with a taser when he fired, it does not necessarily constitute obstruction of justice.

In United States v. Luna, 909 F.2d 119, 120 (5th Cir. 1990), the Fifth Circuit found that a defendant who committed an assault with a gun and then concealed the gun before the crime was reported did not qualify for an obstruction of justice enhancement under § 3C1.1. In Luna, the defendant concealed the weapon "immediately after" the commission of the offense. Id. The government conceded that the investigation of the offense did not begin until "several hours after" the gun was concealed. Id. The Luna court found the obstruction enhancement inapplicable when defendant concealed the gun before the investigation of the crime had begun, because obstruction only occurs if the defendant impedes "the administration of justice during the investigation or prosecution of the instant offense." Id. (emphasis in original). Similarly, in United States v. Wilson, 904 F.2d 234 (5th Cir. 1990), the defendant delivered a package containing firearms to a Federal Express agent for interstate delivery using an alias in the return address on the package. The lower court applied § 3C1.1 based on the defendant's use of the alias. The Fifth Circuit reversed, stating:

> [T]here is simply no evidence that [defendant] willfully impeded or obstructed the administration of justice or attempted to do so either, during the investigation or prosecution of his offense . . . . His intent clearly was not to impede the investigation or prosecution of his offense. His intent was to disguise himself in such a way so that his crime would go unpunished.

Id. See also United States v. Emery, 991 F.2d 907, 912 n. 6 (1st Cir. 1993) (recognizing that "the text of [§ 3C1.1], on its face, seems to require that some investigation be underway").

However, in United States v. Williams, 941 F.2d 1208 (4th Cir. 1991), the Fourth Circuit upheld an obstruction enhancement where a defendant attacked the victim and then hid the weapon in the ceiling of the lavatory where the attack took place. The Williams court reasoned that "[a]ctions taken almost simultaneously with the offense can constitute obstruction of justice." Id. at 1 (internal citation omitted). In Williams, even where the defendant hid the weapon before any officers arrived to investigate, the Fourth Circuit ultimately found that the defendant "could expect the investigation to start immediately" and that his "action in hiding the weapon did impede the investigation and also hampered his prosecution." Id.; see also United States v. Cain, 881 F.2d 980 (11th Cir. 1989) (hiding stolen mail under a car when approached by authorities is obstruction); United States v. Galvan-Garcia, 872 F.2d 638 (5th Cir.) (throwing marijuana out of car during chase is obstruction); United States v. Roberson, 872 F.2d 597 (5th Cir. 1989) (hiding stolen credit card in police car is obstruction).

Here, no investigation had begun when Slager picked up the taser and dropped it next to Scott and then reholstered it. However, the investigation did begin soon thereafter, and Slager's action in moving the taser from its original location behind where he fired the first shot certainly could have "impede[d] the investigation and also hampered his prosecution" like in Williams. While Slager's intent could plausibly have been to "disguise himself in such a way so that his crime would go unpunished" like the defendant in Wilson, the court is not convinced that he intended to obstruct justice by his actions. The court is particularly persuaded by Slager's argument that the South Carolina Criminal Justice Academy trains officers to leave a crime scene untouched unless "the potential exists that an item of evidence (weapon) could be used to cause harm/death to

26

someone at the scene." Slager Objections 10. Furthermore, the court notes that almost immediately after Slager drops the taser next to Scott's body, he picks it up. Thus the taser was retrieved from Slager's holster, not from the ground next to Scott. This indicates that Slager may have picked up the taser to secure the scene as instructed by his South Carolina Criminal Justice Academy training. Indeed, even in his statement to SLED on April 7, 2015, Slager explained that he moved the taser because he did not want to "leave a weapon laying around." Sentencing Hr'g Tr. 87:18–20, Dec. 4, 2017. While this is a close question, the court does not find that Slager's moving of the taser after the shooting constitutes obstruction of justice.

### 2. Statements to Law Enforcement Officers at Scene of Crime

Shortly after the shooting on April 4, 2015, North Charleston police officers Sergeant James Gann ("Gann") and Lieutenant Daniel Bowman ("Bowman") arrived on the scene. ECF No. 54 at 1. Slager informed both officers that Scott was pointing Slager's taser at him and was moving towards him at the time that he fired his first shot. Bowman provided a statement to SLED on April 7, 2015 about Slager's account of the shooting. ECF No. 127-5, Bowman Statement at 2. Indeed, it appears that Slager then repeated this story to the NCPD chief of police. Sentencing Hr'g Tr. 607:4–9, Dec. 6, 2017 ("Slager was interviewed by the chief of police of North Charleston . . . in which Slager demonstrated to his chief how the taser was taken away from him when he was calling for help, and that [the taser] was turned around and thrusted into him").

According to Bowman, Slager said that Scott "was able to use both hands and grab the Taser" and that "[a]fter a short struggle for the Taser [Scott] was able to wrestle it away." Id. According to Bowman's statement, Slager said that Scott then "stood up

and pointed the Taser at Officer Slager," at which point Slager began to fire.  Id.  These are all false statements, especially Slager's statement that he fired his weapon while Scott was pointing the taser at him and was moving towards him, which is directly contradicted by the Santana video.  Slager argues that these inconsistencies are a result of his confusion and faulty memory in the immediate aftermath of a traumatic event, as opposed to a specific intent to obstruct an ongoing investigation.  The court concedes this possibility, especially considering the NCPD's protocol that officers should not give statements until at least 72 hours after an officer-involved shooting.  However, the court is discomforted by how similar this is to Williams, 941 F.2d 1208,  in that Slager could have expected the investigation to start immediately and his actions in giving false renditions of the shooting to Bowman, Gann, and the NCPD chief of police impeded the investigation and hampered the prosecution.  Because the court finds that the obstruction enhancement is squarely met by Slager's statements to SLED on April 7, 2015, as discussed below in section II.B3, the court does not make a finding whether Slager's statements to his supervisors in the immediate aftermath of the shooting also constitute obstruction.

### 3.　　April 7, 2015 Statements to SLED

Later on April 4, 2015, NCPD police officers were joined by SLED investigators who assumed responsibility for the investigation.  Slager agreed to meet with Peterson, the SLED agent tasked with leading the SLED investigation, and Lieutenant Charles Ghent ("Ghent") at his attorney David Aylor's ("Aylor") office on Monday, April 7, 2015.

