UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL SLAGER | CASE NO.<br>2:16 - CR - 378<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255** |

## I.     **INTRODUCTION**

This case stands as a textbook example of why several long-standing rules of attorney and judicial conduct are essential, and it illustrates how badly things can go awry when defense counsel and the district court judge cast these rules aside. While this case was still pending, during an *ex-parte* meeting with Michael Slager's lawyers, the presiding judge expressed his personal opinion that "this is not a murder case." Rather than reporting this incident, moving to recuse the judge, or even informing opposing counsel, the defense team instead constructed their entire plea negotiation strategy around this comment from the judge – they assumed that the judge did not believe that Slager had committed murder, and that his in-court rulings would reflect that belief. As a result, they rejected numerous overtures from the Government to resolve this case with a favorable plea deal. The defense team instead advised Slager to enter into an open plea agreement, potentially exposing Slager to life in prison, buttressed only by their own willingness to gamble years of Michael Slager's life on an off-the-cuff *ex-parte* comment from the district court judge. All of this was done without Slager's knowledge, input, or approval. Slager was never informed of any of the Government's plea offers; counsel rejected or allowed the offers to lapse without Slager's knowledge.

Piling bad judgment upon bad judgment, the attorneys proceeded to Slager's sentencing hearing assuming that they had already prevailed in the most hotly contested issue – whether this was a case of manslaughter or murder. Consequently, the defense team's presentation at sentencing was, to put it charitably, quite convoluted. Making matters even worse, the defense team had conceded several facts in the written plea agreement that inhibited or foreclosed their ability to even *argue* for a lesser sentence. This was also done because counsel relied unwaveringly on their belief that the judge would rule in their favor, and counsel failed to appreciate how the words of the plea agreement would harm them if they were actually tasked with persuading the judge that this was not a murder case. When they found themselves in exactly that predicament, they were unprepared to meet the task, and disaster naturally followed. Again, this was all undertaken without the knowledge, input, or consultation with Michael Slager. In the end, the district court judge ruled that this was a murder case, substantially increasing the sentencing range for the offense. Slager received a 240-month sentence, which is 52-89 months more than Slager would have received if he had accepted the Government's final plea offer. Slager respectfully submits that he would have accepted the Government's plea offer had his lawyers relayed it to him, as is their responsibility under the Sixth Amendment. Slager further submits that his attorneys were ineffective as set forth in detail in this Memorandum, and that he was directly prejudiced by their deficient performance.

II.    **STATEMENT OF FACTS**

**A.    Incident and Charges**

On April 4, 2015, Michael Slager shot and killed Walter Scott during the course of a routine traffic stop that went horribly wrong. Slager was a North Charleston police officer at the time. During a traffic stop on Walter Scott's vehicle, Scott fled the area on foot, and Slager gave chase. After an altercation on the ground with Scott, and several unsuccessful attempts to deploy his taser to subdue Scott, Slager drew his weapon and fired eight times

at Scott, killing him. Days later, Slager was arrested by state authorities and charged with murder. Approximately one month later, Slager was indicted in federal court. (ECF 3). The federal indictment charged Slager with (1) deprivation of rights under color of law, (2) the use of a weapon during the commission of a crime of violence, and (3) obstruction of justice. (ECF 1). The state and federal authorities decided that Slager would be tried for murder in state court first.

### B. State Court Trial

Slager's state court murder trial began on October 31, 2016. Slager chose to take the stand in his own defense, providing a detailed account of the circumstances that led to the shooting. He testified that the morning of the incident was a "normal Saturday morning," and that he first observed Scott's vehicle driving down Remount Road in North Charleston. (Tr. of State Court Proceedings, 11-29-20, p.7). Slager noticed that Scott's brake light was not functioning, and so he conducted a traffic stop. (Tr. of State Court Proceedings, 11-29-20, p. 7-8). Slager testified that he intended to issue a warning to Scott for the brake light violation. (Tr. of State Court Proceedings, 11-29-20, p. 9). When Slager approached Scott and began to interact with him, Scott initially stated that the vehicle did not belong to him; later, Scott stated that he was buying the car. (Tr. of State Court Proceedings, 11-29-20, p. 11). Slager retrieved Scott's information and walked back to his patrol car, with the intention of running Scott's information. (Tr. of State Court Proceedings, 11-29-20, p. 12-14). As Slager was seated in his vehicle, he saw Scott's car door open. (Tr. of State Court Proceedings, 11-29-20, p. 14). At that time, Slager instructed Scott to remain in his vehicle, and to close the car door. (Tr. of State Court Proceedings, 11-29-20, p. 15). Scott complied. (Tr. of State Court Proceedings, 11-29-20, p. 15). Moments later, Slager observed the car door open again, and Scott exited the vehicle and fled from the scene. (Tr. of State Court Proceedings, 11-29-20, p. 16). Slager pursued Scott on foot. (Tr. of State Court Proceedings, 11-29-20, p. 17). As they were running, Slager

shouted after Scott, but Scott continued to run. (Tr. of State Court Proceedings, 11-29-20, p. 17). Slager yelled "taser, taser, taser!" (Tr. of State Court Proceedings, 11-29-20, p. 17).

Scott continued to run, and Slager deployed his taser. (Tr. of State Court Proceedings, 11-29-20, p. 19). The first shot was ineffective, and Scott continued running away from Slager. (Tr. of State Court Proceedings, 11-29-20, p. 19-20). Slager reloaded his taser cartridge and fired a second time. (Tr. of State Court Proceedings, 11-29-20, p. 20). This time, the taser appeared to be effective, because Scott fell to the ground. (Tr. of State Court Proceedings, 11-29-20, p. 21). As Slager approached, Scott attempted to get up from the ground, and Slager pulled the trigger on his taser again. (Tr. of State Court Proceedings, 11-29-20, p. 21). Slager described Scott as being "in a pushup position getting up," and Slager reached for Scott's hand. (Tr. of State Court Proceedings, 11-29-20, p. 25). Scott rolled over onto his side, and then onto his back, facing Slager. (Tr. of State Court Proceedings, 11-29-20, p. 25). Scott continued to resist arrest, "trying to fight and trying to get up." (p. 26). Slager attempted to use his taser's "drive stun" [1] mode to subdue Scott. (Tr. of State Court Proceedings, 11-29-20, p. 27). Slager testified that Scott was stronger than he was, and Slager felt like he "was going to lose the fight." (Tr. of State Court Proceedings, 11-29-20, p. 27).

