UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case Number: 2:16-378 |
| | ) | |
| -versus- | ) | **DECLARATION OF** |
| | ) | **ANDREW J. SAVAGE, III** |
| MICHAEL SLAGER | ) | |
| | ) | |

I, Andrew J. Savage, III, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am 72 years of age having been born on November 3, 1947. I obtained my undergraduate degree from Fordham University and a law degree from the University of South Carolina. I am married with four children and ten grandchildren. I am in reasonably good health, and I am of sound mind.

2. I have been a member of the South Carolina Bar (Bar Number 4946) since 1975. I am a member of the Federal Bar in the District of South Carolina (Federal ID Number 3734). I have been a member of the Fourth Circuit Court of Appeals since 1982. I have practiced criminal law since 1975 primarily in the State of South Carolina in both state and federal jurisdictions. I have also been admitted to practice in foreign jurisdictions and currently maintain membership in the (Federal) Central District of Illinois. I am a member in good standing in all jurisdictions.

3. I am a lifetime member of the National Association of Criminal Defense Lawyers; a founding member of the South Carolina Criminal Defense Lawyers; and a member of the Federal Bar Association. I am a Fellow in the American College of Trial Lawyers and a Fellow in the American Board of Criminal Lawyers. I am one of 16 attorneys who, since 1965, have been awarded the Griffin Bell Award, the highest individual honor awarded by the American College of Trial Lawyers.

4. In April of 2015 I was contacted by Jamie Slager regarding the arrest of her husband, North Charleston Patrolman Michael Slager. Slager was charged with

murder following the release of a third-party video recording showing a small portion of the circumstances surrounding Slager's attempt to arrest Walter Scott.

5. During the course of Slager's representation, I was lead counsel with the primary assistance of Donald L. McCune, Jr. and the additional assistance of Shaun C. Kent, J. Scott Bischoff, II, and Miller W. Shealy, Jr., all members in good standing with the South Carolina Bar.

6. While murder charges were pending in State court, Slager was indicted for the charges of Deprivation of Rights Under Color of Law, Use of a Weapon During Commission of a Crime of Violence, and Obstruction of Justice in the Charleston Division of the South Carolina Federal District Court. These charges arose from the same circumstances that led to the State's charge.

7. While charges were pending, a decision was made by the respective prosecutors and the Federal Judge to proceed first in State Court.

8. It light of the charges in multiple jurisdictions, there were no substantive plea negotiations prior to the call of the State case in October of 2015. In December 2015, the jury became deadlocked and the Court declared a mistrial. The State Court refused to allow the jury to declare a verdict for any of the charges that they had considered, but the following day, the jury foreman during multiple national television appearances, stated that jurors, on their initial vote, acquitted Slager on the charge of Murder but that they could not reach a unanimous agreement on the charge of Manslaughter. The foreman's statement was later confirmed by several additional jurors. Several of the State trial jurors, without solicitation, voluntarily attended the Federal Sentencing Hearing. They also wrote letters to the sentencing judge stating their observations and opinion of the charges.

9. During the course of the State trial, Federal Prosecutors and/or FBI agents were present every moment of the proceedings. I personally observed their attendance. I was also told of the attendance by Federal District Court employees. During the trial I had several informal discussions with one of the Federal prosecutors in an attempt to resolve charges in both jurisdictions. Getting prosecutors from both jurisdictions to agree to a recommended outcome proved impossible.

10. Following the State mistrial, the State prosecutor publicly declared that she would retry Slager on the same charges but the Federal Court ordered the Federal trial proceed next and our concentration refocused on those charges.

11. Slager requested to be declared an indigent so that some of his legal expenses could be paid under the Federal Criminal Justice Act.

12. Negotiations with the administrators of CJA funding were labored particularly over the cost of investigators and expert witnesses who had testified in the State proceedings and whose work product would be used again in the Federal case.

13. The difficulty in obtaining approval for CJA funds necessitated multiple ex-parte meetings with the Presiding Judge to obtain his approval for our projected budget.

