IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Crim. No. 2:16-cr-00378-RMG |
| | ) | Civ. No. 2:20-cv-01945-RMG |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL SLAGER, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |

**THE UNITED STATES' RESPONSE IN OPPOSITION TO PETITIONER'S MOTION
TO VACATE UNDER 28 U.S.C. § 2255 AND MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

I.   INTRODUCTION ...................................................................................................... 2

II.  FACTUAL AND PROCEDURAL HISTORY ................................................... 7

III. SLAGER'S COUNSEL WAS NOT INEFFECTIVE........................................ 23

    A. To Prevail on a Claim of Ineffective Assistance of Counsel, Slager Must Show Both
       Deficient Performance and Prejudice. .......................................................... 23

    B. Ground One: Counsel's Decision to Reject a Binding Guidelines Range in Favor of an
       "Open" Plea Was a Considered and Strategic Choice Well Within the "Wide Range of
       Reasonable Professional Assistance." .......................................................... 25

       1. Slager's defense was deliberate, not deficient. ....................................... 26

       2. The evidence rebuts Slager's claims that his attorneys' strategy was based on a
          single conversation and that he never received the Government's final offer of 151-
          188 months........................................................................................... 28

       3. *Lafler* and *Frye* are inapposite because counsel's advice was the result of reasoned
          consideration, not negligence, and there is no credible evidence that Slager would
          have accepted a plea to a guidelines range of 151-188 months............................. 32

    C. Ground 3: Counsel was Not Constitutionally Ineffective for Advising Slager to Accept
       a Global Plea Agreement in which he Admitted the Facts and Elements of Count One.
       .................................................................................................................... 35

IV.  CONCLUSION...................................................................................................... 40

## I.     <u>INTRODUCTION</u>

Petitioner Michael Slager, acting as a North Charleston police officer, shot and killed Mr. Walter Scott on April 4, 2015.  A bystander captured the killing on video.  Slager fired his weapon eight times at Walter Scott as Mr. Scott, who was unarmed, ran away from Slager.  Five bullets entered the back of Mr. Scott's body and he was pronounced dead on the scene.  In an attempt to justify his unlawful killing of Mr. Scott, Slager made a series of inconsistent, evolving, and self-serving statements, first to local authorities, then in his state trial court testimony, and finally again in his testimony in a federal motions hearing.  Slager eventually pleaded guilty to violating 18 U.S.C § 242, thereby admitting that his killing of Mr. Scott, an unarmed person who was running away from him, was objectively unreasonable.  As part of this carefully negotiated plea agreement, the State of South Carolina agreed to dismiss the pending murder charge against Slager and the federal government agreed to dismiss the two other charges in the federal indictment, including a charge that carried a mandatory ten-year consecutive sentence.  Slager obtained an "open" plea agreement, one that enabled him to argue for a lower cross-reference in the Sentencing Guidelines and a reduced sentence.  After a four-day contested sentencing hearing, the district court found that the appropriate cross reference was second degree murder and sentenced Slager to 240 months in prison, a sentence squarely within the Guidelines.  Slager is now seeking to reduce the sentence he received for his unlawful killing of Mr. Scott.

Slager has filed a motion under 28 U.S.C. § 2255 seeking to vacate his sentence due to what he describes as ineffective assistance of counsel.  Slager raises two grounds for relief.  First, Slager alleges that his counsel's mistaken and unreasonable reliance on an *ex parte* comment by the district judge caused them to reject, without his knowledge, a plea offer with a stipulated Guidelines range of 151 to 188 months, and instead advised him to enter into an "open" plea

agreement with no stipulated Guidelines range.  In his second ground for relief, Slager alleges that his counsel unreasonably advised him to enter into a plea agreement that limited his ability to later argue for a lower Guidelines range.  Slager concludes that, but for his attorneys' deficient performance, he would have accepted the Government's offer of a stipulated plea to a Guidelines range of 151 to 188 months; or, in the alternative, rejected the Government's plea offer because it required him to admit that his conduct was willful and objectively unreasonable.  Slager argues that an evidentiary hearing is necessary to further develop the facts of his alleged ineffective assistance claims.

This Court should deny Slager's motion without an evidentiary hearing for four principal reasons.  First, Slager's claim that he was not provided with the Government's plea offer for a stipulated sentencing range is false.  On April 26, 2018, Slager and his counsel provided the court with a signed letter indicating that Slager was aware of all plea negotiations, including the government offer that included a stipulated Guidelines range of 151 to 188 months.  In addition, Slager's counsel at the time, Andy Savage, has provided this Court with a signed affidavit attesting to the fact that he provided the plea offer to Slager.  Slager clearly was informed of the Government's offer of a plea to a stipulated range, but he rejected it in favor of an open agreement.

Second, even if this court was inclined to credit Slager's self-serving allegation that he never received the plea offer, no credible, contemporaneous evidence in the record supports the conclusion that he would have accepted a plea offer for a stipulated Guidelines range of 151 to 188 months.  Third, although Slager argues he was provided ineffective assistance when he was advised to plead to Count One, since this limited his ability to argue for a lower Guidelines range, the admissions Slager made as part of the plea agreement were necessary and did not actually limit his arguments at sentencing.  In order to plead guilty to the violation of 18 U.S.C. § 242 charged

in Count One, Slager had to admit to each of the elements of the offense, including that his conduct was objectively unreasonable. Defense counsel's advice to accept a plea offer that included the admissions necessary to establish the offense charged in Count One was clearly appropriate and therefore not constitutionally deficient. Further, as the Court recognized at sentencing, this admission did not preclude Slager from presenting mitigation arguments, including a request for application of a cross-reference for a lower sentencing range.

Fourth, Slager's decision to plead guilty was a sound one. His alternative to pleading guilty to Count One of the federal indictment was proceeding to trial in both federal and state court. The State of South Carolina had charged Slager with a single count of murder. In that case he faced a sentence of up to life in prison. In the federal case, Slager had been indicted for violations of 18 U.S.C §§ 242 (deprivation of rights under color of law), 924(c) (use of a weapon during the commission of a crime of violence) and 1512(b)(3) (obstruction of justice). Slager faced a possible life sentence on Count One, a mandatory consecutive 10-year sentence on Count Two, and a potential 20-year sentence on Count Three. Given the circumstances, his counsel were not unreasonable to advise that Slager accept the plea offer.

 Slager's present claims, like those of many inmates before him, are tainted by "the distorting effects of hindsight." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). As the Supreme Court explained in *Strickland*, "it is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* We can accept as true that Slager, currently serving a sentence of 240 months, now wishes that his attorneys would have made different choices. But the question before the Court is not whether any other attorney, with the full benefit of hindsight,

might have charted for Slager a different and possibly more successful course. *See id.* (observing that "there are countless ways to provide effective assistance in any given case" and that "even the best criminal defense attorneys would not defend a particular client in the same way"). Rather, the controlling question in this matter is whether Slager can overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* In other words, whether Slager can demonstrate that – through a contemporaneous lens – his attorneys acted *unreasonably*, and did so to his detriment.

When viewed through a contemporaneous lens, Slager's path to a sentence short of 240 months is not nearly as clear as it appears from his vantage today. In May 2017, Slager's attorneys faced hard choices, constrained by the substantial weight of the evidence against him in dual state and federal prosecutions. But having already secured a mistrial in state court, believing they had persuasive arguments to mitigate his sentence, and betting that the sentencing judge would favor their arguments,[1] Slager's counsel had reason for optimism. Their decision to reject a stipulated range and instead negotiate an open deal – one that came with the opportunity for greater benefits, but also the possibility for greater risks – was logical and well-considered, if ultimately unsuccessful. But given the circumstances, the choice was clearly tactical and strategic after due consideration, and not ineffective. Slager's failure to secure a sentence under 240 months speaks

---

[1] Although Petitioner makes much of the Court's passing observation that "this is not a murder case," Petitioner overstates the import of this comment. As explained further below: (1) the comment took place in an *allowable* ex parte meeting; (2) in the course of a conversation about expert witness fees, relevant evidence, and elements of proof (i.e., murder vs. color of law); (3) and though Petitioner's counsel now claim that they interpreted the remark to be an improper ex parte preview of the Court's opinion of the applicable sentencing cross-reference, they acknowledge it was their own subjective interpretation, never expressly confirmed by the Court; and (4) ultimately, the Court's decision to overrule the PSR and apply the murder cross-reference revealed their mistake.

less to his attorneys' performance than to the seriousness of his own conduct and the court's findings that Slager's statements and testimony about his conduct was "self-serving, evolving, and internally inconsistent."  In sum, that failure is due to Slager's conduct and his lies about his conduct, not to his defense counsel.

