IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Case No. 2:16-cr-0378-RMG |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Michael Slager, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |
| _____ | ) | |

    This matter comes before the Court on Petitioner Michael Slager's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. (Dkt. No. 168.) Petitioner initially raised four grounds for relief, but subsequently abandoned Grounds Two and Four, leaving Grounds One and Three in contest. The Government moved for summary judgment, arguing that it was entitled to judgment as a matter of law. Petitioner opposed the motion. (Dkt. Nos. 185, 18.) The Court denied the motion for summary judgment, finding that there were material factual disputes in the record requiring an evidentiary hearing. (Dkt. No. 191.) The Court conducted an evidentiary hearing on April 12-13, 2021. The Court now issues the following findings of fact and conclusions of law.

**I.     Legal Standards**

**A.     28 U.S.C. § 2255**

    To obtain relief under 28 U.S.C. § 2255, a petitioner must prove by a preponderance of the evidence that his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a). An individual bringing a motion under § 2255 is entitled to an

1

evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief[.]" 28 U.S.C. § 2255(b). The petitioner is entitled to an evidentiary hearing where the record "contains a dispute of material fact sufficient to preclude the grant of summary judgment to the Government." *United States v. White*, 366 F.3d 291, 301 (4th Cir. 2004). "[N]o hearing is required where the district judge is thoroughly familiar with the case" and "it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." *Ouellette v. United States*, 862 F.2d 371, 377 (1st Cir. 1988); Rule 4(b) of the Rules Governing Section 2255 Proceedings.

B.      **Ineffective Assistance of Counsel**

Criminal defendants have a Sixth Amendment right to assistance of counsel, which extends to the plea negotiation process. *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985). To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that a reasonable probability exists that, but for the counsel's error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

To establish deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104 (2011). The district court must apply a "'strong presumption' that counsel's representation is within the 'wide range' of reasonable professional assistance." *Id*. (*quoting Strickland*, 466 U.S. at 689). A petitioner must also "overcome the presumption that, under the circumstances, the challenged action might be

2

considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). Courts generally show a marked reluctance to accept counsel's "tactical decision" as evidence of ineffective assistance. *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 105. The question is whether counsel's representation amounted to "unreasonableness under prevailing professional norms" rather than whether it deviated from best practice or the common custom. *Strickland*, 466 U.S. at 689.

With respect to prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding"; rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla*, 559 U.S. at 371.

Where the claim of ineffective assistance of counsel arises out of the plea bargaining process, the performance prong of the *Strickland* test may be satisfied by counsel's failure to communicate a plea offer to the defendant or lack of a reasonable basis for advice regarding sentencing exposure. *See Missouri v. Frye*, 556 U.S. 134, 149 (2012); *United States v. Merritt*, 102 Fed.Appx. 303, 307, 309 (4th Cir. 2004). The prejudice prong requires the defendant to show a reasonable probability that he would have accepted the plea agreement, a reasonable probability that the prosecution would have adhered to the agreement, and a reasonable

probability that the agreement would have been accepted by the trial court. *Frye*, 556 U.S. at 150.

**II.     Discussion**

**A.     Ground One**

*Findings of Fact*

1.     Petitioner asserts the following claim under Ground One of his motion:

> Counsel failed to meaningful pursue a 11(c)(1)(C) plea agreement with the Government, relied on out of court *ex parte* statements by the sentencing judge to reject/terminate potentially fruitful and favorable plea negotiations, and advised Defendant to decline further pursuit of a negotiated plea agreement.

(Dkt. No. 168 at 5.)

Petitioner subsequently submitted proposed findings of fact and conclusions of law that summarized Ground One as asserting "constitutionally ineffective assistance of counsel" on the basis that defense counsel "unreasonably relied upon an *ex parte* comment by the district judge when forming their plea negotiation strategy, and thereafter failed to communicate the Government's final plea offer as a result . . . ." (Dkt. No. 202 at 1.)

2.     Petitioner, then a North Charleston Police Department officer, was indicted in both state and federal court arising out of the shooting of a motorist, Mr. Walter Scott ("Scott"), on April 4, 2015 that resulted in Scott's death. The state court indictment charged Petitioner with murder. (Exhibit 1.)[1] The federal court indictment charged Petitioner with deprivation of rights under color of law, in violation of 18 U.S.C. § 242; use of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c); and obstruction of justice. (Exhibit 2.)