Peterson received a copy of the Santana video on the evening of April 6, 2015. Prior to this, neither Slager nor the SLED investigators knew of the video's existence. Peterson showed it to Ninth Circuit Solicitor Scarlett Wilson ("Wilson") that evening and to a group of SLED officers and FBI agents the next morning on April 7, 2015. Later that morning, Peterson and Ghent met with Slager and Aylor as planned. After signing a waiver of his <u>Miranda</u> rights, Slager told the SLED investigators certain facts that indicated he was justified in shooting Scott, including that he fired his weapon at Scott while Scott was coming toward him with a taser. This version of events is demonstrably false and was ultimately abandoned by Slager himself when he signed his plea agreement. The SLED agents asked Slager to provide a written statement but a scheduling conflict cut the interview short before this could be completed. When the SLED agents returned later that afternoon, Aylor again advised Slager to sign a waiver of his <u>Miranda</u> rights. Slager then signed the second <u>Miranda</u> waiver, at which point he and Aylor were shown a portion of the Santana video. After seeing the video, Aylor spoke with Slager privately and informed him that he would no longer provide representation in this matter. The SLED agents then arrested Slager and charged him with murder.

A threshold issue with whether the statements to law enforcement officers at the scene of the crime and the April 7, 2015 statements to SLED agents can constitute evidence for the obstruction charge is whether these statements have a requisite nexus to obstructing an official proceeding. Namely, each of these statements was made before Slager was arrested by state law enforcement, which happened on the afternoon of April 7, 2015. Slager was not indicted by a federal grand jury until May 10, 2016.

The Fourth Circuit has adopted a version of the "federal nexus" test in <u>Fowler v.</u>

<u>United States</u>, 563 U.S. 668 (2011) as applied to § 1512(b)(3), holding that a government

does not need to show "beyond a reasonable doubt (or even that it is more likely than not)

that the hypothetical communication would have been to a federal officer." <u>United States</u>

<u>v. Ramos-Cruz</u>, 667 F.3d 487, 497 (4th Cir. 2012). Rather, the government must simply

show more than "a mere possibility that a communication would have been with federal

officials," and that "[this] likelihood of communication to a federal officer was more than

remote, outlandish, or simply hypothetical." <u>Id.</u> The court is guided by the Fourth

Circuit's reasoning in <u>United States v. Self</u>, which in pertinent part holds:

> Section 3C1.1 draws no distinction between a federal investigation and a
> state investigation. It merely requires that the conduct occur during the
> investigation of "the instant offense." U.S.S.G. § 3C1.1. The failure of the
> guideline to distinguish between an investigation by federal officials as
> opposed to state officials undoubtedly is founded in a recognition that state
> officers are authorized to and frequently do investigate criminal conduct
> that ultimately is prosecuted under federal law. Indeed, in the initial stages
> of a criminal investigation, it may be anything but clear whether the conduct
> being investigated violates state law, federal law, or both. Accordingly, the
> appropriate focus of inquiry is not whether federal officials had begun
> involvement with the investigation, but whether the investigation was for
> "the instant offense."

132 F.3d 1039, 1042 (4th Cir. 1997). Slager was not arrested for murder until after he

gave these statements. But when Slager gave his statements to SLED agents, an

investigation into the shooting had begun. Peterson had already received the Santana

video on April 6, 2015, and had communicated with FBI agents about the contents of the

video on the morning of April 7, 2015 before Slager made his statements. This satisfies

the <u>Fowler</u> standard.

Having determined that Slager's statements to SLED presents a federal nexus, the

court proceeds to determine whether his statements constitute obstruction of justice. The

court finds that they do. At the point that Slager made the statements, he was represented by an attorney. He was aware that there was an investigation—if not yet a prosecution—underway for the shooting. Indeed, at the start of the interview Ghent explained that the interview was conducted as part of a criminal investigation. ECF No. 127-4, Peterson Memorandum at 9. During his interview with SLED, Slager said that Scott "jerked the [t]aser" out of his hands and "pointed the barrel" directly at him with his arms out, after which Scott "was continuously coming forward at him with the [t]aser." Id. Slager then said that Scott "took a step forward and was coming at him," and that Scott "had the [t]aser in his right hand and was pointing it directly at him." Id. Indeed, the Peterson memorandum reveals that during the interview Slager physically acted out the scene where Scott was coming at him with the taser. Id. At the time that he fired, Slager said that Scott was "turning to his left" and "in the opposite direction that Slager was moving." Id. Slager also said that after he fired, he found the taser "located between the place where he had been shooting and where Scott landed." Id. at 11. This account of the shooting is repudiated by the Santana video, which clearly shows that Scott was running away from Slager at the time that the first shot was fired, and that Slager picked up the taser approximately ten feet behind where he fired the shot—not between him and Scott.

During the sentencing hearing, Ghent testified about the interview that he had with Slager. Slager was advised of his Miranda rights and signed a written waiver before giving his statements. Sentencing Hr'g Tr. 71:24–72:21, Dec. 4, 2017. The statement was recorded by Peterson and Ghent in contemporaneous notes during the interview, and then organized into Peterson's memorandum. Ghent testified that the interview with

Slager was "largely very linear," and there were "very very few" details that Slager could not recall. Id. at 73:11–15. When asked what specific details Slager was "uncertain" of, Ghent testified that Slager was unsure of "very small" details, such as referring to the Advance Auto store where the initial traffic stop occurred as "Auto Zone," not "exactly" remembering the description of Scott's shirt, and not being sure whether he radioed in "subject" or "suspect" down. Id. at 86:1–12. Ghent further testified that during the entirety of the interview, Slager "seemed to have a good grasp of the events . . . didn't seem to have trouble remembering a lot of the details, was very detailed, [and] very linear for the most part in his telling of the story." Id. at 90:7–10.

The court notes that Ghent testified that during the interview, Slager's recollection of the initial traffic stop was consistent with the dashboard camera video of the traffic stop that was later recovered from Slager's police cruiser, and that Slager's description of the first taser deployment matched the radio traffic and debris left behind at the crime scene. Id. at 74:15–17; 75:19–23. Ghent also testified that Slager did not have any problems remembering the details of either the traffic stop or the taser deployment. Id. at 74:11–14; 75:15–18. Indeed, Ghent testified that Slager also had no problem recalling the details of the second taser deployment, and that Slager's recollection of this taser deployment also matched the other evidence in the case. Id. at 77:3–10.

Once Slager began to describe the ground altercation, Ghent testified that not only did Slager have no trouble recalling the facts, he recruited Aylor's investigator Levi Miles ("Miles") to assist in physically acting out the events, with Miles "acting as the victim." Id. at 77:22–78:13. Slager described Scott's movement during the ground altercation as "wiggling." Id. at 79:21–24. Slager never stated or physically acted out

that Scott "punched" or "kicked" him, or that Scott had ever "gotten on top" or "drive stunned" him. Id. at 81:5–19. Slager then described the series of events immediately before he fired the first shot, claiming that Scott "grabbed the barrel" of the taser with "both hands" and "pull[ed] the taser out of his hands." Id. at 82:7–17. Slager then described Scott "continuously coming forward" with the taser at "pretty close range," while acting out the events with Miles's assistance. Id. at 83:6–20. Slager stated that, at the time he fired his weapon, his primary focus was "on the barrel of the taser coming at him." Id. at 83:24–84:2. According to Ghent, at "no point" during the interview did Slager indicate that he had been tased. Id. at 84:3–16. Ghent further testified that Slager did not "seem to" have "any trouble" remembering the events that transpired immediately after the shooting—namely, handcuffing Scott. Id. at 86:13–87:1. Slager then said that he found the taser between where he fired the shots and where Scott fell after he was shot, and that Scott must have dropped it there. Id. at 87:2–10.