Slager used his radio to call for help from his partner. (Tr. of State Court Proceedings, 11-29-20, p. 28). Slager testified that at that moment, Scott grabbed his taser and started "yanking on it." (Tr. of State Court Proceedings, 11-29-20, p. 29). Slager testified that Scott gained control of the taser, and that he pointed the taser at Slager. (Tr. of State Court Proceedings, 11-29-20, p. 29). They both stood up, and Slager backed up. (Tr. of State Court Proceedings, 11-29-20, p. 30). Slager testified that he saw Scott moving towards him. (Tr. of State Court Proceedings, 11-29-20, p. 30). Slager stated that his

---

[1] "Drive stun" is a function of the taser whereby the device is activated and "is held against the target without firing the projectiles, and is intended to cause pain without incapacitating the target." https://en.wikipedia.org/wiki/Taser#Drive_Stun_capability

emotional state in that moment was "fear," "I was scared . . . it was total fear that Mr. Scott didn't stop, continued to come towards me." (Tr. of State Court Proceedings, 11-29-20, p. 31). Slager drew his firearm and began to fire. (Tr. of State Court Proceedings, 11-29-20, p. 32). He testified that he was unsure how many shots he fired at Scott, but he kept firing "until the threat was stopped, like I'm trained to do." (Tr. of State Court Proceedings, 11-29-20, p. 32).

During closing argument, Slager's defense counsel urged the jury to acquit Slager. Counsel touched on Slager's mental state, arguing:

> [Slager] didn't shoot [Scott] because of a brake light. He shot him in fear of his life … because this man was out of control and would do anything to stop anyone at that time. Is he going to car-jack somebody? Is he going to grab somebody off the street? How was Slager supposed to know that?

(Tr. of State Court Proceedings, 11-30-20, p. 60). Later, Counsel cautioned the jury not to convict Slager of manslaughter, stating:

> Murder, manslaughter, you know what manslaughter is? Manslaughter is when you go home and you catch your wife in bed with your best friend. That's manslaughter. That's when you're provoked by the actions of your loved one. That's what heat of passion means. This was not heat of passion … provocation is meaningless in this circumstance unless you see evidence of him going – what's the word? If you lose rational reasoning temporarily, he's so upset, he's so overcome by what happened that he loses his sense of responsibility. That kind of thing. It didn't take place. Manslaughter is a red herring … There was no manslaughter.

(Tr. of State Court Proceedings, 11-30-20, p. 65). In summation, defense counsel urged the jury to return a verdict of not-guilty on all charges. (Tr. of State Court Proceedings, 11-30-20, p. 68). After deliberating for three days, the jury announced that they were unable to reach a verdict, and a mistrial was subsequently declared. (Tr. of State Court Proceedings, 12-5-16, p. 12). After the mistrial, the parties' focus shifted to the federal charges, and it

was decided that the federal proceedings would move forward prior to any state court retrial.

### C.     Meeting with Presiding Judge

At some point prior during the pendency of Slager's federal case, members of the defense team met with the presiding judge in chambers to discuss matters relating to their C.J.A. appointment. (A. Savage Decl., ¶¶14-15; C. Savage Decl., ¶¶7-8; McCune Decl., ¶¶2-4). Because this meeting dealt with C.J.A. funding matters, it was *ex-parte*. Defense counsel were aware at this point that the judge had reviewed transcripts of Slager's state court trial, and had attended portions of the state court trial, and he was therefore familiar with the details of the case. During this meeting the judge, unprompted by anything said or asked by counsel, expressed his opinion that "this is not a murder case." (A. Savage Decl., ¶¶14-15; C. Savage Decl., ¶¶7-8; McCune Decl., ¶¶2-4). The attorneys understood this comment to mean that the judge believed that Slager's conduct constituted voluntary manslaughter, involuntary manslaughter, or even possibly a lesser offense. (McCune Decl., ¶9). Based on this statement by the judge, the defense team did not believe that the judge would apply the murder cross-reference under the Guidelines.[2]

### D.     Plea Negotiations

Around the time of the defense team's meeting with the district court judge, plea negotiations were ongoing between Slager's defense lawyers and the prosecution. On or about April 20, 2017, the defense team collectively received an email from Beth Drake, the U.S. Attorney for South Carolina. The email stated as follows: "Last offer still stands, and that is G/L range of 151 to 188, with your ability to argue for variances and departures. If you guys want to counter with something other than the involuntary guidelines, we will

---

[2] U.S.S.G. § 2H1.1 provides that the base offense level for violations of §242 is "the offense level from the offense guideline applicable to any underlying offense." Where the underlying offense conduct is second-degree murder, a base offense level of 38 is applied. U.S.S.G. §2A1.2(a). A cross-reference to voluntary manslaughter carries a base offense level of 29. U.S.S.G. §2A1.3(a).

certainly consider." (A. Savage Decl., ¶19; McCune Decl., ¶10). Based on the Judge's prior comments that "this is not a murder case," defense counsel did not advise Slager to accept this offer. (A. Savage Decl., ¶19). In fact, counsel never even conveyed the offer to Slager. (McCune Decl., ¶11; M. Slager Decl., ¶3; T. Slager Decl., ¶4). As a result, the plea offer was allowed to lapse without Slager's knowledge. (McCune Decl., ¶¶10-13; M. Slager Decl., ¶3).

E.     **Guilty Plea by Agreement**

On May 2, 2017, Slager appeared before the district court to enter a guilty plea by written agreement. (ECF 114). Under this agreement, Slager agreed to plead guilty to count one of the indictment, for violating 18 U.S.C. § 242, Deprivation of Rights Under Color of Law. (ECF 114). In exchange, the Government agreed to dismiss the remaining counts of the indictment. (ECF 114, p. 4). The agreement did not contain any specific language about the applicable cross-reference or sentencing Guidelines range. (ECF 114, p. 3).

The agreement contained the following recitations of fact and admissions by Slager:

> On April 4, 2015, Michael Slager was a commissioned police officer with the North Charleston Police Department (NCPD). Slager was on duty as a police officer when he stopped Walter Scott's vehicle after observing that the center brake light was not working. During the stop, Scott fled the scene on foot. Slager engaged in a foot chase of Scott for approximately 200 yards. During the chase, Slager deployed the probes of his Taser. His first attempt to use his Taser was unsuccessful in stopping Scott. Slager ultimately caught up to Scott and deployed his Taser probes a second time.
>
> After the second Taser deployment, Scott fell to the ground. Scott managed to get off the ground and again run away from Slager. The defendant's Taser dropped to the ground behind the defendant. As Scott was running away, Slager fired eight shots at him from his department-issued firearm. During the time that each of the eight shots were fired, Scott was unarmed and running away from Slager. Five shots hit Scott, all entering from behind. Scott suffered bodily injury and died on the scene as a result of the injuries from the gunshots.