14. In early January of 2017 an ex-parte administrative meeting was scheduled with the Presiding Judge to review and provide oversight of the defense team's proposed budget.

15. At a January 2017 ex-parte conference we discussed with the Court the need for a number of experts and the cost to retain those experts. During the course of our discussion, the Court informed those present that it was his opinion that this clearly was not a murder case. I accepted the Court's words as his thoughtful conclusion as I knew from other statements the Court made that he was thoroughly familiar with the facts and circumstances of the case. The Court's statement was not a casual or off-hand comment. It was also consistent with the Government's previously stated position. Following that conference, I proceeded with the firm impression that this was the settled position of the Court. I accepted his words as a given. Thereafter the facts never changed; after a seven-week State trial, a unanimous jury concluded that it was not a murder case, as did the probation agent and her supervisor in their Presentence Report. There was no reason to second guess what the Court's finding would be.

16. On May 2, 2017, Slager pled guilty to Deprivation of Rights Under Color of Law. On December 7, 2017, I learned how wrong I had been in my advice to Slager. Trusting the Court's affirmation, I had repeatedly assured Slager that he was not risking a longer sentence by rejecting the Government's final offer. I told him repeatedly that I had known the Judge for over forty years, and that based on my

professional and personal relationship with him, that I felt very comfortable in assuring Slager that I believed the Judge's unsolicited statement and given that, I believed rejecting the Government's offer was in his best interest. I emphasized that, in light of the Court's statement, there was no risk for him for a greater sentence and there was a chance of a lesser sentence than what the Government was offering.

17. During the State trial, the Federal Prosecutor told me and said separately to another member of the South Carolina Bar (who was not involved in Slager's case), that the Government would accept a plea to a ten year sentence to run concurrently with the State sentence. He would also recommend that Slager serve his sentence in the Bureau of Prisons. He later told me that the State prosecutor would not agree.

18. In February, the Court provided a specific trial date, and the effort to resolve the case intensified. Plea discussions progressed in a more focused fashion. During that time Slager was actively assisting us in the preparation of his case and was in our office for long hours nearly every day of the week. Don McCune and I kept Slager apprised of each contact with the prosecution. All the while I continued to judge each plea discussion through the lens of the Court's unqualified statement that this was not a murder case.

19. The introduction of multiple Government negotiators made negotiations cumbersome. At various times, we dealt with attorneys in the Charleston United States Attorney's Office; the Washington, D.C. Office of the Department of Justice; and with the Acting United States Attorney in Columbia. Although we had no contact with the State Solicitor at that time, we were told that the Solicitor was also involved and that she (not them) was impeding the resolution. We rejected the Government's final offer which would have required a finding of Voluntary Manslaughter as the underlying offense with a range of 151-188 months before adjustments. My advice to Slager to reject this offer was based on my firm belief that Slager would not risk a judicial finding of his underlying conduct greater than manslaughter, and we still would have an opportunity to argue for less.

20. Starting in April of 2015, and through the course of my representation of Slager, my relationship with Slager and his family developed into a close connection.

      Slager and his family lived with us at our home when his house was firebombed (January 8, 2016) and when he and his family were threatened. I enjoyed both a legal and paternal relationship with Slager, and I believe he trusted me implicitly. Every time he asked about the risk he was taking by not accepting the Government's offer to plead with a guaranteed voluntary manslaughter finding as to the underlying offense, I assured Slager that he was not facing a more punitive sentence.

21. Shortly before the sentencing hearing, the probation office advised me that the Sentencing Judge's law clerk had visited their office and expressed a strong difference of opinion with their findings as stated in the Presentence Report. This was the first sign that we might have an issue with the underlying charge at sentencing. I informed co-counsel and Slager, but again urged him, despite this new, troubling information, to rely on my advice based on what the Court unambiguously told us.

22. In hindsight, I realize that my blind trust in the Court's statement induced me to provide advice that was harmful to Slager and that it was my advice, not his conduct on April 4, 2015, that led to his extraordinarily harsh and unexpected sentence.

*s/ Andrew J. Savage, III*
Andrew J. Savage, III
Savage Law Firm

Date: August 18, 2020