As for the language of his plea agreement, Slager now contends that his counsel were unreasonable to advise that he sign a plea agreement with language acknowledging that his conduct was willful and objectively unreasonable.  Slager's complaint, however, elides the fact that without admitting criminal intent, and to depriving Scott of his constitutional right not to be subjected to unreasonable or excessive force, Slager could not have pleaded guilty to Count One.[2]  And since the Government did not offer a plea deal that did not include an admission of guilt to Count One, Slager's only alternative to accepting those terms was going to trial twice – in federal court and again in state court – where he faced dual prospects of potential life sentences.  Given the circumstances, his attorneys' recommendation to accept a global plea was not unreasonable, but indeed prudent.  Slager effectively said so himself, when he represented in open court during an extensive colloquy that he knowingly and voluntarily acknowledged his guilt, agreed with the Government's recitation of the elements, agreed with the accuracy of the factual basis, and agreed with the advice of his attorneys.   Distilled to its essence, Slager's grievance now is that once he pleaded guilty to willfully using objectively unreasonable force to kill Walter Scott, he was not allowed to later deny it at sentencing.  But his lawyers, who had spared him two more trials and greatly minimized his chance of serving a life sentence – not to mention securing the dismissal of Count Two that carried a mandatory consecutive ten-year sentence – could not shield Slager from

---

[2] Deprivation of rights under color of law, in violation of 18 U.S.C. § 242.

the consequences of his own admitted conduct.[3]  Though the ultimate result was not what Slager or his attorneys wanted, the Sixth Amendment does not guarantee Slager his most favored outcome.  Slager's counsel were not ineffective.

Because there is no genuine issue of material fact as to any of the claims raised in Slager's motion, this Court should reject Slager's claims and grant judgment in favor of Respondent, the United States.

## II.       FACTUAL AND PROCEDURAL HISTORY

### *Slager's Offense, Arrest, and Indictment*

On the morning of April 4, 2015, North Charleston Police Officer Michael Slager stopped a car after observing that its center brake light was not working.  Presentence Investigation Report ("PSR") ¶ 14.  During the stop, the driver, Walter Scott, was unable to produce a registration or proof of insurance.  *Id.*  While Slager was in his patrol car running Mr. Scott's information, Mr. Scott ran and Slager gave chase.  *Id.*  During the chase, Slager pulled his Taser and fired twice.  PSR ¶ 15.  The first attempt missed, but the second hit Mr. Scott and caused him to fall.  *Id.*

Slager attempted to place Mr. Scott under arrest, but a struggle ensued.  PSR ¶ 16.  Though particular details of this struggle were contested at sentencing, the essential facts were not and are not in dispute. Mr. Scott escaped Slager.  *Id.*  And as Mr. Scott ran away, Slager drew his firearm and fired eight shots at Mr. Scott, hitting him five times in the back of his body.  *Id.*  Mr. Scott fell to the ground and did not move.  PSR ¶ 17.  He soon died on the scene.  PSR ¶ 18.

Immediately following the shooting, Slager called into his radio "Shots fired. Subject is down. He grabbed my taser," holstered his firearm, and handcuffed Mr. Scott.  PSR ¶ 17.  Slager

---

[3] Because Slager discharged his firearm in the course of the offense, he faced a mandatory consecutive 120-month sentence on Count Two of the Indictment.  *See* 18 U.S.C. § 924(c)(1)(A)(iii).

felt for Mr. Scott's pulse.  *Id.*  Video evidence, filmed by a bystander, showed Slager retrieving the taser and dropping it near Mr. Scott's body.  *Id.*  A very short time later, Slager picked up the taser and holstered it.  *Id.*  Slager told another officer who arrived on the scene that Mr. Scott had grabbed his taser and was facing him when Slager fired his first shot.  Dkt. No. 127, at 9.  Slager also told the officer that he had rendered emergency aid to Mr. Scott.  *Id.* at 9.  Both of these statements were false. *Id.*

On April 7, 2015, Slager was interviewed by agents from the South Carolina Law Enforcement Division ("SLED").  At the time of the interview, Slager did not know that a bystander had filmed the incident, or that state and federal investigators had already received and reviewed the footage.  Dkt. No. 127 at 21.  After waiving his Miranda rights, Slager gave SLED agents a detailed account of the shooting.  Among other things, Slager claimed that Mr. Scott pulled the taser from his hands, arose to his feet, and charged him with the taser.  *Id.* at 9.  Slager claimed he was dodging Mr. Scott when he fired his first shot.  *Id.* at 10.  Slager further claimed he recovered his taser from the ground between the spot where he had been shooting and where Mr. Scott fell.  *Id.*  As the investigators knew, these statements were false, belied by the bystander's video.  *Id.* at 21.  Slager was arrested and charged with murder by South Carolina authorities later that day.

On May 10, 2016, a federal grand jury in the District of South Carolina returned a three-count indictment charging Slager with violating 18 U.S.C. § 242 (deprivation of rights under color of law), 18 U.S.C. § 924(c) (use of a weapon during commission of a crime of violence), and 18 U.S.C. § 1512(b)(3) (obstruction of justice).  Dkt. No. 3.

*The State Trial and Global Plea Negotiations*

On October 31, 2016, Slager went to trial on the state charges. In December, the jury announced it was deadlocked, and the judge declared a mistrial. Dkt. No. 68. Following the announcement, state and federal authorities agreed to proceed on the federal charges, while the state reserved the right to re-try Slager.

For several months, the parties prepared for a federal trial. Slager's defense team submitted numerous pretrial motions. Beginning on April 21, 2017, the Court held two days of hearings, where Slager testified in support of his motion to suppress statements he made to SLED. Dkt. No. 54. During the hearing, Slager claimed to remember new details that he had not reported to SLED only days after the incident – such as claiming that Scott punched him while they were on the ground. Dkt. No. 118 at 91. Slager also claimed that he had a memory of Mr. Scott "on top" of him, something he admitted he had never told SLED investigators. *Id*. at 89. At the same time, Slager claimed that he did not remember other critical details. For instance, Slager claimed he simply did not remember that he had shot Scott while he was running away. *Id*. at 75. Slager's testimony, even during these two days of testimony, was inconsistent. On the first day of testimony, Slager remembered telling SLED agents that his justification for shooting Scott was that Scott was "continuously coming towards him" with a Taser, and recalled he had not told SLED he had been drive-stunned by Scott. *Id.* at 58, 91. But three days later, he claimed, repeatedly, that he could not remember either what happened during the shooting or what he told SLED. Dkt. No. 119 at 14-25. As the Court said, this testimony was part of Slager's "self-serving, evolving, and internally inconsistent" account of what took place that ultimately led the Court to conclude that Slager was not credible. Dkt. No. 140 at 7 -12.

9

During the hearings, the Court inquired about the status of plea negotiations, and instructed the parties: "I don't know whether there has been any plea negotiations, but if there are any plea offers and rejections, I want you to do them in writing, file them under seal, and have Mr. Slager sign them, okay?" Dkt. No. 118 at 203.

On April 26, 2017, Slager's attorney Andy Savage sent the Court a letter outlining the parties' progress in settlement discussions, "[i]n accordance with [the Court's] request to be advised of the defendant's position with regard to a plea . . . ." April 26, 2017 letter from Andy Savage to Hon. David C. Norton (attached as "Exhibit A"). In the letter, Savage enumerated twenty-three communications between the Government and Slager's defense team that took place over a three-week period from April 6 to April 26, 2017. *Id.* Further, Savage wrote that "Michael Slager has been kept informed of all discussions about a plea and has given me authority to enter into a plea agreement." *Id.* Per the Court's request, Slager signed the letter, expressly acknowledging that he had "reviewed and [] endorse[d] the accuracy of the information contained in this memorandum." *Id.* Enclosed, Savage included each of the documents supporting the twenty-three communications identified in the letter. Attachments to April 26, 2017 letter from Andy Savage to Hon. David C. Norton (attached as "Exhibit B").