---

[1]  Exhibit numbers reference exhibits jointly offered into evidence at the evidentiary hearing held on April 12-13, 2021.

4

After the state court murder trial ended in a mistrial, federal prosecutors moved to commence the federal criminal proceedings.

3.  Attorney Andrew Savage, III ("Savage") was appointed as defense counsel in the federal case under the Criminal Justice Act ("CJA"). Savage had previously represented Petitioner in the state court trial on a *pro bono* basis. On January 3, 2017, Savage, an attorney in his office, Donald McCune ("McCune"), and Savage's wife and paralegal, Cheryl Savage, met with the trial judge, United States District Judge David C. Norton, in a legally appropriate *ex parte* meeting to discuss the CJA case budget. In the course of the meeting, while discussing the state court mistrial, Judge Norton stated that the state court case was "not a murder case." (Exhibit 28.) At the time of the January 3, 2017 meeting between defense counsel and Judge Norton, Petitioner was actively contesting the federal charges and there was no discussion of a possible guilty plea, a potential presentence report, or a possible cross reference in the presentence report that might be to voluntary manslaughter or second degree murder. Judge Norton's comment about the state case was welcomed by defense counsel because it appeared confirmatory of their position that Petitioner's conduct constituted voluntary manslaughter and not murder, which defense counsel understood might one day become an issue at sentencing should Petitioner plead guilty to or be convicted of the federal charges.

4.  Judge Norton was subsequently advised that extensive plea negotiations had been conducted between defense counsel and the Government, but that no plea agreement had been reached. Judge Norton instructed defense counsel to detail in writing all plea offers that the Government had made to Petitioner and to have both Savage and Petitioner certify to the accuracy and completeness of the information. (Dkt. No. 220 at 157:24-158:15; 159:11-13.) On April 27, 2017, Savage submitted a letter to Judge Norton listing and attaching twenty-three

emails that detailed extensive exchanges between the Government and defense counsel regarding a plea agreement. Savage advised Judge Norton that "Michael Slager has been kept informed of all discussions about a plea and has given me authority to enter into a plea agreement." (Exhibit 4 at 3.) Among the twenty-three emails listed in and attached to the letter was an email dated April 20, 2017 from United States Attorney Beth Drake to Savage tendering an offer to plead with a guideline range 151 to 188 months, consistent with a guideline range for voluntary manslaughter. (*Id*.; Exhibit 5 at 47.) This was the Government's plea offer of which Petitioner now claims he was never informed. Petitioner signed Savage's letter to Judge Norton, certifying "I have reviewed and I endorse the accuracy of the information contained in this memorandum." (Exhibit 4 at 4.) At the evidentiary hearing, Savage testified that he communicated each and every plea offer from the Government to Petitioner, including the plea offer of April 20, 2017, and that defense counsel "didn't do anything he wasn't cognizant of." (Dkt. No. 220 at 206:15-18, 159:4-5.) Petitioner denied that Savage or any defense attorney communicated to him any of the plea offers, except the final plea agreement. (Dkt. No. 221 at 332:23-25, 334:22-25, 340:21-25.) The Court finds Savage's testimony on this matter credible and Petitioner's testimony not credible.

5. On May 2, 2017, Petitioner appeared before Judge Norton to plead guilty pursuant to a global plea agreement. The plea agreement provided that Petitioner would plead to the § 242 count and that federal prosecutors would dismiss the § 924(c) count (with its mandatory minimum consecutive ten-year sentence) as well as the obstruction count. Further, as part of the global plea agreement, the state agreed to dismiss the murder count, thereby accomplishing the defense team's major goals of avoiding both another state murder trial and possible incarceration in a state prison facility. (Exhibit 7.) The global plea agreement placed Defendant on notice that

the Government would seek a cross reference to second degree murder with a sentence of up to life imprisonment, and that Petitioner had the right to advocate for a lower sentence and to seek a downward departure or variance. (*Id*. at 3-4.) The parties expressly recognized that the sentencing Court would make the final sentencing decision. (*Id*. at 3.)