The § 3C1.1 enhancement for obstruction is to be imposed only if the obstruction, or attempted obstruction, was "willful[ ]." Therefore, the question before the court is whether, by giving false statements to SLED, Slager "had the specific intent to obstruct justice." United States v. Hernandez, 83 F.3d 582, 585 (2d Cir. 1996); see, e.g., United States v. Defeo, 36 F.3d 272, 276 (2d Cir. 1994) (defendant must have "consciously acted with the purpose of obstructing justice" (internal quotation marks omitted)). In determining intent, the court can rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence. United States v. Sisti, 91 F.3d 305, 313 (2d Cir. 1996). U.S.S.G. § 3C1.1 Application Note 1 states that "[i]n applying [§ 3C1.1] in respect to alleged false testimony or statements by the defendant, such

testimony or statements should be evaluated in a light most favorable to the defendant." Even under this defendant-friendly standard, Slager's statements to SLED qualify for the § 3C1.1 enhancement for obstruction.[13]

The court has carefully considered the testimony of defense expert Dr. Charles Morgan ("Dr. Morgan"), an expert in forensic psychiatry and cognitive performance under stress. During the sentencing hearing, the bulk of Dr. Morgan's testimony explained certain physiological processes that occur when a person experiences a high-stress event and claimed that these processes may distort the subject's decision-making, perception, and memory. Dr. Morgan also discussed how certain individuals such as U.S. Special Forces are trained to control their physiological reactions to stress. Finally, Dr. Morgan concluded that Slager's description of the shooting was that of someone who has experienced a high-stress event.

The court credits Dr. Morgan's testimony on the effects of trauma on memory generally. The bulk of Dr. Morgan's testimony centered on the premise that levels of stress sufficient to impact memory or perception occur "in life-threatening

---

[13] The court acknowledges that there is no audio or video recording of this interview. However, there is a detailed 12-page "memorandum of interview" that Peterson made soon after the interview, based on the contemporaneous notes that she and Ghent made. ECF No. 127-4, Peterson Memorandum. The court credits this memorandum of interview as an accurate—or at least the most accurate—record of what Slager said during the interview. This is especially so considering that Slager did not give a statement, even though he was informed that if he chose to not give a statement the SLED memorandum of interview would be the official statement from the interview. Sentencing Hr'g Tr. 89:2–25, Dec. 4, 2017 (Ghent testifying that at the end of the interview, Slager was informed that if he did not provide a written statement, Peterson's memorandum would be utilized as his statement). Peterson reviewed her contemporaneous notes with Slager in Aylor's presence, and allowed him to make any necessary changes. Id. at 88:18–25. The court has carefully reviewed the handwritten notes that Ghent and Peterson made during the SLED interview and finds that Peterson's memorandum is an accurate representation of those handwritten notes.

circumstances." See Sentencing Hr'g Tr. 361:11–18, Dec. 5, 2017 (Dr. Morgan testifying that in a six-year study of Gulf War veterans, he found that veterans changed their report regarding even material memories such as "where they [had] been burned or injured in ambushes."). The court understands Dr. Morgan's testimony about the "differences in perception" for people undergoing stress, such as "tunnel vision" and the "fragmented memories" of victims of trauma. Id. at 365:17–384:1. However, the court does not consider Dr. Morgan's testimony to support a conclusion that Slager's stress affected his perceptions and memories of the shooting. While Dr. Morgan's explanation of the physiological processes associated with stress is reliable, he did not come to a conclusion that these processes actually impacted Slager's memory.

Dr. Morgan did conduct a psychiatric evaluation of Slager, where he determined that Slager: (1) "does not have a formal psychiatric disorder[,]" (2) "does not suffer from a personality disorder[,]" and (3) possesses a "personality style [that is] characterized by careful deliberation, control of his emotions and having a long fuse (i.e. unlikely to lose his temper), above average stress tolerance, and a sensitivity for the feelings of other people." Gov. Ex. 24, Morgan Report at 1–2. But at no point during this evaluation of Slager did Dr. Morgan conduct an analysis of any trauma-related memory loss that Slager was suffering from. Sentencing Hr'g Tr. 414:25–415:6, Dec. 6, 2017 (Dr. Morgan testified that he did not reach a "specific conclusion" that Slager had, "in fact, experienced memory loss with respect to the shooting."); id. at 415:23–25; 416:1–3 (Dr. Morgan testifying that he did not give Slager a diagnosis of a dissociative disorder or of memory loss). Indeed, the only language in Dr. Morgan's report that seems to relate to

this issue indicates that Slager has a "personality style [that is] characterized by . . . above average stress tolerance." Gov. Ex. 24, Morgan Report at 2.

Dr. Morgan's testimony did not offer an opinion on whether Slager's account of the shooting is the result of his distorted perception and memory or his desire to avoid criminal responsibility, but instead simply explained how the brain works. For example, Dr. Morgan testified that at high levels of stress, the frontal cortex of the brain "shuts down." Sentencing Hr'g Tr. 357:22–358:12, Dec. 5, 2017. To the extent Dr. Morgan outlines certain principles to consider in evaluating Slager's statements to SLED, the court has kept those principles in mind.

Slager's primary argument is that his false statements to SLED were the result of faulty memory induced by the trauma of shooting Scott. The court is not convinced. The statement to SLED was made three days after the Scott shooting. Furthermore, it was a more detailed account of the same false narrative that Slager told Gann, Bowman, and the NCPD chief of police. During his SLED interview, Slager claimed once again that he fired while Scott was coming towards him with the taser, which is directly contradicted by the Santana video which shows that Slager fired his first shot when Scott was over fifteen feet away and the eighth shot when Scott was nearly forty feet away. During the federal sentencing hearing, Ghent testified that during the entirety of the interview with SLED, Slager "seemed to have a good grasp of the events [and] didn't seem to have trouble remembering a lot of the details." Sentencing Hr'g Tr., 90:7–10, Dec. 4, 2017.

In United States v. Sullivan, 28 F. Supp. 2d 1365, 1370 (S.D. Fla. 1998), the court found that a defendant—an FBI Supervisory Special Agent who was aware that the FBI was investigating the status of money taken from evidence—obstructed justice when he

lied to his supervisors about the status of the money when asked. The <u>Sullivan</u> court made special note of the fact that "[g]iven the Defendant's trusted status as an FBI Supervisory Special Agent, his words and representations were not initially questioned." <u>Id.</u> If law enforcement had not obtained the Santana video, Slager's status as a NCPD officer would likely have meant that his rendition of the events would not have been immediately questioned. Furthermore, at the time that Slager gave his materially false statement to SLED, he was aware that there was an investigation into the Scott shooting, and that his statement was part of that investigation.