> *The defendant used deadly force even though it was objectively unreasonable under the circumstances. The Defendant acknowledges that his actions were done willfully, that is he acted voluntarily and intentionally and with specific intent to do something that the law forbids.*

(ECF 114, pp. 2-3)(emphasis added). Slager was not advised about the potential significance of the  factual concessions contained in the agreement. (M. Slager Decl., ¶¶4-7).

### F.     Presentence Investigation Report, and Objections

On August 15, 2017, the United States Probation Office completed its draft Presentence Investigation Report ("PSR"). The report determined that the appropriate cross-reference under the Guidelines for Slager's violation of 18 U.S.C. § 242 (pursuant to U.S.S.G. §2H1.1) was voluntary manslaughter. (PSR ¶33). The PSR assigned a base offense level of 29 for voluntary manslaughter, pursuant to U.S.S.G. §2A1.3(a). The PSR added a six-level enhancement under U.S.S.G. §2H1.1(b)(1)(A) and (B), because Slager was a public official at the time of the offense. (PSR ¶34). The PSR provided for a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a) and (b). (PSR ¶¶40-41), for a total offense level of 32. (PSR ¶42). Based on this offense level and criminal history category I, the PSR provided a Guidelines range of 121 to 151 months. (PSR ¶¶27, 68). Additionally, the PSR suggested that a departure may be appropriate under U.S.S.G. §5K2.10, which provides for a Guidelines reduction where "the victim's wrongful conduct contributed significantly to provoking the offense behavior." (PSR ¶88).

On September 1, 2017, the Government filed numerous objections to the PSR. The Government argued that the appropriate cross-reference under the Guidelines was second-degree murder, rather than voluntary manslaughter. (Gov. Objections to PSR, p. 2).[3] The Government noted that in his plea agreement, "the defendant acknowledged that he shot

---

[3] The Government also argued that Slager should receive a two-point upward adjustment under obstruction of justice, and that a departure under U.S.S.G. §5K2.10 would not be appropriate in this case. (Gov. Objections to PSR, p. 2).

Walter Scott without legal justification," and that "the defendant had admitted with his guilty plea that his conduct was objectively unreasonable." (Gov. Objections to PSR, p. 17, 20). The Government argued that Slager's concessions in the plea agreement precluded a finding of voluntary manslaughter. (Gov. Objections to PSR, p. 23).

On September 21, 2017, defense counsel filed a response to the Government's objections, taking the opposing view on each of the Government's arguments. (Def. Response to Gov. Objections to PSR, p.1). Regarding the cross-reference issue, the defense's response stated as follows:

> There is no evidence that Slager acted out of malice; rather, Slager, in fear of his life, deployed lethal force. At the time Slager made the decision to use lethal force, he was alone, exhausted, had been stripped of his Taser and was overpowered by Scott. At some point, *the firing became objectively unreasonable, though Slager remained in fear of his life*. This negates malice . . . *Slager had objectively reasonable fear at the time he made the decision to use lethal force. At some point during the incident, Slager's perception crossed the line into objectively unreasonable fear*. Nonetheless*, Slager continued to have actual fear* for his life such that actual malice did not exist. . .

(Def. Response to Gov. Objections to PSR, p. 13)(emphasis added). The defense team submitted an additional "Memorandum for Sentencing" which provided further analysis of these issues. (ECF 128). The memo stated, "Slager approached Scott and attempted to detain him by placing handcuffs on him. Scott, who was on the ground, resisted. Slager was unsuccessful in his efforts to handcuff him. With growing fear, and without knowing anything about Scott or why he was so violently resisting detainment for a minor offense, Slager realized he was unable to control Scott." (ECF 128, p. 13). Slager's "level of fear continued to escalate," the memo stated, "as frightening thoughts raced through his mind." (ECF 128, p. 14). In its argument regarding the appropriate cross reference, the memo correctly noted that legal provocation and resulting anger and "heat of passion" will mitigate an otherwise malicious killing. (ECF 128, pp. 19-20). However, the memo

repeatedly made reference to Slager's alleged *fearful* state of mind, and argued that provocation that gives rise to *fear* will negate malice. (ECF 128, p. 23).[4] The memo repeatedly characterized Slager's mental state being consumed by fear, rather than one consumed by anger or "heat of passion." Nevertheless, the memo urged the district court to apply the voluntary manslaughter cross-reference, as recommended by the PSR.

### G.    Federal Sentencing Hearing

The primary contested issue at Slager's federal sentencing proceeding was the proper cross-reference under §242 – voluntary manslaughter or murder. The Government maintained its position at sentencing that the proper cross reference was murder, whereas defense counsel attempted to persuade the court to apply a cross-reference to voluntary manslaughter. The Government presented three witnesses at sentencing. The first witness, Feidin Santana, was the eyewitness who filmed the video of the shooting incident. (ECF 151, pp. 23, 31-32). Santana testified that on the morning of April 4, 2015, he was walking to his barber shop when he observed Walter Scott running away from Officer Slager. (ECF 151, p. 26-27). Santana saw them turn and run into an empty lot, and he ran after them to observe what was happening. (ECF 151, p. 27). When they came back into view, Santana observed Scott and Slager "in a tussle," with Scott on the ground and Slager on top of him. (ECF 151, p. 28). Santana testified that he could hear "something electric." (ECF 151, p. 29). Slager yelled "stop," but Scott did not surrender and continued resisting arrest. (ECF 151, p. 57). Santana decided to take out his camera phone, and he began filming the incident. (ECF 151, p. 31). Santana then observed Scott get up "very fast," and Scott ran away from Slager. (ECF 151, p. 32). At that moment, "what [Santana] heard was just

---

[4] "As will be demonstrated, there was adequate provocation caused by the resistance of Scott to Slager's lawful commands and attempt to arrest him. Because the malice was mitigated by provocation *and the ensuing fear*, the proper cross reference…" (ECF 128, p. 21). "'Heat of passion' is a term of art describing a disturbance to the ability to think rationally that is brought on by strong feelings, *including feelings of fear*." (ECF 128, p. 21). "That provocation by Scott *and fear experienced by Slager* are the hallmarks of the 'heat of passion' that incited Slager." (ECF 128, p. 25).

gunshots." (ECF 151, p. 32). In the moment before Slager began shooting, Santana observed "something falling behind" Slager, but he did not know what the item was. (ECF 151, p.33). After the gunshots, Scott fell to the ground. (ECF 151, p. 34). Santana did not see Scott move again, after he fell to the ground. (ECF 151, p. 36).