The documents reveal that the form, but not the terms, of the plea agreement the parties would eventually agree upon was largely complete on April 6. Exh. B. The next day, Savage responded with several revisions, but otherwise agreed that the April 6 draft was "the basic format that we will be signing." *Id.*

On April 10, attorney Don McCune spoke to the prosecution, collected their comments on Savage's revisions, and relayed those comments to the defense team. *Id*. In particular, McCune noted that prosecutors viewed Savage's revisions to the proposed factual basis as a "deal breaker,"

because they would not support a conviction under 18 U.S.C. § 242. *Id*. McCune concluded the email with a series of guidelines calculations accounting for three possible sentencing scenarios, each contemplating a different applicable homicide cross-reference: second-degree murder, voluntary manslaughter, and involuntary manslaughter. *Id*.

On April 12, Savage sent United States Attorney Beth Drake a newly-revised version of the Plea Agreement that included a proposed agreement that "Slager will be allowed to seek a sentence not to exceed sixty (60) months or less without objection by the Government and that the Government will advise the Court that a sentence of sixty (60) months is reasonable." *Id*. That same day, Drake responded to inform Savage that sixty months was too low, but she would discuss with the trial team a "cap or a recommendation." Exh. B. She indicated that Savage's suggestion to stipulate a sentence or range was novel, as the parties "understood originally that both sides were going to agree to disagree and let the judge sort it out based on arguments at the sentencing." *Id*.

On April 13, Savage responded to say that he was prepared to travel "anywhere" to meet with Drake, management at the United States Department of Justice Civil Rights Division, and others to explain "the basis for our opinion" that "given the totality of the circumstances [Slager's] punishment should not exceed the parameters we have suggested." *Id*. That same day, Drake responded with a proposed stipulated range of 168-210 months, based on a cross-reference for voluntary manslaughter. *Id*.

Over the next week, the parties continued to communicate and exchange information. On April 20, Drake emailed Savage, writing, "[l]ast offer still stands, and that is G/L range of 151 to 188, with your ability to argue for variances and departures." *Id*. Two days later, Savage responded to indicate his opinion that "an agreement will not be possible." *Id*. Savage explained

that: (1) during the state trial, a member of the federal prosecution team had suggested the Government would consider a sentence of ten years; and (2) the state jury unanimously acquitted the murder charge, two wanted to acquit on all charges, and when polled, "nearly all thought five years was excessive."  Exh. B.  Savage indicated his belief that state authorities had pushed federal prosecutors to support a sentence above ten years.  *Id*.

On April 26, Savage reiterated his claim that "the State is the driving factor that now has your offer over ten years" and again recalled his discussion of a ten-year sentence with a member of the federal team.  *Id*.  Soon thereafter, Drake responded to say that "nobody on the federal side is talking a recommendation/cap of ten," but reminded Savage that the pending offer would allow Slager to argue for a variance or departure even with a higher stipulated range.  *Id*.  Drake closed her email with a note of admiration for Savage, observing that he "fight[s] like hell for each and every client" he has.  *Id*.

*The Plea Agreement and Hearing*

Approximately one week later, on May 2, 2017, Slager, the United States, and the State of South Carolina entered into a global plea agreement, whereby Slager pleaded guilty to Count One of the indictment: deprivation of civil rights under color of law, in violation of 18 U.S.C. § 242. In exchange for Slager's guilty plea, the United States agreed to dismiss the remaining counts, including Count Two that carried a ten-year mandatory consecutive sentence, upon sentencing and to recommend a three-level reduction for acceptance of responsibility.  Dkt. No. 114, at ¶ 6. Likewise, South Carolina agreed to dismiss its murder charge upon sentencing.  *Id.* at ¶ 7.  The plea agreement also identified the following elements necessary to sustain a conviction for Count 1: (1) "That, in North Charleston, South Carolina, the defendant deprived Walter Lamar Scott, Jr., of the right to be free from the unreasonable and excessive use of force by a law enforcement

12

officer, a right secured by the Fourth Amendment to the United States Constitution"; (2) "that the defendant acted under the color of law"; (3) that the defendant acted willfully"; and (4) "that bodily injury or death resulted, or that the offense involved the use of a dangerous weapon." *Id.* at ¶ 2. In addition, the parties agreed to a specific factual basis for Slager's admission of guilt:

> On April 4, 2015 Slager was a commissioned police officer with the North Charleston Police Department. Slager was on duty as a police officer when he stopped Walter Scott's vehicle after observing that the center brake light was not working. During the stop, Scott fled the scene on foot. Slager engaged in a foot chase of Scott for approximately 200 yards. During the chase, Slager deployed the probes of his Taser. His first attempt to use his Taser was unsuccessful in stopping Scott. Slager ultimately caught up to Scott and deployed his Taser probes a second time.

> After the second Taser deployment, Scott fell to the ground. Scott managed to get off the ground and again run away from Slager. The defendant's Taser dropped to the ground behind the defendant. As Scott was running away, Slager fired eight shots at him from his department-issued firearm. During the time that each of the eight shots were fired, Scott was unarmed and running away from Slager. Five shots hit Scott, all entering from behind. Scott suffered bodily injury and died on the scene as a result of the injuries from the gunshots.

> The defendant used deadly force even though it was objectively unreasonable under the circumstances. The defendant acknowledges that his actions were done willfully, that is he acted voluntarily and intentionally and with specific intent to do something that the law forbids.

*Id.* at ¶ 4.[4]  The parties expressly stipulated that the agreed-upon factual basis was "accurate," and satisfied "all of the elements" of 18 U.S.C. § 242.  *Id.*  The parties further reserved the right to "bring additional facts to the attention of the Court . . . for purposes of determining an appropriate sentence."  *Id.* at ¶ 5.  Importantly, the plea agreement signed by the Slager explicitly stated that the government intended to argue for application of the second-degree murder cross reference.  *Id.*

---

[4] The language in the final paragraph of the factual basis simply reiterates the elements of the offense of conviction, as discussed at length below in response to Slager's Third Ground for relief.

In addition to these provisions, the Plea Agreement included several standard but pertinent clauses regarding Slager's admission of guilt and satisfaction with his agreement and his attorneys' performance. For instance, Paragraph 10 provided that Slager "represents to the court that he has met with his attorneys . . . on a sufficient number of occasions and for a sufficient period of time" to discuss the case, receive advice, and understand the consequences of pleading guilty. Dkt. No. 114. In addition, it provided that Slager represented to the Court that he "has entered this Agreement as a matter of [his] free and voluntary choice, and not as a result of pressure or intimidation by any person." *Id.*

Along the same lines, Paragraph 21 provided that Slager "has had sufficient time to discuss this case, the evidence, and this Plea Agreement with his attorney and he is fully satisfied with the advice and representation his attorney provided." *Id.* Under this paragraph, Slager further acknowledged that he: (1) "has read the Plea Agreement, understands it, and agrees it is true and accurate;" (2) "is entering into this Plea Agreement and is pleading guilty because he is guilty;" and (3) "is entering his guilty plea freely, voluntarily, and knowingly." *Id.*

On March 7, 2018, Slager appeared before the Court to enter his guilty plea. Dkt. No. 117. At the hearing, the Court conducted an extensive Rule 11 colloquy, where Slager represented to the Court his satisfaction with his attorneys' performance and the terms of his plea agreement, his agreement with the accuracy of the facts as stipulated in the parties' factual basis, his knowledge and understanding that he was pleading guilty to an offense that carried a penalty of up to life in prison, and that his plea was knowing, voluntary, and freely given. *Id.* The Court accepted his plea. *Id.*

*The Presentence Investigation Report*

Prior to sentencing, a probation officer prepared a Presentence Investigation Report (PSR). To determine Slager's base offense level, the probation officer relied on U.S.S.G. § 2H1.1, which instructs a judge sentencing for criminal violations of civil rights to apply "the offense level from the offense guideline applicable to any underlying offense." *Id.* § 2H1.1(a)(1). The probation officer found that the underlying offense was voluntary manslaughter, for which the base offense level is 29. PSR ¶ 33. Because Slager acted under the color of law when he committed the offense, the probation officer applied a six-level offense characteristic enhancement under U.S.S.G. § 2H1.1(b)(1). *Id.* ¶ 34. After reducing Slager's offense level for acceptance of responsibility, the probation officer calculated Slager's total offense level as 32, which, combined with a criminal history category of I, yielded a recommended advisory Guidelines range of 121 to 151 months' incarceration. *Id.* ¶¶ 40-42, 68.