6. Before his guilty plea was accepted, Petitioner underwent an extensive plea colloquy with Judge Norton on May 2, 2017. Petitioner recognized that he could be sentenced to up to life in prison and affirmed to Judge Norton that no one had made "any prediction or promise to you as what your sentence is going to be." (Exhibit 8 at 10, 22.) Petitioner further assured that Court that he had reviewed every page of the plea agreement with his attorney before signing it.[2] Petitioner also admitted to the factual summary presented by the Assistant United States Attorney, which included a statement that he had shot the unarmed victim five times in the back while he was running away from him. (*Id.* at 22, 23-24.)

7. On June 29, 2017, Savage presented to Judge Norton an additional CJA budget for the sentencing phase of the case, which exceeded $95,000 and included the use of an extensive array of experts and other witnesses in what was projected to be an "unusually fact-intensive . . . mini trial" to address the disputed issue of whether Petitioner's conduct constituted voluntary manslaughter or second degree murder. (Exhibit 9 at 5.) Defense counsel's memorandum candidly acknowledged that the proper cross reference at sentencing was contested by the parties and was very much in play. (*Id*.)

8. In its presentence investigation report ("PSR"), United States Probation Services recommended a cross reference to voluntary manslaughter. The Government objected to the PSR and asserted that the proper cross reference was to second degree murder. (Exhibits 10, 15.)

---

[2] The global plea agreement bears both Petitioner and Savage's initial on every page to indicate that defense counsel had reviewed the substance of each provision with Petitioner. (Exhibit 7.)

Defense counsel found the PSR very encouraging and supportive of their view that the proper cross reference was to voluntary manslaughter and not to second degree murder.

9.  The sentencing hearing was conducted over four days, from December 4-7, 2017. Defense counsel and Government counsel vigorously contested the facts and the law concerning whether Petitioner's conduct constituted malice, which would support a cross reference to second degree murder, and whether there was sufficient provocation to support a cross reference to voluntary manslaughter. Petitioner asserted that Scott was on top of him in the course of a physical altercation and obtained control of his taser. The Government contested these claims and relied heavily on a video of a substantial portion of the encounter between Petitioner and the victim that was filmed by a bystander, Mr. Feiden Santana. The video provided undeniable evidence that Petitioner shot Scott five times in the back while he was running away, which demonstrated that Petitioner's prior statements to his supervisors, to law enforcement and to the state and federal courts were not true. Referencing those prior statements, Judge Norton found them "self-serving, evolving, and internally inconsistent," and concluded that Petitioner was an "incredible witness." (Exhibit 140 at 12.) The sentencing Court rejected by a preponderance of the evidence Petitioner's claim that Scott gained control of his taser and that the victim was ever on top of Petitioner. (*Id*. at 13.) The sentencing Court further found that Petitioner's conduct constituted malice and supported a cross reference to second degree murder, noting that "Slager shot at Scott eight times while he was unarmed and running away, and of these eight shots five shots hit Scott in the back. The Santana video makes clear that at no point after Slager began to employ deadly force did Scott turn around, and at no point did Scott ever have a taser in his hand." (*Id* at 23.)

8

10. The sentencing court applied the cross reference to second degree murder, adopted an enhancement for obstruction of justice, and gave downward variances and departures based on history and other factors, ultimately imposing a sentence of 240 months imprisonment. (*Id*. at 57.) The Fourth Circuit subsequently affirmed Petitioner's sentence. *United States v. Slager*, 912 F.3d 224 (4th Cir. 2019).

11. Petitioner filed his present motion to vacate on May 20, 2020, claiming under Ground One that defense counsel was ineffective by unduly relying on Judge Norton's January 3, 2017 statement about the state court case, which had allegedly caused defense counsel not to relay the Government's plea offer of a sentence of 151 to 188 months. The Court finds that defense counsel were resolutely committed to the voluntary manslaughter defense prior to the January 3, 2017 meeting and remained committed to the defense thereafter. After the guilty plea, defense counsel sought and obtained a robust budget to contest the second degree murder cross reference and to establish provocation to support voluntary manslaughter. Defense counsel were relentless in their pursuit of these defenses, including the conducting of a four-day mini trial on sentencing. At the evidentiary hearing, Savage acknowledged that while he found Judge Norton's January 3, 2017 comment encouraging, he could identify nothing he did or failed to do as a consequence of hearing the statement. (Dkt. No. 220 at 205:17-24.)[3] The Court finds Savage's testimony on this point credible.