Similarly, in <u>United States v. Smith</u>, 203 F.3d 884 (5th Cir. 2000), the Fifth Circuit upheld a district court's application of the obstruction of justice enhancement under U.S.S.G. § 3C1.1 where a bank teller gave a statement that the bank robbers were black males, when in reality the teller knew that the robbers were female. The <u>Smith</u> court agreed with the lower court that the teller's materially false statement "significantly obstructed" the investigation of the bank robbery, as FBI agents focused on finding "two black bank robbers who in reality did not exist." <u>Id.</u> at 891. The <u>Smith</u> court found that the bank teller's statement "went far beyond merely denying her own involvement or refusing to provide information, which would not qualify for the obstruction enhancement" but that the statement was made to obstruct the investigation into her own involvement in the robberies. <u>Id.</u> Here, too, Slager used the SLED interview to advance his false narrative of being forced to fire when Scott was coming towards him with a taser. Had Peterson not already received the Santana video at the time of the interview, Slager's statement would have sent the investigation into the Scott shooting on quite a different trail.

Had Slager refused to provide information, perhaps his conduct would not rise to the level of obstruction. But Slager made his detailed false statement to SLED investigators with his attorney present after agreeing to a DNA swab and signing a Miranda waiver. During the course of the interview with SLED, Slager physically acted out the false narrative of Scott coming at him with a taser in his hands to support his self-defense defense. And finally, during a pre-trial hearing in federal court on the admissibility of the statement, Slager testified that he had asked Aylor if there was "any video, surveillance video of businesses, security cameras, anything" of the shooting, presumably to ensure that there was nothing to repudiate his false account. ECF No. 118, Hr'g Tr., 64:1–23, Apr. 21, 2017 (Upon being questioned about whether he asked Aylor if there was a video before participating in the SLED interview, Slager answered "correct" and stated that he wanted Aylor to verify "if a video existed"). It is not a stretch for the court to find that Slager's inquiries about the presence of a video that captured the shooting indicate that he was wary of the true account of the shooting coming to light. It was only after being assured—albeit falsely—by SLED investigators that there was no video that Slager began his interview. At the time that Slager gave his statement to SLED, Slager knew that he was advancing a materially false account— namely, that Scott's coming towards him with a taser put him in fear for his life and he fired in self-defense.

Under these facts, there is a preponderance of evidence to support an obstruction-of-justice enhancement. Slager's statement satisfies each of the factors outlined in Dunnigan. First, Slager's statement that Scott was coming toward him with a taser at the time that he fired his first shot is false, as it is repudiated by the Santana video showing

Scott running away as Slager fired his first shot. Second, his statement was material to the official investigation of Scott's shooting. And third, Slager's obstructive conduct was willful, in that he does not contend that he was misled by his attorney or by anyone else. The court cannot find that Slager can give a Mirandized statement in the presence of his attorney 74 hours after a shooting—after asking about the presence of a video that would have captured the events at issue—that offers detailed facts of a false narrative because of faulty memory or confusion as opposed to with the willful intent to provide false testimony. Were it not for the Santana video, Slager's statements would certainly have hindered the investigation. Slager's statement fulfills each of the <u>Dunnigan</u> factors, and as such, the obstruction of justice enhancement is proper.

### 4. Evolving State Court Testimony and Federal Court Testimony

Next, the court analyzes whether the contradictory statements that Slager made in his state court testimony and pre-trial testimony in federal court constitute obstruction of justice. While Slager's contradictory and evolving rendition of the events of the shooting certainly render Slager an incredible witness, the court does not make a finding whether these statements rise to the level of obstruction of justice. As discussed above in section II.B.3, the court finds that the obstruction of justice enhancement is firmly met by Slager's April 7, 2015 statements to SLED. Although the court does not decide if Slager's evolving testimony also qualifies as obstruction of justice, it discusses these contradictions at some length to explain why it considers Slager an incredible witness.

The commentary to U.S.S.G. § 3C1.1 makes clear that the phrase "obstruct[ ] or impede[ ] . . . the administration of justice" in clause (A) of § 3C1.1 includes committing, suborning, or attempting to suborn perjury. U.S.S.G. § 3C1.1 cmt. n. 4(b) ("The

following is a non-exhaustive list of examples of the types of conduct to which this adjustment applies: . . . (b) committing, suborning, or attempting to suborn perjury . . . .”); see also Dunnigan, 507 U.S. at 92 (“Both parties assume the phrase ‘impede or obstruct the administration of justice’ includes perjury, and the commentary to § 3C1.1 is explicit in so providing.”).  This is true regardless of whether the perjurious testimony is given during another trial or during a pre-trial proceeding. United States v. Akinkoye, 185 F.3d 192, 205 (4th Cir. 1999) (“We have held that perjurious testimony given in pre-trial proceedings may be considered in determining whether to apply the enhancement.”); see also United States v. Hover, 293 F.3d 930, 935 (6th Cir. 2002) (holding that obstruction of justice enhancement was warranted for perjury given in prior trial).

During the state trial, Slager testified that during the ground altercation Scott was “in a pushup position” and in the process of getting off the ground.  ECF No. 127, Ex. D, State Trial Testimony November 29, 2016 25:7–18.  Slager further testified that while Scott was trying to get up from the ground, Scott was “on his back, facing [Slager]” and [Slager was] on top of [Scott].”  Id. at 25:7–18.  Slager testified that he had his taser in his hand and that Scott was “trying to get up” and was “not listening” to what Slager was saying, so Slager used the drive stun mode on the taser on Scott.  Id. at 26:3–27:5.  Slager further testified that Scott “grab[bed] the taser with his hand” and that after the ground altercation had ended and both men were standing up, Scott “continued” towards Slager until they were an “arm’s length” away.  Id. at 29:9–30:20.  Continuing his testimony, Slager testified that Scott was “coming towards” him with the taser, and that was when Slager pulled out his firearm and pulled the trigger “until the threat was stopped.”  Id. at 31:3–32:5.

In federal court, there were two days of pre-trial hearings during which Slager testified, April 21, 2017 and April 24, 2017. During his April 21, 2017 testimony, Slager claimed for the first time that Scott punched him in the chest, a fact that is not reflected in the statement that Slager gave to Bowman, Gann, and the NCPD chief of police, in the Peterson memorandum capturing Slager's April 7, 2015 statement to SLED, or in Slager's state court testimony. ECF No. 118, Federal Court Testimony April 21, 2017 92:11–94:7 (Slager testifying that he first remembered that Scott punched him in the chest when he was "in jail"). Slager also testified that Scott was on top of him at some point during the ground altercation, a fact that he had not previously revealed. Id. at 89:24–90:11 (When asked if he recalled "for the first time" in federal pre-trial testimony that Scott was on top of him during the ground altercation, Slager replied "Yeah. Some things come back and some things don't."). It was during the April 21, 2017 testimony that Slager also testified for the first time that Scott "drive-stunned" him with the taser, even though during his April 7, 2015 statement to SLED Slager stated that he did not know if Scott was even able to activate the taser. Id. at 90:17–91:2. A review of the state trial testimony reveals that Slager never testified that Scott drive-stunned him during the ground alteration, although Slager testifies at length that he held Scott down and used the drive stun on Scott "to make him comply." ECF No. 127, Ex. D, State Trial Testimony November 29, 2016 26:24–27:14.