The Government's second witness was Charles Ghent, a SLED employee who interviewed Slager on April 7, 2015. (ECF 151, pp. 70-72). Ghent conducted the interview along with other agents at Slager's attorney's office. (ECF 151, pp. 71-72). In that interview, Slager stated that he stopped Scott's car for a brake light violation. (ECF 151, p. 73). While Slager was running Scott's vehicle information, Scott fled on foot. (ECF 151, p. 74). Slager gave chase, yelling "taser taser taser" after Scott. (ECF 151, p. 75). Slager deployed the taser, striking Scott in the upper back. (ECF 151, p. 75). Slager reloaded his taser and deployed it a second time, and Scott "locked up" and fell to the ground. (ECF 151, p. 76). Slager tried to push Scott down, and bring Scott's hand backwards into a handcuffing position. (ECF 151, p. 78). Scott continued to resist arrest. (ECF 151, p. 78-79).[5] Slager stated that he removed the cartridge from his taser and attempted to "drive stun" Scott. (ECF 151, p. 79). He then used his radio to call for help. (ECF 151, p. 80). At that point, Slager stated that Scott attempted to grab his taser and pull it away. (ECF 151, p.82). Slager reported that Scott managed to get the taser away from him, and then got up. (ECF 151, p. 82). Slager stated that Scott was "coming at him, pointing the taser towards him," and that Slager got up, drew his weapon, and fired. (ECF 151, p. 83). After the shooting, Slager used his radio to report "shots fired." (ECF 151, p. 85). At some point after the initial interview, Ghent arranged a second interview with Slager and his attorney, at which point they showed Slager the Santana video. (ECF 151, p. 90-91). Slager did not provide further statements to SLED. (ECF 151, p. 91).

---

[5] Ghent testified that "there was certainly a physical encounter" between Slager and Scott. (ECF 151, p. 129). After the shooting, Slager's uniform was "disheveled" and dirty, and he had an injury on his hand. (ECF 151, p. 129-130). Scott's autopsy also revealed injuries consistent with a physical altercation. (ECF 151, p. 130). Scott's cell phone was damaged, and his watch was broken. (ECF 151, p. 146-48).

The Government's final witness was Anthony Imel, an FBI audio and video analyst. (ECF 151, p. 156). Imel conducted an analysis of the Santana video. (ECF 151, p. 159). He testified that he believed the video showed the taser in Slager's hand, not Scott's. (ECF 151, p. 168-69). Imel acknowledged that there was an "altercation or confrontation" between Slager and Scott in the moments before the shooting. (ECF 151, p. 200). Imel testified that Slager's shots were fired at Scott beginning when he was over sixteen feet away, and that the final shot was fired when Scott was nearly forty feet away from Slager. (ECF 151, p.174-77).

The defense began its presentation with the testimony of Grant Fredericks, a forensic video analyst. (ECF 152, p. 211). Fredericks analyzed the Santana video. (ECF 152, p. 217). Fredericks made two key observations: (1) that Slager and Scott were "changing positions very rapidly" in the seconds before the shooting, and (2) that "the movement of Officer Slager's left forearm up and down, tracks with the movement of the taser wire," and that "the taser wire is clearly wrapped around Officer Slager and connected to Mr. Scott." (ECF 152, pp. 223, 231).

The defense also presented the testimony of Eugene Liscio, a "3D forensic analyst" who used the Santana video to construct a 3D model of the shooting incident. Liscio opined that based on his observations of the video and the 3D model he created, that the taser came to rest nine feet from where Slager was standing when he fired his weapon. (ECF 152, p. 308). He stated that the movement of the taser was inconsistent with it being thrown by Slager's right arm. (ECF 152, p. 314). Based on these observations, Liscio stated that it is possible that Scott was the one who threw down the taser in the moments before the shooting. (ECF 152, p. 316). He testified that either Scott threw the taser down and it bounced off the ground, or the taser struck and bounced off of Slager's foot. (ECF 152, p. 317).

Wade Humphries, a lieutenant with the North Charleston Police Department, testified that he worked with Slager in the years leading up to the shooting, and that Slager

was a "highly motivated" officer. (ECF 153, p. 447). In fact, Humphries testified that Slager was his "go to man" when he needed something, and that Slager could always be counted on "to get the job done." (ECF 153, p. 449). Regarding the shooting incident, Humphries testified that NCPD officers were expected to pursue fleeing suspects on foot. (ECF 153, p. 470). He further stated that Slager used verbal commands to try to stop Scott from fleeing and resisting, and that the circumstances authorized Slager to use force against Scott. (ECF 153, p. 475-76).

The defense also presented the testimony of Darko Babic, an expert in "electric arcing on metal surfaces." (ECF 153, p. 519). Babic testified that the projectile probes on Slager's taser could have been effective even if only one probe was embedded in Scott's skin, provided that the other probe was within a "zone of proximity" of the body, which would permit the circuit to complete. (ECF 153, p. 534). Babic testified that the "zone of proximity" that would allow this kind of arcing to occur would be roughly 1 inch to 1.5 inches. (ECF 153, p. 534). Babic testified that he inspected Slager's taser, and there were six areas that had marks that were "consistent with electrical arcing damage." (ECF 153, pp. 538, 554). Babic also inspected the internal data kept in Slager's taser, which indicated that Slager deployed his taser seven times within a 72-second time window, in the moments leading up to the shooting. (ECF 153, pp. 545-47).

In closing argument, the Government urged the court to apply the cross-reference to second-degree murder. (ECF 153, p. 587). The Government repeatedly pointed out that the language of the plea agreement foreclosed defense counsel's primary arguments for a lesser cross-reference:

> The defendant shot Walter Scott in the back while he was running away. When he pleaded guilty, the defendant agreed it was unlawful . . . The defendant admitted during his plea that he acted voluntarily and intentionally, and that he specifically intended to do what the law forbids, namely, that he used deadly force even though it was unjustified. Now, this admission, in conjunction with all the other evidence in

this case, plainly establishes malice for the purpose of the murder cross-reference.

…

Now, in the defendant's murder trial, Mr. Savage . . . He addressed the jury: 'Manslaughter. You know what manslaughter is? Manslaughter is when you go home and catch your wife in bed with your best friend. That's manslaughter. That's when you're provoked by the actions of your loved one. That's what heat of passion means. This is not heat of passion.' He goes on to say that, 'Manslaughter is a red herring.' Well, Your Honor, manslaughter is a red herring in this case.

…

Now, in the past, as I mentioned before, the defense has argued that this is not the case of heat of passion . . . As Mr. McCune argued at the close of all evidence in the State trial, stated once again, there is no evidence of heat of passion that resulted in a desire to do – an uncontrollable impulse to do violence. At the State Court, as appears to be the position of the defendant to this day, is that the defendant acted in self-defense. . . . Self-defense is inconsistent with heat of passion, and self-defense is inconsistent with the charge to which the defendant pled guilty.

(ECF 153, p. 566-70).