The government objected to the probation officer's calculation of Slager's offense level on two grounds. First, the government argued that Slager should receive a two-level upward adjustment, pursuant to U.S.S.G. § 3C1.1, because Slager obstructed justice by (i) tampering with the crime scene immediately following the shooting of Scott, (ii) lying to investigators, and (iii) providing false testimony throughout state and federal court proceedings. *See* Addendum to PSR, at 2-3. Second, the government objected to the cross-reference to voluntary manslaughter as the underlying offense. *Id.* at 3. The government maintained the appropriate cross-reference for the underlying offense was second degree murder for which the base offense level under the Guidelines is 38. *Id.* Because Slager was well aware that he could not shoot a fleeing, non-dangerous subject in the back while running away and because Slager's attempts to cover up the incriminating circumstances of the shooting negated a finding that Slager acted upon "heat of

passion," the government contended the second-degree murder cross-reference was appropriate. *Id.*

Defense counsel submitted no objections to the PSR. They did, however, submit a fifteen-page letter responding to the Government's objections. Addressing the obstruction enhancement, Slager's counsel emphatically maintained that Slager did not tamper with the crime scene and that Slager's actions after the shooting were consistent with officer training and department policy. *Id.* at 7. Counsel further argued that Slager's statements to investigators were neither misleading nor false and that Slager never committed perjury during either his state trial or federal court proceedings. *Id.* As for the Government's objection to Slager's base offense level, Slager's counsel contended that the probation officer correctly identified the underlying offense as involuntary manslaughter because there was no evidence that Slager acted with malice aforethought. Instead, Slager's counsel noted that Slager was "alone," "exhausted," and "in fear of his life" when he deployed lethal force. *Id.* at 9. "At some point," Slager's counsel acknowledged, Slager's conduct became "objectively unreasonable" but he always "remained in fear of his life." *Id.* Slager's fear, counsel argued, "negates malice" and renders a cross-reference to second degree murder unwarranted. *Id.*

*Slager's Sentencing*

Prior to sentencing, both parties submitted sentencing memoranda further outlining their respective positions regarding the appropriate cross-reference to determine Slager's base offense level. To find the underlying offense was second degree murder, the government recognized that the critical "question for the Court . . . is whether the defendant acted with malice aforethought." Dkt No. 127, at 14. The Government maintained that both "[t]he evidentiary record and the defendant's admission that he acted objectively unreasonably when he willfully shot Walter Scott

16

without justification together establishes that his conduct constituted second degree murder." *Id.* The Government further argued that voluntary manslaughter was not the appropriate cross-reference because "[t]he evidence in this case establishes that 'heat of passion' is not applicable here." *Id.* at 16. Relying on Slager's guilty plea and his conduct, demeanor, and behavior during and after the shooting, the Government argued that appropriate cross-reference is second degree murder.

Slager's counsel also submitted a sentencing memorandum. The memorandum first addressed several of Slager's history and characteristics from childhood up to and including Slager's shooting of Scott. Dkt. 129, at 2-17. The memorandum also responded to the objections raised by the Government regarding the appropriate cross-reference to apply to calculate Slager's base offense level and application. Slager's counsel maintained that finding involuntary manslaughter as the appropriate underlying offense would not be inconsistent with the facts Slager admitted as part of his plea agreement. Instead, counsel argued, the facts surrounding the shooting—including Scott's failure to comply with Slager's commands, Slager not knowing if Scott was armed, having no backup on scene, exhaustion from the chase, and not knowing the location of the passenger of the vehicle—mitigated malice and instead constituted "the hallmarks of the 'heat of passion' that incited Slager." *Id.* at 23.

In a separate motion and memorandum, Slager's legal team asked the court for a downward departure pursuant to U.S.S.G. § 5K2.10, which permits a sentencing court to depart from the applicable guidelines range "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior." Dkt. No. 130, at 4. In support, counsel argued that Scott's conduct, which included fleeing from police when stopped for a broken brake light, failing to acquiesce to Slager's commands, yelling "Fuck the Police," and trying to get away from Slager

17

after he was tased, substantially provoked Slager to shoot Scott. *Id.* at 5-9. Slager's counsel also moved the court for a departure under U.S.S.G. § 5K2.0, noting Slager's susceptibility to abuse while in prison as well as enduring successive prosecutions in state and federal court. *Id.* at 12.

The sentencing hearing began December 4, 2017. The hearing spanned four days and included testimony from ten witnesses. The Government presented the testimony of, among others, FBI Special Analyst Tony Imel and Feiden Santana, a bystander who witnessed the shooting of Scott. Imel testified during the sentencing hearing that based on his reverse projection photogrammetry analysis, Scott was over sixteen feet away from Slager when Slager fired the first of eight shots at the back of Scott's body. Dkt. No. 140 at 7. As the sentencing court noted, "[t]he Santana video makes clear that at no point did Scott turn around, let alone attempt to attack Slager." *Id.* This testimony directly contradicted Slager's first version of events that he provided to SLED wherein he claimed that he started firing his gun at Walter Scott as Scott was coming toward him with a taser. Dkt. No. 140 at 29.

Santana testified and provided critically important testimony about the moments not captured on video. Santana testified that he was walking to work when he noticed Slager chasing Scott on foot. *United States v. Slager*, 912 F.3d 224, 228 (4th Cir. 2019). Santana testified that he lost sight of Slager and Scott briefly. *Id.* When he saw them again, Scott was on the ground facing down, and Slager was on top of Scott. *Id.* at 228-29. Santana testified that he then heard something that sounded like electricity and Scott sounded like he was being hurt. *Id.* at 229. Santana also saw Slager punch Scott in the back. He testified that Scott was at no point face-up and that Scott was never on top of Slager. *Id.* He did not see Scott punch or fight with Slager at any point. *Id.* Nor did he witness Scott take control of Slager's taser, charge toward Slager, or

attempt to hurt Slager. *Id.* Santana described Scott's actions during the ground altercation as "[j]ust trying to get away, just trying to leave." *Id.*

Santana testified that after the ground altercation, Scott got up quickly, like "a man determined to just get away." *Id.* Slager was still holding Scott when the two got up, but Scott managed to break free and run. *Id.* At that point, Slager pulled out his service weapon and fired multiple times. *Id.* Scott fell to the ground. Slager put handcuffs on Scott but did not administer any medical treatment. *Id.*

Slager's defense team called three expert witnesses including: Eugene Lucio, David Hallimore, and Dr. Charles Morgan. Eugene Liscio testified that when Slager began shooting into the back of Scott, Scott was "17 or 18 Feet or so" away from Slager. Dkt. No. 140 at 7. Liscio also testified that based on his manipulation of a 3D video, that Scott must have possessed the taser prior to Slager firing the first shot. *Id.* at 10. This was central to Slager's claim that Scott had taken the taser from him and used it against him. But, Liscio admitted, as the sentencing court pointed out, that "there is no part in [the Santana video] where you can actually see the taser being held." *Id.* The court did not credit Luscio's opinion regarding who last had the taser *Id.* at 11. Next, Hallimore testified that after manipulating the Santa video he was able to hear Slager yelling, "drop the taser or I'll shoot." The court, after listening to the audio many times, did not credit this testimony. *Id.* at 8 n.4. Finally, Morgan testified regarding the impact of stress on memories in an attempt to support Slager's claims that his evolving account of what occurred was the result of having a faulty memory rather than intentionally attempting to cover up the fact that he shot an unarmed man in the back while the unarmed man was running away from him. Morgan, however, as noted by the sentencing court, was unable to conclude that Slager's memory was so impacted. *Id.* at 35.

Slager did not testify at the sentencing hearing. Instead, the court was asked to rely on Slager's prior statements and testimony about what took place. In summary, Slager's defense team attempted to show that the shooting happened after a heated fight, during which Scott allegedly climbed on top of Slager, assaulted Slager, grabbed Slager's taser, and used the taser to drive-stun Slager. Based on this adduced testimony, Slager's counsel argued the appropriate cross-reference was voluntary manslaughter. Slager also argued that his false statements during the investigation and prosecution were not intended to obstruct justice but instead were the result of memory lapses caused by the trauma of the shooting.