12. Further, the Court finds utterly incredible Petitioner's claim that he was kept unaware of the plea offers between the Government and his attorneys. The record establishes that Petitioner was aware of the flurry of plea offers between his attorneys and the Government,

---

[3] Savage also testified that, after hearing Judge Norton's January 3, 2017 statement, he sought CJA funding to use every expert that he could to defeat a finding of malice required for a cross-reference to murder. (Dkt. No. 220 at 154:21-155:7.)

as best evidenced by his signature on the letter of April 27, 2017 in which he certifies his knowledge of all plea offers, including the April 20, 2017 offer raised in his motion to vacate. (Dkt. Nos. 4, 5.)[4]

### *Conclusions of Law*

13. Under the well-established standards of *Strickland*, Petitioner has the burden of establishing that counsel's performance fell beneath an objective standard of reasonableness and that he was prejudiced as a consequence of it. *Strickland*, 466 U.S. at 933. Here, to the contrary, the record demonstrates that defense counsel were zealous advocates committed to an ambitious strategy of establishing that Petitioner's plainly criminal conduct constituted voluntary manslaughter and not second degree murder. Their efforts far exceeded a minimally acceptable standard of performance and showed elements of originality and creativity in the face of a daunting set of facts. Despite defense counsel's devotion, tireless efforts, and creativity, they could not overcome the burden of the Santana video and Petitioner's multiple and plainly false versions of what transpired. Attorneys are advocates, not magicians, and they could not make this damning evidence disappear.

14. Petitioner further fails to demonstrate any prejudice arising out of defense counsel's alleged undue reliance on Judge Norton's statement. Savage, while deeply disappointed in the outcome of the case and seeking to assist Petitioner, candidly admitted at the evidentiary hearing that there was nothing he did or failed to do as a consequence of Judge Norton's January 3, 2017 statement. (Dkt. No. 220 at 205:17-24.)

15. At the close of the evidentiary hearing, the Court pressed Petitioner's counsel to identify any prejudice to Petitioner flowing from defense counsel's alleged undue reliance on

---

[4] Petitioner was also included in multiple email communications at the time between defense counsel and the Government regarding plea negotiations. (Exhibits 32 at 39-40, 54, 70.)

Judge Norton's January 3, 2017 statement. Petitioner's counsel first noted the claim that the Government's April 20, 2017 plea offer was not relayed to Plaintiff. As set forth above, the Court finds that claim not credible. Petitioner's counsel then noted certain language in the plea agreement relating to Defendant's conduct being "objectively unreasonable," which he presumably was contending was accepted because of defense counsel's undue reliance on Judge Norton's statement. The Court will address the issue of this challenged language in the plea agreement in depth when addressing Ground Three, below, but it is sufficient to state at this point that the language was a non-negotiable provision for the Government to establish a legal foundation for a guilty plea to violation of § 242. Defense counsel initially objected to the language, but acceded to the Government's position because the alternative was to proceed to trial in federal court, and later state court, on counts that could result in two life sentences. There is simply no credible evidence that defense counsel accepted the challenged language because of reliance on Judge Norton's January 3, 2017 statement.

16.     In sum, the Court finds that Petitioner has failed to establish either prong of the *Strickland* test. He has failed to show that defense counsel's performance fell below an objective standard of reasonableness and failed to show that any such alleged deficient performance resulted in prejudice to him.[5]

---

[5] Petitioner's Ground One claim also referenced defense counsel's alleged failure to seek a plea agreement that included a fixed sentence under Fed. R. Cr. P. 11(c)(1)(C). This claim was not mentioned in Petitioner's proposed findings of fact and conclusions of law or referenced during the evidentiary hearing. Petitioner has plainly failed to carry his burden to demonstrate any merit to this claim. As indicated in the April 27, 2017 letter of Savage to Judge Norton, defense counsel relentlessly pursued a fixed sentence for Petitioner, but the parties could never reach an agreement on what that sentencing range would be. (Exhibit 9.) Ultimately, the plea agreement left the matter open, with each party free to argue the proper cross reference and resulting sentence.

**B.    Ground Three**

*Findings of Fact*

17.    Petitioner asserts the following claim under Ground Three of his motion:

> The facts conceded in the plea agreement were detrimental to the defense's mitigation theory at sentencing, and sentencing counsel nevertheless presented arguments at sentencing that were contrary the facts conceded in the plea agreement.