During the April 24, 2017 hearing, Slager testified that he did not remember telling SLED agents that Scott was "continuously coming forward" with a taser, whether he told SLED agents that he was drive-stunned by Scott, or if he ever told SLED agents that he did not hear Scott activating the taser. ECF No. 119, Federal Court Testimony,

41

April 24, 2017 13:18–14:25.  Indeed, Slager testified on April 24th that he did not

remember "anything" that he told SLED agents during the interview.  Id. at 15:17–17.

Slager then testified that he had no recollection of Scott ever being on top of him during

the ground altercation, id. at 17:21–18:7, or of dropping the taser next to Scott's body

after the shooting, id. at 22:19–23:2.

      The key dispute here is whether Slager's contradictory statements were the result

of "faulty memory" or a "willful intent to deceive the court."  Of course, Slager's claim

of faulty memory alone does not mean that the obstruction enhancement is inapplicable.

In United States v. White, 74 F. App'x 296, 298 (4th Cir. 2003), the Fourth Circuit

upheld a district court's holding that a defendant perjured himself by claiming faulty

memory concerning the arson of a funeral home.  Likewise, in United States v. Brown,

647 F. App'x 267, 268 (4th Cir. 2016) the Fourth Circuit upheld a district court's

decision to apply the obstruction of justice enhancement where a defendant made

statements at a pre-trial suppression hearing that were at odds with the evidence.  The

district court in Brown rejected the defendant's argument that any statements he made at

the suppression hearing were the result of "faulty memory" as opposed to a "willful intent

to deceive the court."  Id.

      Certainly, Slager's evolving testimony of what happened immediately prior to the

shooting renders him an incredible witness.  But whether it constitutes obstruction of

justice or not is a more difficult question.  Slager stretches Dr. Morgan's testimony and

argues that he did not lie as a result of a "willful intent to deceive the court" but because

of a faulty memory, in part due to the effects of trauma on memory.  The court finds it

difficult to accept that the possible effects of trauma on Slager's memory give him an

unchecked license to, more than two years after the shooting, "remember" new facts about the shooting.  For example, during his federal court pre-trial testimony, Slager claimed for the <u>first</u> time that Scott punched him in the chest and that Scott drive-stunned him during the ground altercation.  These are facts that he did not even testify about in November 2016 during his state trial.  Additionally, Slager testified that his memory about the shooting is not better in 2017 than it was when he first gave his statement to SLED.  ECF No. 118, Federal Court Testimony April 21, 2017 93:24–94:2.  Because the court finds that the obstruction of justice enhancement is warranted based on Slager's April 7, 2015 statement to SLED, it does not also conduct the obstruction analysis based on Slager's state and federal court testimony, but finds that these numerous contradictions render Slager an incredible witness.

## C.     Downward Departure Pursuant to U.S.S.G. § 5K2.10

Slager has moved for a downward departure pursuant to U.S.S.G. § 5K2.10, which permits a downward departure "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior."  Slager contends that Scott's conduct— of running from the police when stopped for a broken brake light, of not yielding to verbal commands to stop, of yelling "Fuck the police," of trying to get away from Slager after he had been tased—substantially provoked Slager to shoot an unarmed man in the back five times as he ran away.  The court acknowledges that Scott's reaction to the traffic stop was not admirable.  The question before the court is whether Scott's behavior rose to the level of substantial provocation to warrant a § 5K2.10 downward departure.  It finds that it did not.

Section 5K2.10 hinges a departure on two criteria: 1) the victim must have committed "wrongful conduct;" 2) and such conduct must have "contributed significantly to provoking the offense behavior." The policy statement instructs that

> [i]n deciding the extent of a sentence reduction, the court should consider: 1) the size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant; 2) the persistence of the victim's conduct and any efforts by the defendant to prevent confrontation; 3) the danger reasonably perceived by the defendant, including the victim's reputation for violence; 4) the danger actually presented to the defendant by the victim; 5) any other relevant conduct by the victim that substantially contributed to the danger presented; 6) the proportionality and reasonableness of the defendant's response to the victim's provocation.

U.S.S.G. § 5K2.10. By delineating these factors, the Guidelines contemplate departures where the victim's conduct posed actual or reasonably perceived danger to the defendant, with an emphasis on physical danger. See United States v. LeRose, 219 F.3d 335, 340 (4th Cir. 2000) ("The factors enumerated in § 5K2.10 are tailored to crimes involving violence, and the guideline makes clear that only in unusual cases will victim misconduct 'warrant a reduced penalty in the case of a non-violent offense.'"). In interpreting § 5K2.10, the Fourth Circuit has emphasized that not only must the victim's conduct provoke the defendant, but "the victim must actually have done something wrong." United States v. Morin, 80 F.3d 124, 128 (4th Cir. 1996). Based on a consideration of all the circumstances, the court denies a downward departure based on Scott's conduct.

At the time of his death, Scott was 50 years old, was 5'9 and weighed 209 pounds. Slager, on the other hand, was 33 years old, was 6' and weighed 180 pounds. In United States v. Yellow Earrings, 891 F.2d 650, 654 (8th Cir. 1989), the court found persuasive that the victim was "a rancher and part-time truck driver" who "stood fully six to eight inches taller than Yellow Earrings and was likely much stronger." There is no

such disparity in size and strength here. Slager contends that Scott was a weightlifter and had trained in the martial arts. That may be, but at the time of the shooting Slager was seventeen years younger, three inches taller, and in much better physical shape. Thus, the two men were similarly situated in terms of size and strength.