In response, the defense presented the following arguments:

He, Michael Slager admittedly used excessive force. Why? Because at the time that fight went on, and there was touching, and 1.44 seconds later, he shot with the same legal validity that he could have done when they were on the ground.

…

Did [Slager] know that [Scott] was unarmed when he fired his weapon? No. His fear was expressed in his statement to the SLED agents. He had no idea. All he knew was that this man was acting unreasonably, running against the presence of a police officer, against the command of a police officer, against the warning of 'taser taser taser'. . .

So, I'm not saying and Mr. Slager's not saying that the killing of Mr. Scott was not excessive use of force.

...

It's our position, Judge, that the reasonableness of Mr. Slager's actions were appropriate until they weren't... whether that reasonableness eroded as time and distance, without any overt reaching into a waistband or doing something that would send a message to Slager that he was of imminent harm. That's Mr. Slager's problem.

...

Now, if there is indicia of fear or fear that would make someone fear for their life, then the malice element of using the deadly weapon with intent, is mitigated.

...

And, Mr. Slager, Officer Slager, was never angry, but he was damn sure scared. And that fear, that fear is what caused him to act and do an intentional act, but that intentional act should be mitigated to voluntary manslaughter because of the fear he experienced at the moment.

(ECF 153, p. 600-616).

After arguments concluded, the court orally announced its rulings on each contested issue. Before doing so, the court stated: "I want to thank my wife for her support and her technical advice. She just happens to be the president of the National Association of Medical Examiners, and a forensic pathologist in her own right, and helped me with some of the autopsy report." (ECF 154, p. 623). Defense counsel objected to this comment, noting that "a jury would have been held in contempt of court" if they had consulted with an expert outside of the courtroom. (ECF 154, p. 661). The court did not rule on counsel's objection. The court concluded that the appropriate cross-reference was to second degree murder, and imposed a 240-month sentence. (ECF 154, p. 681).[6]

The court filed a detailed order outlining its findings of fact and reasons for imposing sentence. The court first determined that second-degree murder was the

_____

[6] The court determined that the applicable Guidelines range for the offense was 235 to 293 months, thus the 240-month sentence was within the Guidelines range calculated by the court. (ECF 154, p. 627).

appropriate cross reference for Slager's offense, in part because "there is insufficient evidence that the defendant acted in heat of passion." (ECF 140, p. 4). The sentencing order made repeated references to the language conceded by the Defendant in his plea agreement:

> The government contends that a cross-reference to second-degree murder is more appropriate because Slager's own guilty plea established that he was "objectively unreasonable" in firing eight shots at Scott while Scott was unarmed and running away. Under the facts to which Slager admitted when he pleaded guilty, Slager admits that he "willfully" killed Scott with the specific intent to commit an illegal act. This forecloses Slager's ability to argue that he acted in self-defense, which could bar any legal liability.

(ECF 140, p. 4).

> The court finds that the ground altercation between Scott and Slager that ensued before the first shot was fired – at which point Slager admits that he employed unreasonable deadly force – was not the sort that would cause an "ordinary, reasonable law enforcement officer" to shoot and kill someone…

(ECF 140, p. 15).

> By virtue of the admitted facts in the guilty plea, there is also no dispute that Slager unlawfully killed Scott. Therefore, the court must determine only if the Scott shooting evinces "malice aforethought." It finds that it does.

(ECF 140, p. 19).

> The presence or absence of malice must be inferred from all the facts and circumstances surrounding a killing. That standard is met here, as the facts admitted in the guilty plea establish that Slager fired eight shots at Scott and each of the eight shots was fired while Scott was unarmed and running away.

(ECF 140, pp. 19-20)(citations omitted).

> Under the plea agreement, Slager admitted that he was "unreasonable" in shooting Scott and that he acted "willfully." No. 114 at 2. This admission that the act of shooting Scott was unreasonable negates any possible argument that Slager could make that he acted in self-defense.

(ECF 140, p. 21 n.12).

> Shooting an unarmed man in the back as he runs away is a
> "gross deviation from the standard of care" that requires
> officers to refrain from employing deadly force to seize an
> unarmed suspect. Under the facts in the guilty plea, Slager
> has already admitted that he was unreasonable in employing
> deadly force to do exactly that.

(ECF 140, p. 23).

### H.    Direct Appeal

On direct appeal before the Fourth Circuit, Slager argued that the district court committed reversible error when it used second-degree murder as the sentencing cross-reference for his offense rather than voluntary manslaughter.[7] In its opinion, the Fourth Circuit explicitly referenced the contents of Slager's written plea agreement, noting: "[Slager] admitted that he 'willfully' shot and killed Walter Scott, when Scott was unarmed and fleeing arrest. Defendant further admitted that his decision to shoot Scott was 'objectively unreasonable.' Based on those admissions, Defendant pleaded guilty… Defendant acknowledged that 'his actions were done willfully, that is he acted voluntarily and intentionally and with specific intent to do something that the law forbids." *United States v. Slager*, 912 F.3d 224, 227-28 (4th Cir. 2019). The court stated, "several of these key factual determinations are consistent with the facts Defendant *admitted to in his plea agreement*." *Id*. at 235 (emphasis added). In discussing the district court's adverse finding of malice, the Fourth Circuit stated, "In his plea agreement, Defendant admitted that he acted 'voluntarily and intentionally with specific intent to do something the law forbids.'" *Id*. at 236. The court stated that "Defendant testified at his state proceedings that he was neither 'provoked' nor 'angry' during his altercation, but was merely acting in 'self-defense'" and yet, "Because Defendant *admitted in his plea agreement that he acted*

---

[7] Appellate counsel raised four additional issues on appeal that are not pertinent to the present motion.

*'willfully'* the district court found that Defendant was foreclosed from arguing self-defense during his federal sentencing hearing." *Id*. at 237, n.5 (emphasis added).

The Fourth Circuit ultimately affirmed the district court's judgment, making specific holdings on only two of Slager's claims of error. Specifically, the Fourth Circuit ruled that the district court was authorized to cross-reference second-degree murder, in part because of Slager's admissions in his plea agreement. Further, the court held that the district court was authorized to apply a two-level enhancement for obstruction. The court did not address Slager's remaining enumerations of error.

Appellate counsel moved the court for rehearing, arguing that the Fourth Circuit had neglected to rule on Slager's claim that the district court judge erred by engaging in *ex-parte* consultation with his wife regarding the facts of the case. The Fourth Circuit denied the petition without further explanation. Slager's further efforts to have his conviction review by the Supreme Court were not successful. This 28 U.S.C. § 2255 proceeding followed denial of certiorari.