Following the sentencing hearing, the court concluded that second-degree murder was the appropriate underlying offense. The court found that Slager shot Scott with malice aforethought. Dkt. No. 140, at 4. The court further found that shooting Scott in the back when he was unarmed and fleeing was reckless, wanton, and a gross deviation from a reasonable standard of care, such that Slager was aware of the risk of death or bodily harm. *Id.* at 15. After hearing extensive testimony, the court rejected Slager's claim that the shooting was caused by heat of passion. In so doing, the court credited Santana's testimony, finding Santana's state court testimony and his federal court testimony revealed "a consistent story that is at odds with Slager's presentation of the sequence of events—and indeed the events themselves—making Santana a more credible witness." *Id.* at 7. The court found Slager's testimony depicting a heated fight wherein Scott grabbed Slager's taser to be "self-serving, evolving, and internally inconsistent," making him an "incredible witness." *Id.* at 12. Crediting the testimony of Santana, the court concluded that there was not sufficient evidence of heat of passion or sudden quarrel mitigation to reduce the underlying offense from second-degree murder to voluntary manslaughter. *Id.* at 18. Accordingly, the court sustained the government's objection to Slager's base offense level.

The court also sustained the Government's objection insofar that the PSR did not apply an obstruction-of-justice enhancement under 3C1.1. *Id.* at 28. The court found that Slager's statements to SLED investigators during the April 7, 2015, interview were made with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. *Id.* at 29.

Turning to Slager's motion for a downward departure, the court denied the requested departure under U.S.S.G. § 5K2.10 based on victim provocation but granted a two-level downward departure under U.S.S.G. § 5K2.0 in light of the successive state and federal prosecutions and Slager's susceptibility to abuse while in prison. *Id.* at 52. Finally, the court granted a three-level downward variance based on Slager's history and characteristics. *Id.* at 56.

Taking these rulings into account, the court determined that Slager's offense level was 38 and his criminal history category was one, resulting in a Guidelines range of 235-293 months' imprisonment, two to five years' supervised release, and a $100 special assessment. After hearing from members of Scott's family and from family and friends of Slager, the court sentenced Slager to 240 months' imprisonment and two years' supervised release and ordered him to pay a $100 special assessment. *Id.* at 57. The court entered judgment on January 16, 2018. The same day, the court issued a 57-page sentencing order setting out in further detail its reasons for Slager's sentence.

*Slager's Direct Appeal*

Slager appealed the district court's judgment to the United States Court of Appeals for the Fourth Circuit, assigning error to the district court's determination that the underlying offense was second-degree murder as well as its application for a two-level enhancement for obstruction of

21

justice.  The Fourth Circuit affirmed Slager's conviction and sentence in a published opinion.  *See United States v. Slager*, 912 F.3d 224 (4th Cir. 2019).

In doing so, the Fourth Circuit first held that the district court did not err by crediting Santana's version of the events leading up to the shooting, including that Scott was never on top of Slager, that Scott never had the taser in his hands, that Scott immediately began to run away when he stood up, and that Scott was running away when Slager shot him.  *Id.* at 234.  The court observed that Slager's multiple accounts of the shooting that were inconsistent with one another and that "some of Defendant's assertions are flatly contradicted by Santana's video and Defendant's own plea agreement."  *Id.*  By contrast, Santana's narrative throughout state and federal proceedings remained consistent and was supported by the recorded video.  In light of the record evidence, the panel upheld the district court's conclusion to credit the testimony of Santana and reject Slager's testimony.  *Id.*

The Fourth Circuit further upheld the district court's determination that the proper cross-reference was voluntary manslaughter.  The Court observed that Slager admitted in his plea agreement that he acted voluntarily with the specific intent to do something the law forbids and that he fired eight shots at Scott while Scott was unarmed and running away.  *Id.* at 235.  The Court concluded that these facts reasonably supported the district court's conclusion that Slager was aware of a serious risk of death or serious bodily harm when he shot at Scott.  *Id.*  The Fourth Circuit also found no error with the district court's determination that Slager's malice was not negated by sudden quarrel or heat of passion.  Although Scott yelled "Fuck the police" prior to the shooting, the panel concluded these words were insufficient as a matter of law to provoke a reasonable officer to kill.  Further, Slager's claim that he was provoked was contrary to his testimony at his state proceedings when he testified that he was neither "provoked" nor "angry"

22

during his altercation but instead was acting in self-defense. *Id.* at 236. For these reasons, the Fourth Circuit affirmed the cross-reference to second degree murder.

*Slager's § 2255 Motion*

Following an unsuccessful direct appeal and petition for certiorari to the United States Supreme Court, Slager, represented by counsel, now moves the Court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. The petition initially raised five grounds: (1) plea and sentencing counsel were constitutionally ineffective in connection with plea negotiations and advising Slager on the terms under which he should plead guilty; (2) plea and sentencing counsel were constitutionally ineffective at sentencing by failing to present critical witness testimony; (3) plea and sentencing counsel were constitutionally ineffective in advising Slager to enter the plea agreement; (4) appellate counsel was constitutionally ineffective for failing to raise issues to the Fourth Circuit; and (5) plea and sentencing counsel were constitutionally ineffective in failing to make meritorious objections to the Guidelines calculations in Slager's PSR and during the sentencing hearing. Dkt. No. 168. Slager contemporaneously filed with his petition a memorandum in support of Grounds One and Three. In doing so, counsel conceded that his investigation failed to "reveal[] facts and law sufficient to proceed on the remaining Grounds alleged." Dkt. No. 177 at 19 n.8.

## III.    <u>SLAGER'S COUNSEL WAS NOT INEFFECTIVE.</u>

### A.    To Prevail on a Claim of Ineffective Assistance of Counsel, Slager Must Show Both Deficient Performance and Prejudice.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To prevail on an ineffective

assistance of counsel claim, Slager must show: (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Sharpe v. Bell*, 593 F.3d 372, 382 (4th Cir. 2010) (quoting *Strickland*, 466 U.S. at 687).

Under the first prong of *Strickland*, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also Harrington v. Richter*, 562 U.S. 86, 109 (2011) (holding that courts must not "insist counsel confirm every aspect of the strategic basis for his or her actions" because there is "a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect'") (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (*per curiam*)).  A court should not "second guess" defense counsel's performance. *Strickland*, 466 U.S. at 689; *Roach v. Martin*, 757 F.2d 1463, 1476 (4th Cir. 1985).  "While the decisions of trial counsel are always subject to being second guessed with the benefit of hindsight, tactical and strategic choices made by counsel after due consideration do not constitute ineffective assistance of counsel." *Brannon v. Stevenson*, No. 9:13-cv-1792-RMG, 2014 WL 4954884, at *28 (D.S.C. Sept. 29, 2014) (citing *Strickland*, 466 U.S. at 689).  Accordingly, counsel's performance must be evaluated in light of the circumstances of the representation. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004) (the "reasonableness of a lawyer's trial performance must be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of reasonableness is highly deferential.") (quotation marks and citations omitted).  "Perfection is not required," and the test is not "whether the best criminal defense attorneys might have done more" but merely whether the attorney's actions fell "within

the wide range of reasonable professional assistance." *Id.* (citations and internal quotation marks omitted).[5]

In order to establish prejudice under *Strickland*'s second prong, Slager must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Id.* (quoting *Strickland*, 466 U.S. at 696). "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more probable than not standard is slight and matters 'only in the rarest case.'" *Id.* (quoting *Strickland*, 466 U.S. at 693, 697). "The likelihood of a different result must be substantial, not just conceivable." *Id.*

**B.      Ground One: Counsel's Decision to Reject a Binding Guidelines Range in Favor of an "Open" Plea Was a Considered and Strategic Choice Well Within the "Wide Range of Reasonable Professional Assistance."**

In his first ground for relief, Slager argues that his counsel were "constitutionally ineffective in connection with plea negotiations, and advising the Defendant on the terms under which he should plead guilty." Dkt. No. 177 at 19. Specifically, Slager argues that his counsel

---

[5] As the Supreme Court has explained, a court evaluating a claim of ineffective representation must consider "only the commands of the Constitution." *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984). While the Court retains substantial authority under its "supervisory powers to take greater precautions to ensure that counsel in serious criminal cases are qualified," *id.*, ex post evaluation of an individual counsel's performance in one particular case remains limited. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("The Constitution entitles a criminal defendant to a fair trial, not a perfect one.").