(Dkt. No. 168 at 8.)

Petitioner subsequently submitted proposed findings of fact and conclusions of law that summarized Ground Three as claiming that defense counsel were ineffective because they "advised Slager to enter into a written plea agreement that foreclosed Slager's argument for a voluntary manslaughter reference under the guidelines." (Dkt. No. 202 at 1.)  At the Court's direction, Petitioner's counsel identified the following language from the plea agreement as the basis for the Ground Three claim:

> The defendant used deadly force even though it was objectively unreasonable under the circumstances. The defendant acknowledges that his actions were done willfully, that is he acted voluntarily and intentionally and with specific intent to do something that the law forbids.

(Dkt. No. 210) (hereafter referred to as the "challenged language").

18.    Petitioner's plea agreement was finally consummated on the eve of jury selection for the federal court trial, with retrial of the state murder charges to follow soon thereafter. Defense counsel had a number of important goals, but none higher than avoiding a second state murder trial with possible incarceration in the South Carolina corrections system.  Petitioner also sought to avoid a plea on the pending § 924(c) charge, which carried a mandatory ten year sentence consecutive to all other counts.  Defense counsel also sought an agreement that required as little time as possible in federal prison or, at least, the opportunity to argue mitigation to the

12

sentencing judge that might otherwise limit Petitioner's period of incarceration. Defense counsel found themselves negotiating with senior officials in the United States Department of Justice, as well as from the United States Attorney's Office in Columbia, and had to convince the local state solicitor to sign on to a global plea agreement that would result in the dismissal of the state murder charges. Defense counsel tried repeatedly to persuade the federal prosecutors to stipulate to a sentence of ten years or less, but the prosecutors were insistent on a higher guideline range. Ultimately, the parties agreed to leave the issues of the proper cross reference and guidelines to the trial judge, with plans to engage in a multi-day sentencing hearing to contest the issues of the presence of malice and provocation.

19. As drafts of a possible plea agreement were exchanged, defense counsel expressed concern about language in the factual summary that required Petitioner to admit that his use of deadly force was "objectively unreasonable," that his actions were "willful," and that he had acted with the specific intent to do something the law forbids. Defense counsel were concerned that this language might be viewed by the sentencing court as an admission of malice, thereby mandating a cross reference to second degree murder. The prosecutors insisted on the language, explaining that it contained the elements of the § 242 violation, which were essential to make the plea agreement legally valid. After carefully studying the issue, defense counsel concluded that the language insisted on by the Government was necessary to set forth the elements of the § 242 violation and that the elements' inclusion was not dispositive of the issue of malice. (Dkt. No. 221 at 289:14-290:1.) The Government made it clear that without this language, there would be no plea agreement.

20. Although defense counsel would have preferred the challenged language not be included in the global plea agreement, there was much in the proposed deal that was highly

beneficial to Petitioner. The plea agreement was a global settlement of all state and federal charges. The state murder charge was to be dismissed, avoiding a possible second murder trial and possible incarceration in the South Carolina Department of Corrections. The § 924(c) count, with its mandatory minimum ten year consecutive sentence, also went away. While no fixed sentence agreement acceptable to all parties was part of the agreement, Petitioner retained the right to argue the appropriate cross reference and possible mitigating factors. At the evidentiary hearing, defense counsel testified that they contemplated raising factors such as Petitioner's lack of criminal history and prior military service as relevant to the sentencing court's § 3553 analysis. (Dkt. No. 220 at 90:9-14.) Weighing all of these complicated factors and operating under the time pressure of an imminent jury trial, defense counsel advised their client that he should sign the plea agreement.

21.     Petitioner now contends that the challenged language foreclosed a finding of voluntary manslaughter and mandated a cross reference to second degree murder. Petitioner essentially argues that the challenged language was the legal equivalent of malice. Malice "is the distinguishing characteristic which, when present, makes a homicide murder rather than manslaughter." *United States v. Fleming*, 739 F.2d 945, 947 (4th Cir. 1984). Malice is present when the defendant acted "with a heart that was without regard for the life and safety of others." *Id.* at 948. Voluntary manslaughter is "the unlawful killing of a human being without malice . . . [u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). The determination of the presence or absence of malice is made upon all the facts and circumstances surrounding a killing. *Fleming*. 739 F.2d at 947.