Slager does argue that at the time of his death, Scott had consumed cocaine and that this should factor into the analysis. In support, Slager points to Scott's postmortem toxicology report, which found that "cocaine, cocaethylene and cocaine metabolite/degradation product were found in blood." ECF No. 130-4. At the time of his death, Scott's blood contained byproducts of cocaine and alcohol as well as a cocaine degradation product, indicating that he had used cocaine and alcohol anywhere from six hours to several days before his death.[16]

A number of circuits have permitted the admission of evidence that a plaintiff was on drugs at the time of the incident in excessive force cases. See Boyd v. City & Cnty. of

---

[16] While the amount of cocaine in Scott's body at the time of the incident may be relevant to Scott's behavior at the time of the traffic stop, Scott's past drug and alcohol use is certainly not relevant. The Fourth Circuit in Kopf v. Skyrm, 993 F.2d 374, 380 (4th Cir. 1993) found that "there is no special Fourth Amendment exception permitting the head-knocking and dog-mauling of past drug users" in holding that any evidence that the arrestee had used cocaine during the weeks prior to the robbery was irrelevant in an excessive force § 1983 action. Slager's reference to Scott's "incredible strength" as a result of his "chronic" cocaine use mirrors the police officer's argument in Kopf that the jury should find that the arrestee was "in some sort of 'craze' from a desire to obtain crack cocaine." Id. The Kopf court sharply rebuked the "gratuitous testimony and argument" about the arrestee's use of cocaine where there was no reliable evidence that the plaintiff was under the influence of any illegal drug when he was arrested, stating that "[s]o far as we can tell, the only evidence that Casella might have had a fiendish need for cocaine, which led him to crazily resist dog bites and slapjack blows, is the amateur psychological opinion of Wing's lawyer." In the same way, beyond the traces of cocaine revealed by Scott's toxicology report, Slager has not presented reliable evidence of Scott acting in a drug-induced "craze." Therefore, any evidence of Scott's prior drug use is not relevant.

San Francisco, 576 F.3d 938, 948–49 (9th Cir. 2009) (Upholding a ruling that allowed evidence that a decedent had been on drugs at the time of a police shooting because the evidence "was highly probative of the decedent's conduct, particularly in light of [the decedent's] alleged erratic behavior . . ."); Turner v. White, 980 F.2d 1180, 1182–83 (8th Cir. 1992) (Upholding admission of alcohol consumption because "it was incumbent upon the jury to consider Officer White's actions in relation to all the circumstances of the situation that confronted him.  We therefore believe the evidence of alcohol consumption was relevant to the jury's assessment of that situation . . ."); Saladino v. Winkler, 609 F.2d 1211, 1214 (7th Cir. 1979) ("This evidence tends to make more probable that the plaintiff acted as the defendant contended he did or that plaintiff otherwise conducted himself in such a manner as to place the defendant reasonably in fear of his life.").  In the Fourth Circuit, Kopf leaves open the question of whether evidence that an arrestee's behavior during an excessive force incident—in Kopf, of the arrestee being "confused and combative"—should be admitted as symptoms of drug use during the incident.

Slager does not contend that at the time that he stopped Scott or pursued him that he suspected that Scott had used cocaine.  However, even where a law enforcement officer may not have suspected intoxication, this evidence can be relevant where there is a dispute as to the decedent's conduct.  See T.D.W. v. Riverside Cty., 2010 WL 1006618, at *8–*11 (C.D. Cal. Mar. 11, 2010) (admitting evidence of decedent's intoxication despite no evidence that the deputies suspected intoxication); see also Boyd, 576 F.3d at 942–43, 949 (upholding admission of drugs in decedent's system, but not mentioning whether the officers suspected intoxication).  The court is persuaded by the many courts

that have permitted evidence that a decedent was under the influence of drugs or alcohol to explain unusual behavior or to corroborate the officers' version of how a decedent acted. All this being said, the court notes that in the state trial, the court correctly ruled that there was no reliable evidence in the record that Scott was under the influence of cocaine at the time of his arrest. State v. Slager, Charleston Cty. Ct. Gen. Sess., 2015 – A1010201687, Trial Tr. 75:5–76:4, Nov. 22, 2016. (State court judge finding that "there's no evidence in the record that Mr. Scott was under the influence of cocaine at the time of the arrest," and barring any expert testimony "about chronic [cocaine] use and the effects of cocaine on chronic users.").[17] Given that there is no reliable evidence that Scott was under the influence of cocaine at the time of his death, this issue does not affect the court's analysis of this first § 5K2.10 factor. The first factor remains neutral, and does not weigh in favor of Slager.

Slager next contends that by running from the traffic stop and disobeying commands to stop Scott escalated the confrontation. The court agrees. However, "[i]t is not better that all felony suspects die than that they escape." Tennessee, 471 U.S. at 11. When Slager decided to pursue Scott as he fled from the traffic stop, Slager only knew that Scott had a broken brake light.

Generally, only conduct that is both violent and wrongful justifies a downward departure. See Blankenship v. United States, 159 F.3d 336, 339 (8th Cir.1998), cert.

---

[17] Furthermore, the court does not consider any evidence related to "excited delirium" in the analysis of this first factor. State v. Slager, Charleston Cty. Ct. Gen. Sess., 2015-A1010201687, Trial Tr. 74:25–75:20, Nov. 22, 2016. (Oral ruling by state court judge that defense expert can testify as to "basic toxicology" but not "as to anything regarding Mr. Scott when he was under the influence of excited delirium and what that means," finding that it was "pure speculation about the unknown" and "incompetent testimony.").

denied, 525 U.S. 1090 (1999) (affirming denial of departure because while conduct was "wrongful," it was not violent); see also United States v. Bigelow, 914 F.2d 966, 975 (7th Cir.1990) (physical blocking of doorway was not "sufficient physical contact to provoke the attack") (emphasis added).  For example, in Yellow Earrings, the Eighth Circuit upheld the lower court's application of a downward departure where the victim "pushed Yellow Earrings, verbally abused her and attempted to publicly humiliate her when she refused his request for sexual intercourse."  891 F.2d at 652.  The Yellow Earrings court reasoned that had the victim "accepted 'no' for an answer in a reasonably responsible fashion, his subsequent misfortunes would never have transpired."  Id.

The court turns to the events that transpired before Slager fired the first shot to determine factors 2–5 of the § 5K2.10 analysis.  It is undisputed that Scott ran from the car at the initial traffic stop and disobeyed Slager's verbal commands to stop.  It is also apparent that at some point immediately prior to the first shot, Scott and Slager were involved in a ground altercation.  But as discussed, the court finds credible Santana's testimony that during this ground altercation Scott was never on top of Slager, Scott never punched Slager, and that Scott never fought with Slager.  Sentencing Hr'g Tr. 30:5–15, Dec. 4, 2017.  The court also credits Santana's testimony that Scott never took control of the taser or "charg[ed] towards" Slager.  Id. at 30:17–22.  Certainly, Scott's decision to run away and continually disobey commands from a police officer contributed to the escalation of this incident.  But Slager continues to argue the false narrative that Scott "grabbed [his] taser and ripped it from his control" in his sentencing memorandum. ECF No. 128 at 14.  As discussed, the court finds that Scott only ran to get away from Slager, that Scott was never on top of Slager during the ground altercation, and that Scott

never took Slager's taser or threatened him with it.  While Scott's conduct was wrongful—he was running away from Slager and did not have a weapon when he was shot and killed—it was simply not "violent" conduct as contemplated by the Guidelines.