III.    **STANDARD OF REVIEW**

To prove ineffective assistance of counsel, Slager must demonstrate first that "counsel's representation fell below an objective standard of reasonableness," and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). In *Lafler v. Cooper*, 132 S. Ct. 1376, 1384-85 (2012), the Supreme Court held that the Sixth Amendment right to counsel applies to the plea bargaining process, and prejudice occurs when, absent deficient advice, the defendant would have accepted a plea that would have resulted in a less severe conviction, sentence, or both. In *Missouri v. Frye*, 132 S. Ct. 1399, 1408 (2012), the Supreme Court held that a component of the Sixth Amendment right to counsel in the plea bargaining context is that counsel has a duty to communicate any offers

from the Government to his client. *Id*. at 1408 ("When defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires."). To establish prejudice under *Missouri v. Frye*, a defendant must demonstrate "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id*. at 1409.

IV.   **ARGUMENT**

**Ground One:**[8]  **Plea and sentencing counsel were constitutionally ineffective in connection with plea negotiations, and advising the Defendant on the terms under which he should plead guilty.**

Counsel for Michael Slager were constitutionally ineffective in several ways in connection with the plea negotiations, their advice to Slager about his plea options, and related matters. First, counsel for Slager were ineffective in devising a plea strategy based around a single *ex-parte* off-the-record comment from the district court judge. This was objectively unreasonable to the extent that no reasonable attorney would rely on such a remark to formulate and inform their entire plea negotiation strategy, particularly given the high stakes of this case, and the potential downside for Slager. This lapse in judgment by counsel tainted several downstream decisions, in that it caused counsel to reject (and/or not even convey) very reasonable and attractive plea offers from the Government, and it caused counsel to make several crippling factual concessions in the plea agreement, either through sheer negligence or because they did not appreciate the significance of the concessions. (See Ground Three, *infra*). Counsel apparently believed that they were entering sentencing proceedings with an upper hand on the Government, when in fact the opposite was the

---

[8] Present counsel for Slager has submitted this Memorandum with facts, law, and argument pertaining to Grounds One and Three as set forth in our May 20, 2020 filing. (ECF 168). Counsel's investigation has not presently revealed facts and law sufficient to proceed on the remaining Grounds alleged. In the interest of clarity, counsel will continue to refer to the Grounds numerically as they were originally alleged on May 20, 2020. (ECF 168).

case. They mistakenly believed that they had inside knowledge about the district court's likely future rulings, and they allowed this to distort their decision-making for the remainder of this case, to the detriment of their client.

**A.     Plea and sentencing counsel were ineffective in relying on *ex-parte* communications from the district court judge while formulating their plea negotiation strategy.**

Rule 11 of the Federal Rules of Criminal Procedure provides that "[a]n attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement" and that the district court "must not participate in any such discussions." FED. R. CRIM. P. 11(c)(1); *United States v. Bruce*, 976 F.2d 552, 558 (9th Cir.1992) ("[T]he unambiguous mandate of Rule 11 prohibits the participation of the judge in plea negotiations under any circumstances: it is a rule that … admits of no exceptions."). The primary concern raised by a judge's participation in plea negotiations is the potential for coercion. *United States v. Cannady*, 283 F.3d 641, 644 (4th Cir. 2002). A judge expressing his personal opinion about a case can have the side effect of influencing the behavior of the litigants in his courtroom. The present case demonstrates the reason for this concern, and shows the distorting effect that a judge's personal opinions can have on the negotiations between parties.[9]

---

[9] It should also be noted that these *ex-parte* communications were also a clear violation of the Code of Judicial Conduct:

> "[A] judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers."

> Code of Conduct for United States Judges, Canon 3(A)(4).

> "A judge may . . . when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication."

> Code of Conduct for United States Judges, Canon 3(A)(4)(b).

This does not absolve defense counsel of responsibility for their reaction to the judge's comments. Indeed, defense counsel are primarily responsible for working in the best interests of their client, and therefore they have a special responsibility to resist coercive conduct by the judge. Where counsel crossed a line between simply poor tactical choices into constitutionally deficient representation was in the decision to base their entire plea negotiation and sentencing strategy on this single remark by the judge. As the record in this case will clearly demonstrate, defense counsel's negotiating posture was predicated on their unwavering belief that the judge would rule in their favor on the Guidelines cross-reference issue, and counsel failed to consider the consequences of being mistaken in this judgment. The decision was objectively unreasonable under *Strickland*, in that no reasonable attorney would place so much stock in a single *ex-parte* comment by a judge, nor would the attorney fail to appreciate the magnitude of the risk they were imposing on their client by doing so. To do all of this without the client's knowledge or consent is even further beyond the pale.

Advising a client regarding the decision to plead guilty is "[o]ne of the most precious applications of the Sixth Amendment." *United States v. Rivas–Lopez*, 678 F.3d 353, 356 (5th Cir. 2012). "When considering whether to plead guilty or proceed to trial, a defendant should be aware of the *relevant circumstances* and the likely consequences of his decision *so that he can make an intelligent choice*. *Id*. at 356-57 (emphasis added). In *Rivas-Lopez*, the Fifth Circuit considered a §2255 claim in which the defendant rejected a pre-trial plea offer, based in part on his attorney's over-estimation of the likely sentence the defendant would face if he entered a plea agreement. *Id*. at 355. The defendant went to trial, was convicted, and ultimately received a sentence that was less than his attorney's pre-trial calculation. *Id*. The Fifth Circuit likened this scenario to *Lafler v. Cooper*, where defense counsel was similarly deemed ineffective in advising his client to reject a plea offer. *Id*. at 357 n.23 (citing *Lafler*, 566 U.S. 156 (2012)). The common thread between *Lafler* and *Rivas-Lopez* – as well as the present case – was defense counsel's

misapprehension about what could be proven by the opposing side, given the facts of the case. In *Lafler*, counsel believed that the state lacked proof of intent to murder. Counsel was mistaken, and his advice was deficient as a result. In *Rivas-Lopez*, counsel overestimated the Government's ability to prove facts that would enhance the defendant's sentence, and thus overestimated the defendant's sentencing exposure. Counsel was mistaken there as well, and similarly deficient under *Strickland*. In the present case, counsel for Slager clearly misapprehended the strength of the Government's case for murder, and assumed the judge would reject such evidence, based on his *ex-parte* comment. In each case, where counsel allowed their client to reject a plea offer, and counsel's reasoning was grounded in a misapprehension about the facts or law of the case, counsel rendered deficient performance under *Strickland*.