25

unreasonably failed to inform him of the Government's offer to plea to a stipulated Guidelines range of 151 to 188 months, advising him instead to accept an "open" plea agreement with no stipulated range. However, as set forth *supra* at pp. 29-30, the record establishes that Slager's counsel advised him of the offer, and advised him to reject it, based on the reasonable belief that he would be better served by an open plea.[6]  Because counsel's advice to reject a stipulated range and plead guilty to an open plea was a strategic decision made after careful evaluation of the relevant circumstances, it falls into the category of judgments the Supreme Court has described as "virtually unchallengeable." *Strickland*, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Accordingly, this Court should deny Slager's petition for relief as to Ground One.

### 1.      Slager's defense was deliberate, not deficient.

In April 2017, Slager's defense team had a plan.  According to Andy Savage, he was assured by a member of the federal prosecution team in November 2016, during the state trial, that federal authorities would be satisfied with a ten-year sentence. Dkt. No. 177-1 at ¶ 17; Exh. B. That was before the state jury "was unanimous in acquitting the murder charge; two jurors committed to acquittal on any charge," and according to Savage, the defense team learned upon polling the jurors that "nearly all thought five years was excessive." Exh. B. In plea negotiations with federal prosecutors, Savage was adamant that "given the totality of the circumstances [Slager's] punishment should not exceed" sixty months.  *Id.*  The United States Attorney, impressed by his zeal in the course of the extended negotiations, told Savage he "fight[s] like hell for each and every client" he has.  *Id.*

---

[6] Even if Slager's allegation were true, that same body of evidence conclusively establishes that, given the circumstances at the time, he would not have accepted a Guidelines stipulation of 151 to 188 months.

Having persuaded a state jury that Slager's conduct did not arise to the level of murder, Slager's defense team reasonably believed they could do it again in federal court, if necessary. Or, in the event of a plea, the team believed they could similarly persuade the sentencing judge, whom Savage had known for forty years and believed would be sympathetic to their case. Even more, the defense team believed it had persuasive arguments in mitigation, such that even if Slager's guidelines range came in higher than they wanted or expected, they would still be able to work him down to an acceptable sentence by way of a downward departure or variance. It was in this context – having fully weighed the risks and benefits, based on the best knowledge he had – that Savage claims he advised Slager to reject the Government's offer to a stipulated guidelines range of 151-188 months, and instead to accept an "open" plea agreement. Dkt. No. 177-1 at ¶¶ 16, 19, 20.

When the USPO calculated a guidelines range of 121-151 months, based on a voluntary manslaughter cross-reference, the defense team's decision looked like the right one as district courts in most cases adopt the findings of the PSR. Further, even if Slager lost the guidelines objection, he remained eligible for a downward departure or variance, which over 40% of criminal defendants in the District of South Carolina received in 2017.[7] As Savage relates in his declaration, his "advice to Slager to reject this offer was based on my firm belief that Slager would not risk a judicial finding of his underlying conduct greater than manslaughter, and we still would have an opportunity to argue for less." Dkt. No. 177-1 at ¶ 19.

---

[7] Further still, over half of those are granted in the face of Government opposition. *See* United States Sentencing Commission, Statistical Information Packet – FY 2017, District of South Carolina, at 11 (available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/sc17.pdf).

Thus, Slager's defense team invested substantial resources and energy preparing for sentencing, with two goals: (1) to preserve the voluntary manslaughter cross-reference in the PSR, and (2) to win both a departure and variance, in order to get as low as sentence as possible. Slager's team filed nearly 300 pages of briefing and exhibits contesting the Government's objection to the PSR and arguing for both a departure and variance. Dkt. Nos. 128, 129, 130. Over the course of four days, Slager's defense team effectively tried a case on the sentencing issues. Dkt. Nos. 131-34. They called seven witnesses – including experts – and introduced dozens of exhibits. Dkt. Nos. 135, 136. By any measure – but certainly through the forgiving lens of post-conviction review – Slager's team performed competently, diligently, and reasonably. *See Strickland*, 466 U.S. at 689 (reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

Ultimately, the Court agreed with the Government, and applied the murder cross-reference. However, it still granted the defense's arguments for variances and ultimately sentenced Slager to 240 months rather than the Guideline sentence of life imprisonment. The sentence was driven by facts that Slager falsely denied, not by any ineffectiveness by his counsel. Indeed, his defense team was effective and successful in nonetheless securing a lesser sentence than the one called for by the Guidelines.

2. **The evidence rebuts Slager's claims that his attorneys' strategy was based on a single conversation and that he never received the Government's final offer of 151-188 months.**

In his memorandum, Slager reduces his attorneys' counsel – which spanned thousands of hours and involved the consideration of many dynamic and nuanced questions of fact and law – to nothing more than a single determination, based upon a single encounter months prior to sentencing. Specifically, Slager argues that his attorneys were ineffective in "devising a plea

strategy based around a *single* ex-parte off-the-record comment from the district court judge,"
which he argues "was objectively unreasonable to the extent that no reasonable attorney would
rely on such a remark to formulate and inform their *entire* plea negotiation strategy . . ." Dkt. No.
177 at 19.  He further argues that because of his team's unreasonable reliance on this isolated
conversation, they failed to convey the Government's plea offer to a stipulated sentencing range
of 151-188 months, which he claims he would have accepted.  Dkt. No. 177-4 at ¶ 3.

But the record – indeed, Slager's own exhibits – defies both claims.  First, whatever was
said in the January 2017 meeting, whatever weight the team gave it, the comment was clearly not
the single, entire basis for the defense team's plea negotiation strategy.  Indeed, as related above,
Savage explained then – and maintains now – that the defense team had a number of reasons to be
optimistic.  His strategy, if ultimately unsuccessful, was well-considered and reasoned, even if the
comment had never been made, and cannot be reduced to crude reliance on a single passing
statement.  This is precisely the kind of strategic decision-making that this Court and many others
have held to be well outside the realm of ineffective assistance.  *See, e.g., Brannon*, 2014 WL
4954884, at *28 ("tactical and strategic choices made by counsel after due consideration do not
constitute ineffective assistance of counsel") (citing *Strickland*, 466 U.S. at 689).

Second, as to the district court's alleged ex parte comment that Slager's federal case was
"not a murder case," Slager has overstated his own evidence.  First – and most importantly – the
comment took place in an *allowable ex parte meeting*, regarding Federal Criminal Justice Act
("CJA") fees.  Dkt. No. 1771-1 at ¶¶ 11-15.  Second, the alleged comment was made during a
conversation that took place months before Slager had pleaded guilty and before the issue of a
cross-reference to the pending charge was at issue.  Third, though Slager's attorneys claim that
they interpreted the remark to be an improper *ex parte* preview of the Court's opinion of the

applicable sentencing cross-reference to one of the three charges Slager was facing, they acknowledge it was their own subjective interpretation, never expressly confirmed by the Court. Fourth, they ultimately concede that the Court's decision to overrule the PSR and apply the murder cross-reference revealed their mistake. Dkt. No. 117-1 at 16 ("On December 7, 2017, I learned how wrong I had been…"). Fifth, while the Court's off-hand remark could be subject to several interpretations, Slager was facing a murder charge in state court, not federal court. As Savage and McCune explain, the alleged comment by the Court was made months earlier in the course of a conversation about expert witness fees, relevant evidence, and elements of proof, so it would be both relevant and appropriate for the Court to comment on the nature of the case before it, and how it was distinguished from the state murder case Slager's defense team just tried.

Last, Savage admitted in a sworn affidavit provided to this court that he conveyed the offer while advising Slager to reject it, and contemporaneous records corroborate this account. In his declaration, Savage relates that he "repeatedly assured Slager that he was not risking a longer sentence by rejecting the Government's final offer." Dkt. No. 177-1 at ¶ 16. Further, Savage explains that his "advice to Slager to reject this offer was based on my firm belief that Slager would not risk a judicial finding of his underlying conduct greater than manslaughter, and we still would have an opportunity to argue for less."[8]  *Id.* at ¶ 19. Savage's declaration is substantiated by his

---

[8] In his declaration, Savage expresses his regret at the emphasis he purportedly placed on the Court's statement, notwithstanding ample reason in the record to doubt it carried as much weight as he now suggests. Savage is not unique. In *Harrington*, the Supreme Court observed that after an adverse decision, "even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome." 562 U.S. at 110. For that reason, the Court has instructed courts not to "indulge 'post hoc rationalization' for counsel's decision-making that contradicts the available evidence of counsel's actions." *Id.* at 109–10. Instead, courts must inquire into "the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* The record evidence reveals that whatever Savage says now about his state of mind

April 26, 2017 letter to the Court, which identifies the Government's communication of the final offer, attaches the final offer, and certifies that "Michael Slager has been kept informed of all discussions about a plea and has given me authority to enter into a plea agreement." Exh. A. For his part, Slager also signed the letter and acknowledged that he had "reviewed and [] endorse[d] the accuracy of the information contained in this memorandum." *Id.* The Government's offer to stipulate to a guidelines range of 151-188 months was "information" referred to and incorporated by attachment to the letter. Exh. B.