22. The challenged language was not dispositive of the presence of malice.[6] Judge Norton described the basis of his finding that malice was present in this case:

> That standard [for malice] is met here, as the facts admitted in the guilty plea establish that Slager fired eight shots at Scott and each of the eight shots was fired while Scott was unarmed and running away. Five shots hit Scott in the back. The court holds that a jury could infer that shooting an unarmed man in the back as he was running away was a "gross deviation" from the standard of care for a reasonable law enforcement officer. Certainly, shooting at Scott eight times as he ran away meant that Slager was at the very least aware that there was a risk of serious bodily harm.

(Exhibit 21 at 19-20).

23. Petitioner made his difficult legal position even more precarious by his inconsistent and plainly false accounts in statements to law enforcement officers and in testimony under oath in both state and federal court. Judge Norton found Petitioner was "not a credible witness." The Fourth Circuit, in affirming Petitioner's sentence, devoted several pages of the order to Petitioner's inconsistent and demonstrably false statements, which represented an attempt to blame Scott for the circumstances of his death. *Slager*, 912 F.3d at 229-31.

### *Conclusions of Law*

24. Defense counsel's work in negotiating the plea agreement and advising their client required the exercise of professional judgment in a very tough legal environment. A federal jury trial was imminent and a second state trial for murder was scheduled to soon follow. The challenged language was, for the Government, a non-negotiable term. A plea deal was on

---

[6] The challenged language—establishing that Petitioner's use of a firearm was "objectively unreasonable"—was consistent with malice, but did not address the full circumstances of the killing. As Judge Norton noted, the most salient and dispositive factor, when considering all of the facts and circumstances of this terrible incident, was the shooting of a fleeing and unarmed man five times in the back when he posed no possible threat to the safety of Petitioner. (Exhibit 21 at 19-20.) Judge Norton agreed with defense counsel that a § 242 violation can be consistent with manslaughter, but may constitute murder if there is the presence of malice. (*Id*. at 17.)

the table that avoided a second state murder trial and possible state incarceration, and left sentencing up to the trial judge with the right of Petitioner to argue for mitigation and against a cross reference to murder. The PSR had recommended a cross reference to voluntary manslaughter. After carefully assessing this incredibly complicated and difficult set of options, defense counsel recommended that Petitioner sign the plea agreement. The Court finds that defense counsel's work in negotiating the global plea agreement and advising their client fell well within the bounds of reasonable professional competence and practice. The Court further finds that defense counsel's performance in conducting the sentencing hearing was also within the wide range of reasonable professional conduct.

25.    The global plea agreement's challenged language did not require a finding of malice. This is evidenced by defense counsel subsequently seeking over $98,000 in CJA funding to litigate the issue of malice in a sentencing mini-trial at which eleven witnesses testified over the course of four days. What sealed Petitioner's fate regarding malice was not the language of his plea agreement or the performance of his defense counsel, but his own willful act of shooting an unarmed man in the back five times as he ran for his life. Compounding these horrible facts was Petitioner's inconsistent and obviously false statements about the circumstances of the incident, with which he destroyed his credibility.

26.    At sentencing, Petitioner attempted to blame the victim. Now, he attempts to blame his defense counsel and the trial judge. But a careful review of this entire tragic episode makes plain that Petitioner has no one to blame for his present predicament and sentence but himself. Petitioner is the architect of his own demise. The Court finds that Petitioner's defense counsel ably and zealously represented him, and that Petitioner's claim that he was provided ineffective assistance of counsel is wholly without merit.

### III. Certificate of Appealability

28 U.S.C. § 2253 provides:

(c)(2) A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right.

(c)(3) The certificate of appealability . . . shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

A prisoner satisfies the standard by demonstrating that reasonable jurists would find the Court's assessment of his constitutional claims debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). The legal standard for the issuance of a certificate of appealability has not been met here because a reasonable jurist would not find it debatable that Petitioner failed to meet his burden of demonstrating that his plea and sentencing counsel's performance fell below an objective standard of reasonableness and that his sentence would have been different but for any such insufficient performance.

### IV. Conclusion

For the foregoing reasons, Michael Slager's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Dkt. No. 168) is **DENIED**.

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

April 19, 2021
Charleston, South Carolina