The Fourth Circuit has held that "even highly provocative behavior does not justify a downward departure if the defendant's response is disproportionate."  United States v. May, 359 F.3d 683, 690 (4th Cir. 2004).  In May, the court discussed the "proportionality and reasonableness" of setting a cross on fire in an African-American victim's yard in response to the victim's verbal threat that "I've got something for you, too," and ultimately "decline[d] to give [the defendant] the benefit of a downward departure for conduct that he himself provoked."[18]  Id.  In United States v. Harris, 293 F.3d 863, 874 (5th Cir. 2002) the Fifth Circuit reasoned that, while engaging in the proportionality analysis, courts should keep in mind that "a certain degree of victim misconduct may be sufficient to provoke less severe blows but insufficient to provoke more severe blows."  The court is particularly persuaded by the Third Circuit's reasoning in United States v. Mussayek, 338 F.3d 245, 255 (3d Cir. 2003), which states in pertinent part:

> [C]ourts have often relied heavily on the concept of proportionality, that is, that the necessary provocation only exists if the provoked offense is proportional to the provoking conduct. This reasoning makes sense, as it would be exceedingly difficult to apply § 5K2.10 to a situation in which the offense behavior was excessively disproportional to the victim's misconduct.

---

[18] The May court considered the victim's reputation as a "dope pusher" and as a "carrier of a concealed weapon," but ultimately rejected this reputation because the defendant was unaware of it.  Id.  Similarly, any evidence that Scott was trained in martial-arts or was in the National Crime Information Center database as a felon does not factor into the downward departure analysis because at the time that Slager ran after Scott, he was unaware of this information.

Along the same lines, the court agrees with the Eighth Circuit in <u>United States v. Shortt</u>, 919 F.2d 1325, 1328 (8th Cir. 1990) that "[a] concern for the proportionality of the defendant's response in manifested by the terms of § 5K2.10."

The court finds that it is impossible to find that Slager responded proportionally in shooting Scott dead after an altercation in which Scott was never on top, never kicked or punched Slager, and never tased Slager.  <u>See</u> <u>United States v. Paster</u>, 173 F.3d 206, 212 (3d Cir. 1999) (concluding that fatally stabbing wife was disproportionate to her revelation of past infidelities); <u>Blankenship v. United States</u>, 159 F.3d 336, 339 (8th Cir. 1998) (finding defendant's actions not proportional where victim yelled and threatened defendant from outside defendant's home but was unarmed, and defendant left through back door, returned with gun, and shot victim in ensuing struggle); <u>United States v. Dautovic</u>, 763 F.3d 927, 932 (8th Cir. 2014) (denying downward departure based on § 5K2.10 where officer used batons to beat a victim, leading to injuries of a broken right forearm, head injury that required seven staples, and "serious" torso bruising, because the victim was "still aggressive and still fighting" in resisting arrest.).

The court acknowledges Slager's argument that courts have applied a U.S.S.G. § 5K2.10 downward departure in § 242 cases.  But this does not mean that such a departure is appropriate here.  Namely, Slager invokes the Supreme Court case of <u>Koon v. United States</u> to argue that such a departure is appropriate here.  In <u>Koon</u>, the victim Rodney King was beaten severely by police officers.  <u>Koon v. United States,</u> 518 U.S. 81 (1996). The Supreme Court held that the district court did not abuse its discretion in applying § 5K2.10 to depart downward five levels after finding that King's misconduct—which included driving while intoxicated, fleeing the police, and initially resisting arrest—was

provocative, even though King was no longer posing any danger at the time the officers' actions crossed the line to unlawful force.  Id. at 101.  Here, Scott also engaged in an extended course of provocative misconduct.  However, there is a significant difference in the officers' response which supports the court refusal to grant a downward departure under § 5K2.10 here—in Koon, although King was severely injured by the officers' beatings, he was not shot dead. While the Koon court found that the district court had not abused its discretion in applying § 5K2.10 under the facts of the King beating, this court does not interpret Koon to mean that Scott's actions of resisting arrest require the court to apply a § 5K2.10 downward departure in this particular case

The court finds guidance in Harris, where the Fifth Circuit upheld a district court's application of U.S.S.G. § 5K2.10 where a police officer struck the victim in the head with a baton after the intoxicated victim "persisted in thrashing around violently in the car, threatening to damage both the vehicle and himself," and "kicked" the defendant officer when he attempted to subdue him.  Harris, 293 F.3d at 874.  In Harris, the Fifth Circuit credited the district court's finding that the victim "suffered little physical damage" as a result of being hit by the police baton.  Id.  Here, Scott died as a result of Slager shooting him.  Being hit in the head with a police baton may be a "proportional" response to an intoxicated victim's protracted violent behavior, but shooting a man dead for fleeing, not following instructions, and attempting to get away from an officer after a ground altercation is not proportional.

The court must determine whether the conduct of Scott was wrongful and whether Slager's response was proportionate.  Scott's conduct—of running away from a traffic stop, of disobeying lawful commands to stop, even engaging in a ground altercation with

Slager—was certainly wrongful. But it pales in comparison to the offense conduct of Slager shooting him five times in the back as he ran away. Under the evidence presented, the court finds that Slager's actions were "clearly disproportionate" to any provocation arising from Scott's wrongful conduct. Therefore, it declines to grant the U.S.S.G. § 5K2.10 departure.

### D. Downward Departure Pursuant to U.S.S.G. § 5K2.0

Under U.S.S.G. § 5K2.0, the court can depart from the applicable Guidelines range if: "in the case of offenses other than child crimes and sexual offenses, the court finds . . . that there exists an aggravating or mitigating circumstance." U.S.S.G. § 5K2.0(a)(1)(A). As explained below, the court finds that a two-level downward departure is appropriate in this case based on Slager's unique susceptibility to abuse in prison as well as the "hardship" imposed by the successive state and federal prosecutions.

### 1. Susceptibility to Abuse in Prison

Sentencing courts have historically taken into consideration the impact of conditions of confinement on punishment, and susceptibility to abuse is a valid reason for a downward departure under the Guidelines. Koon, 518 U.S. at 81 (approving downward departure for susceptibility to abuse in prison for police officers); U.S. v. Long, 977 F.2d 1264, 1277–78 (8th Cir. 1992) (physical impairment may make a defendant unusually vulnerable to abuse in prison and warrant a downward departure); U.S. v. Parish, 308 F.3d 1025, 1031 (9th Cir. 2002) (approving downward departure based on stature, demeanor, naivety, and class of conviction); U.S. v. Lara, 905 F.2d 599, 603 (2d Cir. 1990) (approving departure based on diminutive size, immature appearance, and sexual orientation).

Because susceptibility to abuse is not "ordinarily relevant" as a basis for departure, it is a "discouraged" factor which is appropriate only if it is "present to an exceptional degree or in some other way [makes] the case different from the ordinary case." Koon, 518 U.S. at 96. Indeed, Koon itself contemplated that where a district court's determination that a defendant is particularly susceptible to abuse is compounded by "widespread publicity and emotional outrage . . . [this] is just the sort of determination that must be accorded deference by the appellate courts." Id. at 112. And indeed, while rare, courts have granted downward departures based on a defendant's susceptibility to prison abuse in similar cases.