Similarly, the Eleventh Circuit considered a §2254 case arising out of a Florida state court conviction in *Dasher v. Attorney General, Florida*, 574 F.3d 1310 (11th Cir. 2009). The facts of that case are instructive here:

> Prior to pleading, [the defense] attorney had obtained a promise from Judge Foster, the sentencing judge, that Dasher would be sentenced to thirteen months in a Florida State prison if he pled guilty. Dasher advised his attorney that he preferred a twelve month sentence, which he could have served in a county jail. Because Judge Foster had indicated that he would go no lower than thirteen months, Dasher's attorney advised him that . . . the only way to obtain a lower sentence was to plead guilty "straight up" without any agreement . . . Dasher's attorney told him that, if he pled straight up, he "doubted that [Dasher] would get anything over 13 months," . . . Based on the advice of his attorney, and on the very same day, Dasher rejected the thirteen month plea offer and pled guilty without any agreement. Subsequently, Judge Foster sentenced Dasher to a period of ten years incarceration.

*Id*. at 1312-13. The Eleventh Circuit was unambiguous in its condemnation of Dasher's attorney: "the advice he gave to Dasher was a piece of foolishness." *Id*. at 1317. "There

was simply no chance that, if he took a plea straight up, Dasher would have received a sentence of twelve months or little more than thirteen months." *Id*. The Eleventh Circuit noted that "Dasher was clearly risking a sentence of substantially more than thirteen months, and there was certainly no reason to believe he would do better." *Id*. at 1318. Much like the defense attorneys in the present case, Dasher's attorney made a catastrophic miscalculation based on the sentencing judge's remarks, and this miscalculation caused his client to reject an eminently reasonable and favorable plea offer. This was deficient performance that entitled Dasher to habeas relief. The same result is demanded here.

**B.**      **Plea and sentencing counsel were ineffective in failing to convey a plea offer to Slager, and allowing the plea offer to lapse without communicating it to Slager.**

As outlined *supra*, in *Lafler v. Cooper*, 132 S.Ct. 1376 (2012), the Supreme Court held that the Sixth Amendment right to counsel applies during the plea bargaining process, and that prejudice occurs when a defendant would have accepted a plea offer but-for counsel's deficient advice. In *Missouri v. Frye*, the high court clarified that a component of counsel's responsibility under the Sixth Amendment is the requirement that that counsel communicate any plea offers to the defendant. *Missouri v. Frye*, 132 S.Ct. 1399, 1408 (2012). In other words, counsel is deficient where he fails to convey a plea offer to the defendant, and that offer expires before the defendant has the option to consider it. *Nunes v. Mueller*, 350 F.3d 1045 (9th Cir. 2003).

Slager can demonstrate that he was never informed of the Government's April 20 plea offer. (McCune Decl., ¶¶11-12). There is no question that this was constitutionally ineffective performance under *Lafler* and *Frye*. The only remaining inquiry is whether Slager can demonstrate prejudice. The record before this court amply demonstrates the prejudice Slager has suffered. To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, a defendant must demonstrate a "reasonable probability they would have accepted the

earlier plea offer had they been afforded effective assistance of counsel." *Frye*, 132 S.Ct. at 1409. "To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge *or a sentence of less prison time*." *Id.*; (citing *Glover v. United States*, 531 U.S. 198, 203 (2001) ("[A]ny amount of [additional] jail time has Sixth Amendment significance")).

The Government's April 20 offer included a Guidelines range of 151 to 188 months. After his attorneys rejected this offer without his knowledge, Slager ultimately received a 240-month sentence, which is 52 to 89 months more than Slager would have received if he had accepted the Government's final plea offer. Additionally, Slager would have been authorized under the terms of the rejected plea deal to argue for variances and departures, opening to the door to an even lesser sentence than the stipulated Guidelines range. In short, the prejudice to Slager is clear, and he is entitled to relief on this Ground.

**Ground Three:**     **Plea and sentencing counsel were constitutionally ineffective in advising the Defendant to sign the Plea Agreement (ECF 114) that conceded critical facts adverse to Defendant's interests.**

Voluntary Manslaughter is available as a lesser-included offense in homicide cases when the circumstances surrounding the killing indicate provocation that would "arouse a reasonable and ordinary person to kill someone." *United States v. Collins*, 690 F.2d 431, 437 (5th Cir. 1982). "For a law enforcement officer, the standard is provocation that would cause a *reasonable officer* to kill someone." (ECF 140, p. 5)(quoting *United States v. Velazquez*, 246 F.3d 204, 213 (2nd Cir. 2001)(emphasis added). In other words, the lynchpin of this legal concept is the presence of provocation, and its impact on the defendant's mental state. Although there are some eccentricities between jurisdictions, voluntary manslaughter commonly requires proof that provocation led to anger, rage, and an uncontrollable "heat of passion." *Hope v. Cartledge*, 857 F.3d 518 (4th Cir. 2017)("[If] the killing was committed while in the sudden heat of passion upon reasonable provocation, then the defendant would be guilty of the lesser offense of voluntary manslaughter.").

Many jurisdictions have rejected claims that a fear-based response to provocation can mitigate an otherwise malicious killing. Indeed, some jurisdictions have held that self-defense (i.e. killing out of fear of imminent bodily injury) and voluntary manslaughter (i.e. killing in response to provocation and heat of passion) are mutually exclusive defenses, due to the broadly divergent triggering factors and resulting mental states required for each. *See, e.g.*, *Blake v. State*, 292 Ga. 516, 739 S.E.2d 319 (Ga. 2013) ("The distinguishing characteristic between voluntary manslaughter and justifiable homicide is whether the accused was so influenced and excited that he reacted passionately rather than simply to defend himself."). In *Cook v. State*, 784 S.E.2d 665 (S.C. 2015), the Supreme Court of South Carolina considered whether a voluntary manslaughter instruction was erroneous where the defendant claimed he had acted out of fear rather than out of "an uncontrollable impulse to do violence." The court concluded that the defendant either acted in self-defense or with malice, but not under heat of passion. *Id*. at 668 (noting that the evidence "does not suggest that Cook was acting under an uncontrollable impulse to do violence"). Thus, it was error for the trial court to instruct the jury on voluntary manslaughter. *Id*. at 669. The apparent contradiction between these theories can be summarized as follows:

> Judicial refusal to recognize provocation and self-defense as cumulative rather than conflicting claims stems from an assumption that different response mechanisms underlie these distinct doctrines; self-defense assumes a cognitive based decision, namely, a choice followed by a carefully calculated risk-assessment under which the use of deadly force was imminently necessary for defensive purposes. This view further assumes that the choice was a cold, deliberate, and reasoned decision. In contrast, provocation assumes the opposite response, namely an emotional reaction triggered by anger resulting in loss of control. Self-defense and provocation doctrines are therefore predicated on contrasting understandings of defendants' behaviors because an inability to exercise restraint is incompatible with a deliberated and reasoned decision to kill in self-defense. The thought processes and response mechanisms of fearful killers are simply inconsistent with those of angry defendants.