On the factual determination as to whether Slager ever in fact received the Government's offer to a stipulated Guidelines range of 151 to 188 months, this Court should find Savage's affidavit and the corroborating April 26, 2017 letter (which includes both his and Slager's representations that Slager was apprised of the Government's plea offer to a stipulated range) to be conclusive evidence. Further, this Court should find that Slager's allegation to the contrary – that he never received the offer and would have accepted it if he had – is unsupported by any evidence in the record and also is incredible. As explained at length by the Court in its Sentencing Order, Slager's record of sworn testimony in this case is "self-serving, evolving, and internally inconsistent," such that the Court described him as "incredible" no fewer than four times in the course of its analysis. Dkt. No. 140 at 12, 39, 42, 43. Given Slager's history of dishonesty – to this Court, to the state court, and to investigators – this Court should find that Slager's naked allegation that he never received the Government's plea offer is so outweighed by Savage's declaration and the contemporaneous record, including Slager's own signed acknowledgment of that he received the plea offer, that no genuine issue of material fact exists. *See United States v.*

---

at the time, his handling of the plea negotiations, his staking of reasoned positions, and his explanation for their basis is objectively reasonable.

*Baldwin*, 60 F.3d 825 (4th Cir. 1995) (per curiam) (citing *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985)) ("Unsubstantiated assertions fall far short of the standard needed to show ineffective assistance....").

     **3.**     ***Lafler* and *Frye* are inapposite because counsel's advice was the result of reasoned consideration, not negligence, and there is no credible evidence that Slager would have accepted a plea to a guidelines range of 151-188 months.**

In support of his argument for ineffective assistance, Slager relies principally on the Supreme Court's jointly-issued opinions *Lafler v. Cooper*, 566 U.S. 156 (2012) and *Missouri v. Frye*, 566 U.S. 134 (2012). In those holdings, the Court expanded ineffective assistance claims to reach deficient counsel in the plea bargaining stage, and announced the "general rule" that "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145. Slager argues that because his defense team never conveyed the Government's final plea offer of 151-188 months, their counsel was *per se* unreasonable under *Lafler* and *Frye*.

As an initial matter and as set forth above, the record establishes that Slager received and rejected the offer, based upon his attorney's reasoned advice. But even if Slager's present claims were true, neither *Lafler* nor *Frye* gain Slager any ground. Most importantly, neither *Laffler* nor *Frye* considered *Strickland*'s first prong, regarding deficient performance. For that reason as well as others, the cases do not ultimately determine the outcome here.

In *Lafler*, the Court confronted the question of whether a defendant suffered prejudice as the result of ineffective assistance where he was negligently advised to reject a plea agreement (based on the attorney's mistake of law), went to trial, and was sentenced to a term of prison far exceeding the terms of the rejected plea offer. The Court concluded the defendant was prejudiced, but advised that in similar cases, the "defendant must show that but for the ineffective advice of

32

2:16-cr-00378-RMG     Date Filed 11/02/20     Entry Number 185-1     Page 33 of 40

counsel there is a reasonable probability" that "the defendant would have accepted the plea." *Lafler*, 566 U.S. at 164.

*Lafler* is distinguishable from the present case for two reasons. First, as discussed above, counsel's advice to reject the Government's offer was based on a considered strategy, not a negligent mistake of law.[9] Second, there is no "reasonable probability" that Slager would have accepted a plea offer stipulating to a range of 151-188 months, whatever he may say now. At the time, Slager's understanding of the risks and benefits of an open plea would have been informed by his attorneys, who believed in good faith that they could secure him a better deal. According to Savage, Slager – just one week prior – had authorized a stipulation to 60 months. Exh. B. There is no credible evidence in the record to suggest that Slager would have so quickly embraced a stipulation to an additional 91 months (over seven-and-a-half years) of imprisonment, particularly given his attorneys' reasoned objections.

Slager is not the first defendant to claim, in an attempt to vacate his sentence, that he would have accepted a previously-rejected plea offer. For this reason, the Fourth Circuit has held that courts should view this type of "self-serving" testimony with "heavy skepticism." *Merzbacher v. Shearin*, 706 F.3d 356, 367 (4th Cir. 2013) (citing *United States v. Day*, 969 F.2d 39, 46 n. 9 (3d Cir. 1992)); *see also Purdy v. Zeldes*, 337 F.3d 253, 259 (2d Cir. 2003) (noting that "in most circumstances a convicted felon's self-serving testimony is not likely to be credible"). Naturally, courts have even greater reason to doubt the self-serving testimony of a defendant, like Slager,

---

[9] In *Lafler*, the parties stipulated to deficient performance, such that the only issue raised for appeal was *Strickland*'s second prong, regarding prejudice. 566 U.S. at 160 ("The instant case comes to the Court with the concession that counsel's advice with respect to the plea offer fell below the standard of adequate assistance of counsel guaranteed by the Sixth Amendment."). The Government has made no such concession in this case.

whose credibility has already been questioned by the Court. *See, e.g., Young v. United States*, No. 2:09-CR-00223-01, 2016 WL 5496517, at *11 (S.D.W. Va. Sept. 29, 2016), aff'd, 685 F. App'x 181 (4th Cir. 2017) (denying Petitioner's claim that he would have accepted a previously-rejected plea offer, without an evidentiary hearing, where the court had previously found Petitioner's testimony to be "not credible," "improbable," and "unconvincing"). [10]

*Frye* is distinguishable from the present case for the very same reasons. In *Frye*, the Court also considered a case of ineffective assistance at the plea-bargaining stage. However, unlike in *Lafler*, the attorney in *Frye* negligently failed to convey a time-limited offer before it expired. In that case, the Court held that as a general matter, defense counsel are obligated to communicate formal plea offers "on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145. First, as previously discussed, Slager's defense team did in fact convey the plea offer, and was not deficient in advising Slager to reject the plea offer. Second, as with *Lafler*, in order to prevail under *Frye*, Slager must demonstrate that it was "reasonably probable" that he "would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel." *Merzbacher*, 706 F.3d at 366 (citing *Frye*, 566 U.S. at 147). As explained above, the record makes clear that Slager's team had a reasoned basis at the time to believe the offer of 151 to 188 months was unreasonably high. Their conversations with Slager – even assuming the offer was never conveyed – reflected this belief. Because there is no credible evidence to suggest that Slager believed any differently at the time, it is not "reasonably probable" that Slager would have accepted the

---

[10] Slager's claim that his "attorneys never told [him] about any plea offers made by the government in [his] case" is specious for several reasons. First, it is contradicted by Savage's present declaration. Second, it is contradicted by Slager's own attestation in the April 26 letter. Third, it is most obviously contradicted by Slager's eventual guilty plea.

Government's offer. In all probability, Slager would have rejected it for the same reasons Savage did: because he expected he could do better with an open plea in federal court.