Relying on Koon, the lower court in United States v. LaVallee, 439 F.3d 670, 677 (10th Cir. 2006), granted a two-level downward departure under § 5K2.0 based on the defendant correctional officer's particular susceptibility to abuse in prison. In LaVallee, the defendants were charged after a three-year investigation revealed a "vast conspiracy to abuse inmates." Id. at 678. The Tenth Circuit found that there was no abuse of discretion in the district court's decision to grant a two-level downward departure, based in part on the fact that the case was reported in a publication distributed among federal inmates and because of the investigation's overall notoriety. Id. at 707–708.

The court in United States v. Volpe, 78 F. Supp. 2d 76, 84 (E.D.N.Y. 1999), aff'd in part, dismissed in part, 224 F.3d 72 (2d Cir. 2000) also granted a two-level downward departure in an 18 U.S.C. § 242 case that drew similarly "extensive" media coverage. In Volpe, the defendant Justin Volpe ("Volpe") was a police officer in New York City who had been convicted of the "brutal" sexual assault of Abner Louima in a police precinct that left Louima hospitalized for two months. Id. at 82. Volpe moved for a downward

departure on a variety of grounds, including that he was "unusually susceptible to abuse in prison." Id. The Volpe court granted this departure, reasoning that the violence of Volpe's crime, his status as a police officer, and the extensive national publicity surrounding the case would "expose Volpe to abuse at the hands of other prisoners or segregation to avoid such abuse." Id.

Because of the release of the Santana video and the subsequent national media attention surrounding this case,[20] the court finds persuasive Slager's argument that he will be more susceptible to prison abuse than other similarly-situated defendants. Indeed, Slager states that as a result of the press coverage of the Scott shooting, the home he lived in when the shooting occurred was firebombed, and that during pre-trial detention he has been placed in a special housing unit with twenty three hours of solitary confinement per day. ECF No. 130 at 10–11. Like Volpe, LaVallee, and Koon, this case presents a violent crime, a police officer, and extensive national publicity. Cf. United States v. Strange, 370 F. Supp. 2d 644, 649 (N.D. Ohio 2005) (denying downward departure based on a law enforcement officer's susceptibility to abuse in prison after finding that defendant's case was not "exceptional" like the cases in which media coverage of the incident was "overwhelming"), United States v. Colbert, 172 F.3d 594, 597–98 (8th Cir.

---

[20] See e.g., The Most Commented-On Articles of 2015, The New York Times (Dec. 28, 2015), https://www.nytimes.com/2015/12/18/insider/the-most-commented-on-articles-of-2015.html (Explaining that the article "South Carolina Officer is Charged with Murder of Walter Scott" was the third-most commented-on article on the New York Times website in the year 2015, with 5,325 public comments submitted); Former South Carolina police officer who fatally shot Walter Scott indicted on federal civil rights violation, The Washington Post (May 11, 2016), https://www.washingtonpost.com/news/post-nation/wp/2016/05/11/former-north-charleston-officer-who-shot-walter-scott-indicted-on-federal-civil-rights-violation/?utm_term=.f1e46845c052.

1999) (denying downward departure for police officer where crime did not receive "torrent of publicity."). The court agrees with the reasoning of the Volpe court that a defendant "is to be punished for his crimes, not the attendant media coverage." Volpe, 78 F. Supp. 2d at 89. Slager is granted a downward departure based in part on his unique susceptibility to abuse in prison.

## 2. Successive Prosecutions

District judges may also consider the "hardship" imposed by successive prosecutions in deciding whether to depart downward. Koon, 518 U.S. at 112. In Koon, the court found that the district court did not abuse its discretion in granting a downward departure based on successive state and federal prosecutions. Id. at 112 ("District Court did not abuse its discretion in determining that a 'federal conviction following a state acquittal based on the same underlying conduct . . . significantly burden[ed] the defendants.' The state trial was lengthy, and the toll it took is not beyond the cognizance of the District Court."). The court is persuaded by Slager's factual arguments regarding the hardships that the federal prosecution imposed on him, and finds that the circumstances of this case present a compelling claim for a downward departure.

Certainly, no constitutional bar exists as to successive prosecution. See United States v. Wallace, 578 F.2d 735, 739 (8th Cir.), cert. denied, 439 U.S. 898 (1978). And the court acknowledges the reluctance with which even the Koon court—and certainly subsequent courts interpreting Koon—upheld the district court's application of a downward departure based on successive prosecutions. In overturning the district court's downward departure in United States v. Phillips, 367 F.3d 846, 862 (9th Cir. 2004), the Ninth Circuit held that where the defendant's prior state prosecution consisted "merely"

of a "post-indictment," "pre-prosecution" negotiation in which the defendant paid a fine, the prior state prosecution "cannot alone" justify the downward departure. But here, Slager was indicted on federal civil rights charges before the state murder trial began. When the five-week state trial ended in a mistrial, Slager faced a second, federal trial— based on the same underlying conduct. These successive state and federal prosecutions, although legal, raise a "specter of unfairness." <u>United States v. Koon</u>, 833 F. Supp. 769, 786 (C.D. Cal. 1993), <u>aff'd in part, vacated in part</u>, 34 F.3d 1416 (9th Cir. 1994), <u>aff'd in part, rev'd in part,</u> 518 U.S. 81 (1996). Therefore, the court considers this factor as well in granting a downward departure.

### E.      Variance

Slager requests a significant variance in this case. The court applies a three-level downward variance in recognition of the fact that Slager's history and characteristics show he has led an otherwise "spotless life." Sentencing Hr'g Tr. 681:10, Dec. 7, 2017.

After careful consideration of the facts, a thorough review of case law, and keeping in mind the 18 U.S.C. § 3553(a) factors, the court imposes a sentence of 240 months. This sentence is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. <u>Booker</u>, 543 U.S. at 268 (2005) (internal citations and quotations omitted). The court recognizes that the shooting of Walter Scott was "a tragedy that affected an entire community, and a tragedy that affected our entire nation." <u>Id.</u> at 680:14–16. It is confident that this sentence "demonstrates to the community that no one is above the law, and that Walter Scott mattered." <u>Id.</u> at 680:20–22.

### III.  CONCLUSION

For the foregoing reasons, the court (1) applies the second-degree murder cross-reference and (2) applies the obstruction of justice enhancement based on Slager's April 7, 2015 statements to SLED.  Further, the court denies the downward departure based on § 5K2.10, but grants a two-level downward departure under § 5K2.0 based on Slager's susceptibility to abuse in prison and the successive state and federal prosecutions. Finally, it grants a three-level variance based on Slager's history and characteristics.  The court imposes a sentence of 240 months.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 16, 2018**
**Charleston, South Carolina**