Michal Buchhandler-Raphael, <u>Fear-Based Provocation</u>, 67 AM. U. L. REV. 1719 (2018).

Setting aside the question of whether fear-based voluntary manslaughter was even a viable defense in this proceeding, the more important issue is that defense counsel was foreclosed from arguing this defense from the inception, because of the concessions made in the plea agreement. As previously noted, the written plea agreement conceded that Slager acted in a way that was "objectively unreasonable" when he fired his weapon at Scott. At the heart of a claim of voluntary manslaughter is the notion that the subject was provoked to such an extent that a *reasonable person* would react to such provocation with violence. Conceding that the defendant behaved unreasonably is therefore a concession that he did not commit voluntary manslaughter.[10] There is no plausible strategic reason to concede facts that are essential to the theory of defense.

The prejudice from counsel's error is apparent in this record. Because the plea agreement conceded these key disputed facts, for all intents and purposes, Slager went to his federal sentencing without any available defenses to the Guidelines' murder cross-reference. Perhaps the prejudice would be less glaring if defense counsel had articulated a clear, lucid theory for applying the voluntary manslaughter cross reference (despite having already conceded the predicate facts in the plea agreement). Instead, counsel presented an inscrutable hodge podge of mitigation arguments, with elements borrowed haphazardly from differing legal theories. Counsel conceded that there was "no question" that Slager's conduct was a crime. (ECF 153, p. 600). And yet, moments later counsel argued that Slager had the right to fire his weapon at Scott, "with the same legal validity that he could have done when they were on the ground," and speculated that Slager may have believed Scott was armed. (ECF 153, p. 600). Both of these arguments would seem to support a claim of self-defense, which contradicts counsel's earlier concession that Slager had committed a crime. Counsel then argued that Slager's reaction was characterized by "fear," an argument

---

[10] It should also be noted that by pleading guilty and admitting that he "willfully" and "intentionally" did "something that the law forbids," Slager was foreclosed from arguing that he acted in self-defense.

that counsel made throughout these proceedings in numerous filings, while still maintaining that Slager's conduct was at times "reasonable," but moments later, "unreasonable." (ECF 153, p. 616).

Counsel also conceded that shooting Scott was "excessive force." (ECF 153, p. 601). And yet, Counsel urged the court to consider whether Slager may have believed that Scott was "armed and dangerous." (ECF 153, p. 607). Counsel urged the court to consider whether there was justification for the shooting that "eroded" as the distance between Slager and Scott increased, questioning whether "firing all those continuing shots [was] necessary." (ECF 153, p. 607-08). "That's Mr. Slager's problem," counsel conceded. (ECF 153, p. 608). Counsel also argued that during the ground altercation with Scott, "Slager became fearful for his life, used force, and the force became at some point unreasonable," and that consequently, "voluntary manslaughter just negates the malice because of extenuating circumstances which he experienced." (ECF 153, p. 612). In sum, at various times counsel argued that Slager's mental state was characterized by fear, but also heat of passion, and that his conduct was at times reasonable, unreasonable, criminal, or legally justified.

This is where defense counsel's error in conceding key facts in the plea agreement caused manifest prejudice to Slager. With the concessions in the plea agreement, defense counsel foreclosed his own argument for a lesser cross-reference to voluntary manslaughter. More specifically, by conceding that Slager "used deadly force even though it was objectively unreasonable under the circumstances," counsel placed himself in a bind whereby his own request for a voluntary manslaughter cross-reference required him to contradict the stated terms of Slager's plea agreement. The Government correctly pointed out that counsel should be prohibited from doing so. (Gov. Objections to PSR, p. 23). Defense counsel attempted to square the circle by arguing that Slager's reasonable conduct *became* unreasonable, or that the reasonableness of his conduct "eroded" during the course of the incident. Simultaneously, counsel argued that Slager acted out fear that was

"objectively unreasonable," while also claiming that Slager was overwhelmed by both fear and anger based on his fight with Scott. Alongside this web of contradictions, counsel also seemed to imply at times that Slager acted in self defense. The incoherence of these arguments is a foreseeable consequence of the concessions made in the plea agreement. The fact that the plea agreement admitted that Slager acted with "specific intent to do something that the law forbids" only complicates an already blurry picture. Lastly, it bears noting that the catastrophic downstream consequences of the admissions in the plea agreement were readily identified and noted by the Government, the district court judge, and later the Fourth Circuit. At each step in this process, the admissions in Slager's plea agreement were used to stymie defense counsel's arguments. And rightly so, because the noted concessions foreclosed each of defense counsel's arguments as a matter of law, which underscores the prejudicial nature of counsel's oversight. There is simply no strategic reason that an attorney would advise his client concede the main contested facts in a criminal case. The prejudice is amply demonstrated by defense counsel's inability to mount any reasonable defense or mitigation argument at sentencing. Consequently, Slager is entitled to relief on this Ground.

## V.    REQUEST FOR EVIDENTIARY HEARING

An evidentiary hearing is warranted and must be granted "[u]nless the motion and the files and record of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255 (emphasis added). The standard for obtaining an evidentiary hearing is lenient. *See Murchu v. United States*, 926 F.2d 50, 57 (1st Cir. 1991)(district court erred in refusing evidentiary hearing were movant's allegations were "not conclusory, contradicted by the record, or so inherently incredible as to permit them to be ignored."). "Unless it is clear from the pleadings and the files and records that the prisoner is entitled to no relief, the statute makes a hearing mandatory." *Raines v. United States*, 423 F.2d 526, 529 (4th Cir. 1970). "When a colorable Sixth Amendment claim is presented,

and where material facts are in dispute involving inconsistencies beyond the record, a hearing is necessary." *United States v. Magini*, 973 F.2d 261 (4th Cir. 1992) (citing *Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir.1990)).

Slager's allegations are non-conclusory and contain information and facts that, if proven, would entitle him to relief. Additionally, some of Slager's asserted grounds involve factual claims made by prior counsel and Slager himself. The Fourth Circuit has recognized that certain categories of §2255 petitions, such as those "involving credibility," "will require an evidentiary hearing in open court." *Raines*, 423 F.2d at 530. Therefore, the court should hold an evidentiary hearing in this case.

VI.    **CONCLUSION**

Based on the foregoing, the court should grant Slager an evidentiary hearing on his 28 U.S.C. § 2255 motion and grant him § 2255 relief.

RESPECTFULLY SUBMITTED,

*s/ Christopher R. Geel*
**Christopher R. Geel (#12432)**
Geel Law Firm, LLC
P.O. Box 21771
Charleston, SC 29413
843-277-5080
August 18, 2020                Chris@GeelLawFirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the District of South Carolina by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*s/ Christopher R. Geel*
Christopher R. Geel (#12432)