C.     **Ground 3: Counsel was Not Constitutionally Ineffective for Advising Slager to Accept a Global Plea Agreement in which he Admitted the Facts and Elements of Count One.**

In his third ground for relief, Slager argues that his counsel was constitutionally ineffective for advising him to enter into a plea agreement that contained admissions that were "adverse to Defendant's interests." Specifically, Slager claims that because the factual basis included an admission that his shooting of Scott was "objectively unreasonable," it precluded him from arguing for a "fear-based voluntary manslaughter" cross-reference and thereby rendered his attorney's assistance constitutionally deficient. Dkt. No. 175 at 26. This argument fails for two reasons. First, objective unreasonableness is necessary in order to prove an element of the offense to which Slager pleaded guilty. In other words, in order to plead guilty to a violation of Section 242, Slager had to admit his actions were objectively unreasonable. Second, this admission did not preclude Slager from arguing for a "fear based voluntary manslaughter" cross-reference based on his subjective beliefs, even if objectively unreasonable. The district court made this point, explaining that the language in the guilty plea "[left] open the possibility that the portion of the incident between Slager and Scott . . . warrant[ed] a 'heat of passion' mitigation." (Dkt. No. 140 p. 4). The sentencing court explicitly recognized that other courts have found that "where there is evidence a person was scared for his life, a jury should be instructed on voluntary manslaughter." Dkt. No. 140 at 5 (*quoting Kinard v. United States*, 96 F.2d 522, 525 (D.C. Cir. 1938)). The sentencing court, however, declined to find voluntary manslaughter not because of the plea language but because, as described below, the facts did not support the voluntary manslaughter cross-reference.

Defense counsel's advice to enter into a plea agreement that included the elements of the offense and left open the opportunity for presenting mitigation evidence and arguments was not constitutionally deficient. This advice was within the "wide range of reasonable professional assistance." *See Strickland*. 466 U.S. at 689. We will address each of Slager's arguments in turn.

First, in order to plead guilty to the violation of Section 242 charged in Count One, Slager necessarily had to admit to each of the elements of the offense, including that his conduct was objectively unreasonable. To prove a violation of 18 U.S.C. § 242, the Government was required to prove beyond a reasonable doubt that Slager: (1) acted under color of law; (2) deprived a victim of a right protected by the United States Constitution; and (3) acted willfully. *See United States v. Lanier*, 520 U.S. 259, 264 (1997) (*citing Screws v. United States*, 325 U.S. 91 (1945)). Additionally, in order to prove a felony violation, the Government was required to prove that (4) bodily injury or death resulted, or that the offense involved the use of a dangerous weapon. 18 U.S.C. § 242.

In this matter, the constitutional right at issue was the Fourth Amendment prohibition against unreasonable search and seizure. *Tennessee v. Garner*, 471 U.S. 1 (1985) (holding that apprehension of a fleeing suspect is subject to the Fourth Amendment's reasonableness requirement and explaining that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."). In order to prove a Fourth Amendment violation, like the one charged in this case, the government is required to prove beyond a reasonable doubt that the defendant's conduct was "objectively unreasonable." *Graham v. Connor*, 490 U.S. 386, 394 (1989).

Without an admission from Slager that his conduct was objectively unreasonable, the Government could not have signed the plea agreement and this Court would not have been able to accept the plea to Count One. As a consequence, defense counsel's advice to accept a plea offer that included the admissions necessary to establish the offense charged in Count One was clearly appropriate and therefore not constitutionally deficient.

Second, Slager's admission that his use of force was objectively unreasonable did not foreclose his ability to argue that the cross-reference to second-degree murder should not apply. To apply the cross-reference for second-degree murder, the Government had to establish, by a preponderance of the evidence, that: (1) Slager unlawfully killed Walter Scott; and (2) the Slager did so with malice aforethought. *See* 18 U.S.C. § 1111. Malice, is established by demonstrating (1) an intent to kill, (2) an intent to cause serious bodily injury, or (3) the existence of extreme recklessness and wanton disregard for human life. *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989). Malice aforethought "is the distinguishing characteristic which, when present, makes a homicide murder rather than manslaughter." *United States v. Fleming*, 739 F.2d 945, 947 (4th Cir. 1984).

Slager, meanwhile, could negate this showing by establishing that he acted, not with malice, but upon "a sudden quarrel." In so doing, Slager could establish that the appropriate cross-reference for Count One was voluntary manslaughter. Voluntary manslaughter "is the unlawful killing of a human being without malice . . . [u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). With evidence that the shooting occurred during the "heat of passion," Slager could secure the cross-reference to a lower sentencing guidelines range.

This Court recognized at sentencing that, for the cross-reference, the dispositive issue was whether "the events that transpired between Slager and Scott constitute[d] heat of passion." Dkt.

No. 140 at 17.  Slager's guilty plea, the Court reasoned, left "open the possibility that the portion of the incident between Slager and Scott that occurred before [eyewitness] Feidin Santana . . . began filming the bystander video that captures the shooting . . . warrants a 'heat of passion' mitigation such that the cross-reference to voluntary manslaughter would be appropriate."  *Id.* at 4.  "The court agrees that a cross-reference of voluntary manslaughter can be <u>consistent</u> with a § 242 violation.  But this does not mean that a voluntary manslaughter cross-reference is <u>appropriate</u> under the circumstances of this case."  *Id.* at 17 (emphasis in original).

After considering testimony from experts, video footage, and the eye-witness testimony, the court determined that these facts were not sufficient to establish heat of passion.  Dkt. No. 140 p. 6.  The Court then explained that the success of Slager's heat-of-passion claim rested on "what happened in the minutes immediately prior to the events captured by the Santana video."  *Id.* In this case, that "depend[ed] on whether Scott was ever 'on top of' Slager during the ground altercation and/or was in control of his taser, and whether Scott tased or attempted to tase Slager."  *Id.*  Slager and Feidin Santana were the only individuals who could offer eyewitness testimony as to what occurred prior to the start of the video.

Santana testified that Scott was never on top of Slager, always was facing down, never gained control of Slager's taser, and never charged at or tried to fight Slager. *Id.* at 8-9.   By contrast, Slager claimed that the shooting happened after a heated ground fight, during which Scott allegedly climbed on top of him and assaulted him.  Slagger further maintained that Scott grabbed his taser and used it on him.  Faced with these competing narratives, the district court credited Santana's testimony, finding Slager's "contradictory stories" to be "self-serving, evolving, and internally inconsistent."  *Id.* at 12.

After rejecting Slager's account of the incident, the district court found "that the ground altercation between Scott and Slager that ensued before the first shot was fired—at which point Slager admits that he employed unreasonable deadly force—was not the sort that would cause an 'ordinary, reasonable, law enforcement officer' to shoot and kill someone, and so a cross-reference to voluntary manslaughter would be erroneous."  *Id.* at 15. Contrary to Slager's claim, therefore, the terms of the plea agreement did not foreclose the defense from arguing for a voluntary manslaughter cross-reference.  Instead, it was Slager's evolving account of the incident and his incredible testimony that dissuaded the Court from applying the voluntary manslaughter cross-reference.  To put it another way, this Court recognized that the cross-reference to voluntary manslaughter could have applied, but that it did not here because the Court did not find Slager's account of the incident to be credible.

Finally, the advice Slager received clearly was not constitutionally deficient.  Slager's counsel resolved both the state and federal cases with a plea to Count One in the federal indictment. In so doing, Slager avoided both the risk of a consecutive ten-year sentence for Count Two in the federal indictment and the prospect of a retrial in the state's murder case.  Slager now second-guesses his decision to enter into the plea agreement, but it did provide him with significant concessions.  Slager's regret should not be with the terms of the plea agreement, as it did not preclude his counsel from making the mitigation presentation he desired, but rather with his own failure to present a credible account supporting a claim that his unlawful use of force occurred upon a sudden quarrel.  Against this backdrop, defense counsel's strategy fell within a "wide range of reasonable professional assistance" and therefore did not violate *Strickland*. 466 U.S. at 689. For these reasons, the Court should reject Slager's request for relief.

IV.    **CONCLUSION**

For the reasons stated above, this Court should deny Slager's Section 2255 motion, and grant summary judgment in favor of the United States.

Respectfully submitted,

PETER M. McCOY, JR.
UNITED STATES ATTORNEY

By:    /s/Brook B. Andrews
       BROOK B. ANDREWS (#10231)
       NATHAN S. WILLIAMS (#10400)
       BENJAMIN N. GARNER (#11477)
       Assistant United States Attorneys
       1441 Main St., Suite 500
       Columbia, South Carolina 29201
       Tel: (803) 929-3000
       Fax: (803) 254-2943
       brook.andrews@usdoj.gov

       ERIC S. DREIBAND
       Assistant Attorney General
       Civil Rights Division

       /s/Rose E. Gibson
       ROSE E. GIBSON
       Special Litigation Counsel
       Civil Rights Division, Criminal Section
       U.S. Department of Justice
       150 M Street NE
       Washington, DC 20002
       Telephone: (202) 616-4571
       Rose.Gibson@usdoj.gov

November 2, 2020